Appeal No. 2016-2066

# United States Court of Appeals

*for the*

# Federal Circuit

EASYWEB INNOVATIONS, LLC,

*Plaintiff-Appellant,*

– v. –

TWITTER, INC.,

*Defendant-Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
IN CASE NO. 2:11-CV-04550-JFB-SIL HONORABLE JOSEPH F. BIANCO

## CORRECTED BRIEF FOR PLAINTIFF-APPELLANT EASYWEB INNOVATIONS, LLC

ALAN S. KELLMAN
JEFFREY S. SEDDON II
DESMARAIS LLP
230 Park Avenue
New York, New York 10169
(212) 351-3400

*Attorneys for Plaintiff-Appellant EasyWeb Innovations, LLC*

**Claim 1 of U.S. Patent No. 7,685,247:**

1. A message publishing system (MPS) operative to process a message from a sender in a first format, comprising:

a central processor;

at least one sender account;

at least one storage area configured to store at least a first portion of the message; and

software executing in the central processor to configure the processor so as to:

identify the sender of the message as an authorized sender based on information associated with the message in comparison to data in the sender account, wherein the identification is dependent upon the first format;

convert at least a second portion of the message from the first format to a second format; and

publish the converted second portion of the message so as to be viewable in the second format only if the sender has been identified as an authorized sender.

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 26.1, 28(a)(1), and 47.4, counsel for Plaintiff-Appellant EasyWeb Innovations, LLC certifies the following:

1. The full name of every party or amicus represented by me is:

   EasyWeb Innovations, LLC

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   John Codignotto

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   EasyWeb Technologies, Inc.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   John M. Desmarais, Alan S. Kellman, Jeffrey S. Seddon, II, Xiao Li, and Sarah Waidelich, of Desmarais LLP

Dated: July 29, 2016

*/s/ Jeffrey S. Seddon, II /s/*

Jeffrey S. Seddon, II

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... v

STATEMENT OF RELATED CASES .......... viii

JURISDICTIONAL STATEMENT .......... 1

STATEMENT OF THE ISSUES .......... 2

STATEMENT OF THE CASE .......... 3

I. EasyWeb .......... 3

A. John Codignotto Invented An Internet Message Publishing System While Working As An Independent Software Developer In 1998. .......... 3

B. The Patented Invention Is A Message Publishing System That Identifies, Converts, And Publishes Messages On The Internet. .......... 5

1. The Preferred Embodiment Receives And Identifies Messages Based On The Type Of Message .......... 6

2. After Identification, The System Converts Messages From Their Original Format Into Webpages. .......... 10

3. The System Publishes Converted Messages As Part Of A Website .......... 12

II. Twitter .......... 12

A. Twitter Is A Service That Allows Anyone To Publish Messages On The Internet. .......... 12

B. Twitter Allows Users To Publish Messages Via Text Message, Web Browser, Or Mobile Application. .......... 13

C. Twitter Operates Many Computers In A Data Center To Serve A Large Number Of Users And Messages .......... 14

III. The Litigation .......... 15

SUMMARY OF ARGUMENT ........................................................................19

STANDARD OF REVIEW ........................................................................21

ARGUMENT ........................................................................23

I. The District Court Erred In Granting Summary Judgment Of No Infringement Based On Flawed Claim Constructions. ........................................23

A. The District Court's Construction Of "Format" Is Contrary To The Disclosure Of The Specification And The Dependent Claims. ........................................23

1. Limiting "Format" To File Formats Violates 35 U.S.C. § 112 ¶ 4 By Narrowing The Scope Of The Independent Claims To Exclude The Dependent Claims. ........................................24

2. Limiting "Format" To File Format Excludes The Preferred Embodiment Of The Invention. ........................................28

3. The District Court's Reasoning Cannot Support A Construction That Violates 35 U.S.C. § 112 ¶ 4 And Excludes The Preferred Embodiment Of The Invention. ........................................31

B. The District Court's Construction Of "Central Processor" Contradicts The Specification And Imports Limitations Not Present In The Intrinsic Evidence. ........................................35

1. The Specification Discloses The Use Of Multiple Computers, Supporting EasyWeb's Proposed Construction, And Not Limiting The Invention To A Single Computer. ........................................35

2. The District Court Erred By Limiting The Invention Based On A Perceived Purpose In The Specification. ........................................37

C. The District Court's Summary Judgment Of No Infringement Should Be Reversed On Both Grounds. ........................................39

1. The District Court's Ruling That Twitter's Authentication Mechanisms Do Not Depend On The

Format Of The Message Relies On A Flawed Construction Of "Format" And Should Be Reversed. .............39

2. The District Court's Finding That Twitter Lacks A Central Processor Relies On A Flawed Construction Of "Central Processor" And Should Be Reversed. ........................41

II. The District Court Erred In Construing "First Format" And "Second Format." ..........................................................................................42

A. The District Court Erred By Reading Dependent Claim Limitations Into The Independent Claim. ..........................................43

B. The District Court Erred By Imposing Limitations Based On Its Perceived Purpose Of The Invention. ...............................................44

III. The District Court Erred In Concluding That EasyWeb's Patents Claim Ineligible Subject Matter. ..................................................................46

A. The District Court Erred In Determining That EasyWeb's Patents Address An Abstract Idea (Alice Step One). ..........................46

1. The District Court's Identification Of The Allegedly Abstract Idea—"Authentication"—Is Incorrectly Based On A Single Element In The Claims. ......................................47

2. EasyWeb's Patents Claim A Message Publishing System That Authenticates, Converts, And Publishes Messages On The Internet. .......................................................................50

B. The District Court Erred In Determining That EasyWeb's Patents Lack An Inventive Concept (Alice Step Two). .......................54

1. In Determining The Claims Lacked An Inventive Concept Because They Recite A Generic Computer, The District Court Failed To Address The Claims As A Whole. ...........................................................................................55

2. EasyWeb's Patents Describe And Claim An Inventive, Technical Solution That Addresses The Problems Of Publishing Messages On The Internet By Combining

Conventional And Novel Technology In A Novel Manner. ....................................................................57

a. The claimed invention includes non-conventional technology to "convert at least a second portion of the message from the first format to a second format." ..........................................................58

b. The claimed invention includes non-conventional "identification and security" technology. ........................60

c. The claimed invention combines the conversion software and format-dependent authentication system with more conventional elements of the claims. ..........................................................61

d. Like the inventions in *Bascom* and *DDR*, the claims here recite "a technical solution to a problem unique to the Internet." ....................................63

3. Lack Of Preemption Further Demonstrates That EasyWeb's Patents Are Patent Eligible. ..................................63

CONCLUSION ...........................................................................................66

# TABLE OF AUTHORITIES

**Cases**

*Alcon Research, Ltd. v. Apotext, Inc.*,
687 F.3d 1362 (Fed. Cir. 2012) ................................................................ 25, 40

*Alice Corp. Pty Ltd. v. CLS Bank Int'l*,
134 S.Ct. 2347 (2014)........................................................................... passim

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls,* Inc.,
340 F.3d 1298 (Fed. Cir. 2003) .....................................................................34

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
788 F.3d 1371 (Fed. Cir. 2015) .....................................................................64

*Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*,
No. 2015-1763, slip op. (Fed. Cir. Jun. 27, 2016)..................................... passim

*buySAFE, Inc. v. Google, Inc.*,
765 F.3d 1350 (Fed. Cir. 2014) .....................................................................54

*CardSoft, LLC v. VeriFone, Inc.*,
807 F.3d 1346 (Fed. Cir. 2015) .....................................................................21

*Content Extraction & Transmission LLC v. Wells Fargo, N.A.*,
776 F.3d 1343 (Fed. Cir. 2014) .....................................................................54

*Convolve, Inc. v. Compaq Computer Corp.*,
812 F.3d 1313 (Fed. Cir. 2016) .....................................................................21

*CyberSource Corp. v. Retail Decisions, Inc.*,
654 F.3d 1366 (Fed. Cir. 2011) .....................................................................56

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) ........................................................... 55, 58, 60

*Diamond v. Diehr*,
450 U.S. 175 (1981)...................................................................................... 47, 48

*Digitech Image Techs., LLC v. Electrs. For Imaging, Inc.*,
758 F.3d 1344 (Fed. Cir. 2014) .....................................................................54

*Enfish, LLC v. Microsoft Corp.*,
No. 2015-2044, slip op. (Fed. Cir. May 12, 2016) .......................... 46, 50, 52, 56

*E-Pass Techs., Inc. v. 3Com Corp.*,
343 F.3d 1364 (Fed. Cir. 2003) .................................................................. 38, 44

*Gottschalk v. Benson*,
409 U.S. 63 (1972).........................................................................................54

*In re TLI Commc'ns LLC Patent Lit.*,
No. 2015-1372, slip op. (Fed. Cir. May 17, 2016) .................................... passim

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
792 F.3d 1363 (Fed. Cir. 2015) .....................................................................53

*Internet Patents Corp. v. Active Networks, Inc.*,
790 F.3d 1343 (Fed. Cir. 2015) .......................................................... 47, 48, 49

*KSR Int'l Co. v. Teleflex*,
550 U.S. 398 (2007).......................................................................................57

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) .......................................................................44

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008) ..........................................................................21

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
132 S.Ct. 1289 (2012).....................................................................................55

*MobileMedia Ideas LLC v. Apple Inc.*,
780 F.3d 1159 (Fed. Cir. 2015) .....................................................................31

*Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*,
811 F.3d 1314 (Fed. Cir. 2016) .....................................................................53

*OIP Techs., Inc. v. Amazon.com, Inc.*,
788 F.3d 1359 (Fed. Cir. 2015) .................................................................. 53, 64

*Parker v. Flook*,
437 U.S. 584 (1978).......................................................................................54

*Research Corp. Techs. v. Microsoft Corp.*,
627 F.3d 859 (Fed. Cir. 2010) ....................................................................63

*Shire Dev., LLC v. Watson Pharm., Inc.*,
787 F.3d 1359 (Fed. Cir. 2015) ..................................................................22

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
135 S.Ct. 831 (2015)..................................................................................21

*Ultramercial, Inc. v. Hulu, LLC*,
772 F.3d 709 (Fed. Cir. 2014) ....................................................................53

*Versata Dev. Grp. v. SAP Am., Inc.*,
793 F.3d 1306 (Fed. Cir. 2015) ........................................................... 53, 56

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ............................................................. 31, 45

**Statutes**

28 U.S.C. § 1295(a)(1).....................................................................................1

28 U.S.C. § 1331 ...............................................................................................1

28 U.S.C. § 1338(a) ..........................................................................................1

28 U.S.C. § 2202...............................................................................................1

35 U.S.C. § 112 ...................................................................... 24, 25, 43, 44

**Other Authorities**

Fed. R. Civ. P. 56(a).......................................................................................21

## STATEMENT OF RELATED CASES

No other appeal in or from the same civil action in the district court was previously before this or any other appellate court. This appeal may directly affect co-pending litigation captioned *EasyWeb Innovations, LLC v. Facebook, Inc.*, Civil Action No. 2:11-cv-05121-JFB-SIL, before the United States District Court for the Eastern District of New York, Honorable Joseph F. Bianco. EasyWeb Innovations, LLC ("EasyWeb") and its counsel are unaware of any other related cases currently pending before this Court or any other court that will directly affect or be affected by this Court's decision.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action for patent infringement under 28 U.S.C. §§ 1331 and 1338(a). On March 30, 2016, the district court entered an order granting summary judgment of no infringement and lack of patentability on all patents-in-suit. On March 31, 2016, the district court entered final judgment in favor of Twitter, Inc. ("Twitter"). EasyWeb timely filed a notice of appeal on April 21, 2016. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the district court erred in construing the "format"/"format of said message" terms more narrowly than the dependent claims and in excluding the preferred embodiment of the invention, and thus erred in granting summary judgment of no infringement.

2. Whether the district court erred in construing "central processor" to require that a single computer practice all functions recited in the claims, contradicting the specification's teaching that the "'central processor may comprise a number of computers,'" and thus erred in granting summary judgment of no infringement.

3. Whether the district court erred in importing limitations from the dependent claims into its construction of "first format" and "second format," thereby departing from the ordinary meaning of the claim terms.

4. Whether the district court erred in finding the asserted claims of the patents-in-suit directed to a patent-ineligible abstract idea.

# STATEMENT OF THE CASE

## I. EasyWeb

### A. John Codignotto Invented An Internet Message Publishing System While Working As An Independent Software Developer In 1998.

In the late 1990s, John Codignotto noticed that many companies, especially small, local businesses, lacked an Internet presence, primarily because such a presence required technical programming knowledge or hiring a web-coding professional. Appx1429 at 77:25-78:16, Appx1444 at 138:6-10; *see also* Appx157-158 at 2:65-3:21. He began thinking about ways to empower a non-technical business owner to publish information on the web.

Codignotto was an experienced independent software developer, having founded a consulting and engineering firm in the mid-1980s. Appx1413 at 13:3-16:14. He developed a variety of technologies, including accounting software, Appx1413-1414 at 16:25-17:6; transportation information systems, Appx1414 at 17:21-18:13; software for controlling a syringe pump, *id.* at 18:22-19:5; and a teller alert system, as part of a long-standing relationship with one of the largest banks in the United States. Appx1415 at 21:14-23:4.

Even with this experience, the solution did not immediately come to him. But on January 23, 1998, Codignotto had his proverbial eureka moment. Appx1425 at 61:7-63:10, Appx1441 at 127:18-128:9. He conceived a system that

would receive messages created and sent using traditional technology, such as fax, telephone, or email, and automatically publish those messages on the Internet. Appx1428 at 73:6-74:4, Appx1430 at 81:21-82:15.

Codignotto quickly began working on his message publishing system. He ordered a separate telephone line, created a website for publishing messages, and wrote prototype source code. Appx1427 at 70:10-23, Appx1433 at 93:16-96:1.

As Codignotto built his prototype, he also worked on a business model and considered marketing strategies. Appx1431-1432 at 88:5-89:13, 90:22-92:6. He purchased potential Internet domain names, and also investigated acquiring a bank of telephone lines and additional computer hardware. Appx 1427 at 69:24-70:1, Appx1432-1433 at 91:1-93:15. But at the time, the equipment required for the large-scale message publishing system that he envisioned was very expensive, and he did not have the resources to enter the market. Appx1433 at 93:5-15.

Codignotto decided to protect his invention with a patent. Appx1427-1428 at 72:23-73:5. He drafted and filed a provisional application himself, Appx1431 at 85:2-22, Appx1439 at 119:6-120:3, drafted the specification of the non-provisional application, Appx1442 at 131:14-132:5, and relied upon an attorney to draft and prosecute the claims. Appx1465-1466 at 224:19-225:6. In 2006, after six years of vetting by the USPTO, his first patent, U.S. Patent No. 7,032,030 issued. Appx63-101. Four related patents—the other patents-in-suit, which share a common

specification—followed in 2009 and 2010. Appx102-257. To protect that investment, Codignotto formed EasyWeb Innovations, LLC—a single owner LLC—and assigned the patents to his company. Appx1417-1418 at 30:9-33:10.

### B. The Patented Invention Is A Message Publishing System That Identifies, Converts, And Publishes Messages On The Internet.

In order "to allow virtually any person or organization to easily publish a message on the Internet," Appx158 at 4:41-44, Codignotto's patents disclose a message publishing system ("MPS") that, in its preferred embodiment,[1] accepts messages from users in multiple ways, such as by fax, telephone, or email, converts them, and publishes them. Appx161 at 10:29-35. Claim 1 of U.S. Patent No. 7,685,247 ("the '247 patent") is representative of his invention:

> 1. A message publishing system (MPS) operative to process a message from a sender in a first format, comprising:
> a central processor;
> at least one sender account;
> at least one storage area configured to store at least a first portion of the message; and
> software executing in the central processor to configure the processor so as to:
> identify the sender of the message as an authorized sender based on information associated with the message in comparison to data in the sender account, wherein the identification is dependent upon the first format;
> convert at least a second portion of the message from the first format to a second format; and

[1] Unless otherwise noted, the discussion herein refers to the preferred embodiment.

> publish the converted second portion of the message so as to be viewable in the second format only if the sender has been identified as an authorized sender.

Appx178 at 43:47-64.

The patents describe in detail how to implement this system. At a high level, once a message is received, the system identifies the sender of the message using an identification scheme specific to that message type (i.e., fax, telephone, or email). Appx163 at 13:33-34. If the message is sent by an authorized sender, it is converted for publication and review. Because the object of the system is to "allow the message to be reviewed on the Internet World Wide Web, the preferred conversion method converts the message into a one or more webpages." Appx169 at 25:29-32. After conversion, the system publishes the message on the sender's website. Appx171 at 29:5-8, 30:8-11. The specification is not limited to processing individual messages. It can scale to handle a large number of users. *See, e.g.*, Appx175 at 37:42-47 ("[t]he number of telephone lines and the capacity of the Internet connection may be changed to any suitable capacity"), 37:57-61 ("the central processor may actually comprise a number of computers").

#### 1. The Preferred Embodiment Receives And Identifies Messages Based On The Type Of Message.

For each message received, the message publishing system attempts to identify and authenticate the sender using "identification and security means" ("I&S") in order to "prevent an unauthorized person from deleting, replacing or

posting an undesired message." Appx161-162 at 10:59-11:3. Although incoming messages typically are accompanied by some form of identifying information, there is variation in that information depending upon the type of the message. Appx162 at 11:4-13. Therefore, there are "different I&S schemes for each type of message that [a user] may send to the MPS." Appx163 at 13:33-34.

> For example, a user's account could be configured to require only a certain password within the subject text of an email message when an email message is being published, but require a DTMF passcode when an audio message is being published, and require only the caller ID number for publishing a fax message.

*Id.* at 13:34-40. As the figures show, each type of message is identified in a separate part of the system:




*See* Appx146, Appx149, Appx154 (portions combined and annotated). Thus, while the system identifies the sender for all incoming messages, the method of identification depends on the type of message that was sent.

For instance, because the system receives both audio messages and fax messages over a telephone line, it monitors incoming calls for "a fax calling tone (CNG)," which "may indicate that a fax is being sent." Appx165 at 17:66-18:2. If a fax calling tone is detected, the system "would route the call to and initiate the fax receival process," which has a fax-specific identification process. *Id.* at 18:2-5. If no fax tone is heard, i.e. the message is an audio message, the system waits "for

the user to enter their ID info via DTMF digit key presses," then "checks to see if the available ID information confirms the caller as an authorized user of the system." *Id.* at 18:5-10. For emails the system may examine "all the available information associated with or accompanying the email message" in order to "determine the identity of the sender, and if they are an authorized user of the system." Appx172 at 31:39-42. For example, in a low-security environment, "the 'From', 'To', and 'Subject' fields could be used to determine if the sender is an authorized user." *Id.* at 31:42-44.

The claims of EasyWeb's patents capture this identification process. For example, claim 1 of the '247 patent requires "a message from a sender in a first format" and "identify[ing] the sender of the message as an authorized sender based on information associated with the message in comparison to data in the sender account, *wherein the identification is dependent upon the first format*." Appx178 at 43:47-64 (emphasis added). In the claims, the word 'format' is used to capture the message type described in the specification. Indeed, the specification uses the word 'format' broadly to refer to the message type, such as fax or email, or to the file format, such as a .gif or .jpeg file. *Compare* Appx173 at 33:22-25 ("the over-all message was converted from an email compatible format into a webpage compatible format" *with* Appx169 at 25:38-42 (discussing "image file formats" such as "GIF" and "JPEG 2000").

### 2. After Identification, The System Converts Messages From Their Original Format Into Webpages.

After authentication the system "converts the message into one or more webpages." Appx169 at 25:27-34. Single-page faxes, for example, are converted into a set of two webpages. Appx170 at 27:17-32. The conversion process starts with "the extraction of one or more fax pages from a fax message" and the change of any "non-GIF file format to the preferred GIF file format." Appx169 at 25:65-26:4. Next, the system creates a webpage, like that in Figure 9. Appx170 at 27:2-3.




Appx151 (annotations added). The generated webpage includes not only the processed, reduced-size image, but also the sender's business name and contact

information, the date and time the message was published, and a "Zoom In" option. Appx170 at 27:2-14.

The system uses a similar process for other message types. Telephone audio messages are converted into a webpage by converting the message to either a streaming or non-streaming (i.e. downloadable) audio file format, Appx171-172 at 30:59-31:4, then processing the message to "remove undesired artifacts," "reduce [its] storage requirements and transfer time," and set "an optimal volume." Appx172 at 31:14-20. The system then "create[s] a webpage to host the audio message." *Id.* at 31:4-10.

For email messages, the system extracts any files attached to the email message, including audio files, image files, database files, spreadsheet files, program files, and video files. Appx172 at 32:8-30, 32:45-57. Then it creates a table-of-contents webpage for the email message "from a template webpage." *Id.* at 32:23-44. Body text in an email also can be extracted and embedded in a webpage. *Id.* at 32:58-67.

Claim 1 of the '247 patent captures this feature, requiring that the system "convert at least a second portion of the message from the first format to a second format." Appx178 at 43:47-64.

#### 3. The System Publishes Converted Messages As Part Of A Website.

The system publishes the webpages it creates. Appx171 at 29:5-8, Appx174 at 35:33-39. Each user's messages are stored in separate directories by user and grouped together as a website. Appx174 at 35:41-44. And each user's website may be reached through either a top-level domain portion, such as "www.joesdeli.com," or as a separate section of the message publishing system's site, such as "www.easywebs.com/joesdeli." *Id.* at 35:58-67. The system also creates a "main Table-of-Contents webpage, so a reviewer can be presented with a list of all the user's messages that are available for review." Appx170-171 at 28:67-29:4, 29:56-64; *see also* Appx168 at 24:26-36. Claim 1 of the '247 patent captures this feature by requiring that the system "publish the converted second portion of the message." Appx178 at 43:47-64.

## II. Twitter

### A. Twitter Is A Service That Allows Anyone To Publish Messages On The Internet.

Twitter is a service that allows users to send messages—called "tweets"—that are published on Twitter's website on the user's profile or blog. Appx7795. Published tweets also are sent to the user's "followers," i.e. other interested Twitter members. Appx7795-7796. The messages are short: 140 characters or fewer. Appx7795. They are simple: HTML—the code that controls website design—is

not allowed. Appx7798. And Twitter is open to everyone, without the need for any special equipment or expertise. Appx7795. As Twitter puts it, "All you need to use Twitter is an internet connection or a mobile phone." *Id.*

### B. Twitter Allows Users To Publish Messages Via Text Message, Web Browser, Or Mobile Application.

Like the preferred embodiment in the EasyWeb patents, Twitter users can send messages to Twitter in three different ways: (i) via a web browser; (ii) via a mobile application; or (iii) via text message. Appx1397 ¶ 7; Appx38. To send a message with a web browser, the user navigates to Twitter's website, logs-in, and types in a tweet. Appx1397 ¶¶ 8-9. The browser then sends the tweet, packaged with a "cookie," to Twitter. Appx1397-1398 ¶¶ 9-10. The "cookie" is an alphanumeric text string sent from Twitter to the user's browser when the user loaded the Twitter webpage, and it identifies the sender of the message. Appx1398 ¶ 10. Twitter authenticates the tweet using the cookie and publishes it on the user's Twitter page. Appx1398 ¶¶ 10-11; Appx38.

For mobile applications, a user types a tweet into the application, and the application sends the tweet to Twitter. Appx1398 ¶ 13. Unlike the browser, the mobile application does not send a cookie. Instead, it packages the tweet with a different data structure, called an OAuth token, which Twitter uses for identification. *Id.* ¶ 14. The OAuth token is a set of letters and numbers that is

unique to that particular application and is assigned by Twitter the first time the application is loaded. Appx1399 ¶¶ 15-16.

To send a tweet using a text message, the user types a tweet into the mobile phone and sends it to the phone number "40404." Appx1399 ¶ 18. The mobile carrier sends the tweet to Twitter via Twitter's "Cloudhopper" facility. Appx1336-1337 ¶¶ 176-79; Appx1384 ¶¶ 52-58. Rather than packaging the tweet with a cookie or an OAuth token, Cloudhopper sends the user's phone number along with the tweet. Appx1337 ¶ 179.

### C. Twitter Operates Many Computers In A Data Center To Serve A Large Number Of Users And Messages.

Twitter's hardware and software is centrally located in a data center in Sacramento, California. Appx1399 ¶ 21; Appx1294 ¶ 50. The Twitter data center contains thousands of computers. Appx1344 ¶ 193. Those computers are organized into clusters, each of which performs one or more functions, such that individual machines easily can be added or removed to adjust for individual failures and to add more capacity. *Id.* The data center is designed to "enable Twitter to handle the billions of Tweets that flow through its systems each day" and "to handle the scale" of its growth "from hundreds of users to millions and then to billions." Appx1294-1296 ¶¶ 49, 53.

### III. The Litigation

In September 2011, EasyWeb sued Twitter in the Eastern District of New York—where Mr. Codignotto resides—asserting infringement of five EasyWeb patents.[2] Appx59-61. Following discovery, in March 2013, EasyWeb moved for summary judgment on Twitter's invalidity defenses, including invalidity under 35 U.S.C § 101. Appx660-705. At the same time, Twitter moved for summary judgment on a host of issues, including no infringement and invalidity under 35 U.S.C. § 101. Appx953-1025. The parties separately briefed their claim-construction disputes. Appx908-947; Appx3010-3049. In June 2013, the district court heard oral argument. Appx52. About a year later, the district court requested supplemental briefing on § 101 in light of the Supreme Court's decision in *Alice Corp. v. CLS Bank Int'l*, and the parties submitted several letters addressing *Alice* and post-*Alice* decisions. Appx52-54.

On March 30, 2016—three years after the parties briefed summary judgment and claim construction—the district court issued its opinion. Appx1-40. The district court construed four claim terms at issue in this appeal—"format"/"format of said message"; "first format"; "second format"; and "central processor"—as well as several means-plus-function claims. Appx8-15. After construing the

---

[2] U.S. Patent Nos. 7,032,030 (claims 1, 17 and 36); 7,596,606 (claims 1 and 18); 7,685,247 (claims 1-2, 4, 7, 9, 18, 23, 28, 30-33, 39-40, and 43); 7,689,658 (claims 1, 2, 13, 16, 18, 24, and 28); and 7,698,372 (claims 1, 2, and 10).

claims, the court analyzed patent eligibility. Under the first step of the *Alice* analysis, the court reasoned—without addressing prior art or the language of the claims—that "[t]he inventive (and non-obvious) concept in the patents-in-suit … is the format-based authentication system, *not* the message publishing system itself." Appx33 (emphasis in original). Consequently, the court concluded that "EasyWeb's patents are directed to an abstract idea of authentication." Appx34. Under the second step of the *Alice* analysis, the district court concluded—again without addressing prior art, the language of the claims, or preemption—that the asserted claims lacked an inventive concept because the "central processor" recited in one limitation was a "'generic computer.'" Appx35. Having found that the claims fail the *Alice* analysis, the district court granted summary judgment of invalidity. Appx36.

The district court also granted summary judgment of no infringement on two separate grounds. Appx38-39. First, notwithstanding its finding that the method of authentication depended upon whether the user tweeted from a browser, tweeted from a mobile application, or a sent a SMS or MMS tweet, Appx38, the court ruled that Twitter does not infringe because Twitter's authentication mechanisms do not depend on the "format of the message." Rather than looking at the type of tweet sent—i.e., web, mobile, or text—the court narrowly construed the term "format" effectively to mean the "file format" of a message or tweet. The court found that

every message Twitter received was in a "text, gif, jpg, or png format, or a combination thereof" and that Twitter's expert opined that "'Twitter does not select a different identification/authorization mechanism depending on whether it receives text or JPG-, GIF-, or PNG-formatted image' as a tweet." *Id.* Therefore, the district court found no infringement of the asserted claims.

Second, the district court found that Twitter does not infringe because Twitter lacks a central processor. It did so despite acknowledging—and not challenging—EasyWeb's contention "computers are indisputably connected together to perform the claimed functions, such as receiving tweets, authenticating users, and sending tweets to be published" in Twitter's data center. Appx39. The court reasoned that Twitter's data center was not a "central processor" by narrowly construing the term to require that a single computer process each message. Appx15. Because "Twitter uses a distributed architecture and that no single machine in the data center identifies the sender of the message and performs an additional required function," Appx38, the court found no infringement. It did so even though it acknowledged that "[t]he specification never disclaims a distributed server architecture in which the several computers comprising a 'central processor' each perform only a subset of the functions required by the claims." Appx15.

In light of those rulings, the district court did not address the remaining summary-judgment motions, Appx30 n.20, Appx39 n.26, and entered judgment in favor of Twitter. Appx41.

## SUMMARY OF ARGUMENT

1. The district court erred in granting summary judgment of no infringement based on its overly narrow construction of the term "format," which appears in all asserted independent claims. The court restricted the term "format" to require that the identification/authentication process of the claimed system be dependent on a "file format," even though both the dependent claims and the preferred embodiment instead use a "message type" associated with message transmission to select the identification/authentication method.

2. The district court erred in granting summary judgment of no infringement based on its overly narrow construction of the term "central processor," which is included in all asserted independent claims. The court construed the term as "a computer or set of computers, where one computer performs all the functions assigned to the central processor that are necessary for the MPS to process a given message," and required that "two processors cannot handle the same message." But the specification explains that "the central processor may actually comprise a number of computers," and the court's perceived purpose of the claim cannot change the patentee's chosen claim scope.

3. The district court erred in construing the claim terms "first format" and "second format" by adding limitations beyond the plain meaning of the words "first" and "second." The court required that the first format be "a format that is

not webpage-compatible at least in part and that is different from the format in which the message is posted to the Internet" and that the second format be "a format that is wholly webpage-compatible and different from the first format." But nothing in the specification requires these additional limitations, nor is it appropriate for the district court to read in such limitations based on its perceived purpose of the invention.

4. The district court erred in holding the asserted claims invalid under 35 U.S.C. § 101 as directed to unpatentable abstract subject matter. In step one of the *Alice* inquiry, the court found that the patents "are directed to an abstract idea of authentication," because it impermissibly focused on one phrase of one claim limitation to the exclusion of the claim as whole. In step two of the *Alice* inquiry, the district court expanded its analysis to only two additional words in the claim—"central processor"—and held that "the central processor is a 'generic computer,' which 'cannot transform a patent-ineligible abstract idea in to a patent-eligible invention.'" Again, the court did not consider the claims as a whole and did not take any of the additional claim terms into consideration. Because the asserted claims solve an Internet-based problem through a message publishing system that authenticates, converts, and publishes multiple message formats on the Internet, the claims are eligible under 35 U.S.C. § 101.

## STANDARD OF REVIEW

The Court reviews the grant or denial of summary judgment under the law of the regional circuit. *Convolve, Inc. v. Compaq Computer Corp.*, 812 F.3d 1313, 1317 (Fed. Cir. 2016). In the Second Circuit, summary judgment is reviewed *de novo*. *Id*. (citing *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008)). In reviewing the grant or denial of summary judgment, the Court must resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought, then determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Salvino*, 542 F.3d at 309; *see also* Fed. R. Civ. P. 56(a).

When reviewing claim construction, the Court reviews the ultimate determination of claim meaning *de novo*, although any factual findings regarding extrinsic evidence that underlie the district court's constructions are reviewed for clear error. *CardSoft, LLC v. VeriFone, Inc.*, 807 F.3d 1346, 1349-50 (Fed. Cir. 2015) (citing *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S.Ct. 831, 841-42 (2015)). Deference to the district court's factual findings, however, is triggered only if the district court actually made factual findings underlying claim construction; it is not triggered merely by its review of extrinsic evidence. *Id.* (citing *Shire Dev., LLC v. Watson Pharm., Inc.*, 787 F.3d 1359, 1364 (Fed. Cir.

2015)). This Court reviews the claim construction *de novo* if the intrinsic record fully determines the proper scope of the disputed claim terms, regardless of any factual findings by the district court. *Id.* Here, the proper scope of the disputed claim terms is fully determined by the intrinsic record, not by any factual findings of the district court, and therefore review by this Court is without deference.

## ARGUMENT

### I. The District Court Erred In Granting Summary Judgment Of No Infringement Based On Flawed Claim Constructions.

#### A. The District Court's Construction Of "Format" Is Contrary To The Disclosure Of The Specification And The Dependent Claims.

Each asserted claim requires identifying a sender using a method of identification dependent upon the "format" of the message. Appx8. EasyWeb proposed that "format" be construed according to its plain meaning as "message encoding," whereas Twitter's proposed construction, which was adopted by the district court, includes an additional limitation: "message encoding *that determines how the message is reviewed*." *Id.* (emphasis added). Thus, the only issue is whether "format" is limited to encoding "that determines how the message is reviewed," i.e. a "file format," or whether it encompasses file format as well as other factors, such as how the message is transported. *Id.*

This distinction is outcome determinative. The accused Twitter system uses different means to identify senders depending upon how the message is packaged for transmission—whether sent from a browser, mobile application, or mobile phone via SMS/MMS—but does not distinguish among tweets based on the file format. Appx38. If, as EasyWeb proposes, the "format" of a message encompasses the method of transmission, Appx8; *see also* Appx7386 (arguing that "format" includes "how the message is transported"), the accused Twitter system

meets the "identify" limitation. On the other hand, if, as the district court found, "format" is construed narrowly to mean a file format, Appx8; *see also* Appx919-920 (identifying "PDF," "DOC," "plain text," and "JPG" as different formats), Twitter does not.

The district court construed "format" narrowly, because it erroneously found "that the patents use 'format' and 'file format' interchangeably and never associate the transmission protocol with the message encoding." Appx10. The patent specification and claims, however, say otherwise. Limiting "format" to "file format" violates 35 U.S.C. § 112 ¶ 4, by rendering dependent claims broader than their independent claims, and improperly excludes the preferred embodiment.

### 1. Limiting "Format" To File Formats Violates 35 U.S.C. § 112 ¶ 4 By Narrowing The Scope Of The Independent Claims To Exclude The Dependent Claims.

By limiting the term "format" to "file format," the district court excluded from the term "format" any consideration of how the message is packaged for transmission. But dependent claims of the patents-in-suit specify that "the first format comprises the message *type*," Appx178 at 44:1-2 (emphasis added); *see also* Appx217 at 44:11-13, Appx256 at 44:7-8, or that "the first format comprises an email." Appx179 at 46:49-50; *see also* Appx218 at 45:36-37, Appx257 at 45:51-52.

As a statutory matter, a dependent claim "shall be construed to incorporate by reference all the limitations of the claim to which it refers" and must "specify a further limitation." *See* 35 U.S.C. § 112 ¶ 4. Accordingly, an independent claim must "cover at least that range" covered by a dependent claim. *Alcon Research, Ltd. v. Apotext, Inc.*, 687 F.3d 1362, 1367 (Fed. Cir. 2012). Yet both "message type" and "email"—identified as "formats" in dependent claims—are not "file formats" and include consideration of how the message is transmitted. Thus, they are excluded from the scope of the independent claims under the district court's construction.

The term "message type" used in the dependent claims is not a file format or category of file format, as the district court's construction requires. Rather, the specification categorizes "message types" according to how they are transmitted by the user. The specification repeatedly refers to three different types of message—facsimile, telephone audio, and email. *See, e.g.*, Appx165 at 17:24-27 ("the MPS can receive messages of various types, such as facsimile, audio or email messages"); Appx163 at 13:33-40 (noting that "a user could have different I&S schemes for each type of message" and specifying identification schemes for "an email message," "an audio message," and "a fax message"); Appx171 at 29:66-30:2 ("The TOC may group the messages by type (i.e. faxes, email, audio, etc.)"). As Twitter itself acknowledges, fax, telephone audio, and email are not file

formats, but rather are "communication tools that at most define *methods of transmission*." Appx921 (emphasis original).

While true that each message type "has its own preferred conversion method and file format," Appx169 at 25:32-34, the specification never equates incoming messages and message types with file formats. For instance, the specification notes that, "[w]hen an audio or voice message has been received by the MPS, it is typically *recorded to*, or already in an audio file format." Appx171-172 at 30:66-31:1 (emphasis added). In other words, the specification recognizes that some audio messages—the message type—are *not* "already in" a file format and need to be "recorded to" a file format, for example, if the user calls in over a telephone.

The district court's construction also is inconsistent with the dependent claim identifying "email" as a message format. The specification never identifies an email-specific file format. Rather, multiple files with different file formats may be part of a single email message, which "can contain images, sounds or any other type of data." Appx172 at 31:36-39; *see also id.* at 32:23-30 (noting that "files such as database, spreadsheet and program files" can be attached to an email). Indeed, the specification only discusses the file format of an *attachment*, never the file format of the email message itself. *See, e.g.*, Appx165 at 17:36-37 ("For example, if an email attachment is named 'TEST.JPG', the attachment is a JPEG image file.").

The district court briefly acknowledges the dependent claims, but never addresses the insurmountable problem they create for the court's construction. Instead, the district court contends that the presence of the dependent claims does not mean that "the 'format' includes or is affected by the transport encoding or transmission headers." Appx10. But the "format" specifically mentioned, an email, does include information regarding transport encoding and transmission headers. *See, e.g.*, Appx172 at 31:34-36 (indicating that emails typically contain information identifying "who the email is from" and "who the intended recipient is").

Moreover, the only portion of the specification referenced by the district court in addressing the dependent claims—each message type "'has its own preferred conversion method and file format,'" Appx10—distinguishes "message type" and "file format," further demonstrating that interpreting "format" as "file format" contradicts the dependent claims.[3] The district court provides no justification for construing "format" so narrowly that the independent claims exclude the dependent claims.

---

[3] The district court also quotes EasyWeb's expert out of context to suggest that packaging messages for transport is not part of the format. Appx9-10 n.7 ("[E]ncodings done as part of transport 'don't come into the equation.'"). That testimony is ambiguous at best and cannot support a construction that contradicts the intrinsic evidence.

### 2. Limiting "Format" To File Format Excludes The Preferred Embodiment Of The Invention.

The identification/authorization method employed by the claimed invention depends upon the "format" of the message, and, under the district court's construction, the claims require that "identification is dependent upon the first [*file format*]." *See, e.g.*, Appx178 at 43:55-59; *cf.* Appx38 (finding no "format of the message" because Twitter does not select a different identification/authorization mechanism "'depending on whether it receives text or JPG-, GIF-, or PNG-formatted image' as a tweet").

But identification in the preferred embodiment of the message publishing system does not depend upon the file format of the message. Rather, it depends upon the message *type*. *See, e.g.*, Appx163 at 13:33-34 (noting that there are "different I&S schemes for each type of message that [a user] may send to the MPS"). Indeed, in the preferred embodiment the message type—not its file format—is used for identification and authentication:

> [A] user's account could be configured to require only a certain password within the subject text of an email message when an *email message* is being published, but require a DTMF passcode when an *audio message* is being published, and require only the caller ID number for publishing a *fax message*.

*Id.* at 13:34-40 (emphasis added). The figures of the preferred embodiment also demonstrate that identification depends upon the message type, not a file format:




*See* Appx146, Appx149, Appx154 (portions combined and annotated).

Nor does the preferred embodiment distinguish among message types based upon a file format. Rather, it distinguishes between telephone and fax messages by "monitoring for a fax calling tone (CNG)" and, "[i]f a fax calling tone were heard, [routing] the call to and initiate the fax receival process." Appx165 at 17:66-18:6. The figures confirm that a fax tone—not a file format—identifies the message type:




*See* Appx146, Appx149 (portions combined and annotated).

Similarly, the message type and identification process for an email message focuses on whether the message arrives via "a POP3 or other common email protocol" or through the telephone line. Appx165 at 17:30-32. It is not determined by a file format. By construing the claims to require identification based upon file formats, the district court impermissibly excludes the preferred embodiment of the invention, which uses message types. *See Vitronics Corp. v.*

*Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (excluding the preferred embodiment is "rarely, if ever, correct").

#### 3. The District Court's Reasoning Cannot Support A Construction That Violates 35 U.S.C. § 112 ¶ 4 And Excludes The Preferred Embodiment Of The Invention.

To support its overly narrow claim construction, the district court offers a host of rationales that are neither tied to the facts of this case or to the law.

First, the district court reasons that "format" must exclude everything other than a file format because the claim language includes separate language for "the format of said message" (which determines the security scheme) and "information associated with said message" (which is used by the security scheme). *See* Appx9 (citing Appx100 at 45:12-18). But nothing in the language of the claims or the intrinsic evidence mandates that "information associated with said message" and "the format of said message" are mutually exclusive categories. *See, e.g.*, *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1180 (Fed. Cir. 2015) (rejecting argument that two terms were "mutually exclusive" in the absence of any support in the specification or prosecution history). Nor would it make sense to impose such a restriction, as the very purpose of using different identification and security schemes for different message formats is to take advantage of the fact that each message format has certain identifying information associated with the message. *See, e.g.*, Appx172 at 31:39-42 (noting that the system "uses all

*available* information associated with or accompanying the email message to determine the identi[t]y of the sender, and if they are an authorized user of the system") (emphasis added).

Second, the district court relies on an outdated dictionary definition of "format" from 1993—seven years before the filing date—in a time-frame in which computer technology and the Internet radically changed. Appx9 (citing Appx2960). And that definition is only one of six listed in the dictionary and has no connection to "how the message is reviewed," the district court's additional language. Appx2960.

The district court's attempt to justify its construction by reference to the specification fares no better. Appx9. For example, the district court found that the sole passage where "format of the message" is used "disassociates the other 'additional information' from 'the actual format of the message,' indicating that the Court should not combine them when construing the claims." Appx10. But the passage the district court cites only mentions "format of the message" in passing and only then with the modifier "actual":

> Additional information accompanying the message such as the header, packet data, data descriptors, and the actual format of the message can also be used to determine the type of message. For example, if an email attachment is named 'TEST.JPG', the attachment is a JPEG image file.

Appx165 at 17:33-37. The district court does not address what an "actual format" is in this context," nor does it explain how a "file format" can be "additional information accompanying the message." The district court simply reads too much into this sentence, while ignoring the method by which the preferred embodiment operates. Furthermore, that is not the "sole" passage referring to the message format. The specification also describes how "the over-all message [is] converted from an email compatible format into a webpage compatible format," even if an attached "image file was not converted." Appx173 at 33:18-25. Thus, the specification distinguishes the format of the "over-all message" from the format of a file.

Nor does the fact that, in places, "the specification uses 'format' to refer to encoding that determines how a message is reviewed," Appx10, support the district court's conclusion that "format" and "file format" are used interchangeably in the specification. *Id.* In fact, the specification uses "format" both in the narrow "file format" sense and in a broader sense. As one example of the latter, the specification teaches that when the message is converted to a second format, the second format is "preferably being one or more webpages." Appx159 at 5:38-40. "One or more webpages" is not a file format. Even one webpage is often multiple files: at least one file containing markup language, such as HTML, plus other files referenced by the markup language, such as image or audio files. Appx167 at

22:28-58. Indeed, the sample webpage shown in Figure 9 is two files, a "F1P1-R.HTML" file and a "f1p1-r.gif" image file representing the reduced-size image of the incoming fax. Appx170 at 27:33-61. As another example, the specification describes the format of the "over-all message," as discussed above. Appx173 at 33:18-25. Thus, even if "format" is used as shorthand for "file format" in some portions of the specification, it is not used interchangeably. And "varied use of a disputed term in the written description attests to the breadth of a term rather than providing a limiting definition." *See Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308-09 (Fed. Cir. 2003).

Finally, the district court states that EasyWeb's construction is incorrect because it "ascribes inconsistent meanings to 'format' when it is used in the phrase 'first format' compared to the phrase 'second format.'" Appx10. The district court alleges inconsistency because "EasyWeb renders everything but the file format irrelevant to the 'second format.'" Appx11. But neither EasyWeb nor the patent contemplate limiting the "second format" to a file format, as explained above.

Accordingly, the district court's reasoning does not justify limiting "format" to "file format." Instead, the term "format" should be construed as "message encoding," which encompasses both file formats and message types.

### B. The District Court's Construction Of "Central Processor" Contradicts The Specification And Imports Limitations Not Present In The Intrinsic Evidence.

Every asserted claim[4] contains the term "central processor," and the specification explicitly discloses that the "'central processor may comprise a number of computers.'" Appx14. Accordingly, EasyWeb proposed construing the term as "one or more computers as part of a system." *Id.* After the Supreme Court's *Alice* decision issued, Twitter even stipulated to that construction in an attempt to advance its ineligibility argument. Appx13 n.12; Appx8045. Nevertheless, the district court added a new limitation to the term central processor: "a computer or set of computers, where one computer performs all the functions assigned to the central processor that are necessary for the MPS to process a given message." Appx15. The district court explained that its construction requires that "two processors cannot handle the same message." *Id.* That construction is contrary to the specification.

#### 1. The Specification Discloses The Use Of Multiple Computers, Supporting EasyWeb's Proposed Construction, And Not Limiting The Invention To A Single Computer.

Requiring that the invention be implemented on a single computer and prohibiting two computers from processing the same message impermissibly

[4] Some claims in the '030 and '606 patents incorporate a central processor through means-plus-function elements.

narrows the scope of the claims. Absent some disclaimer, "the patentee is entitled to claim scope commensurate with the invention that is described in the specification." *Inline Plastics Corp. v. EasyPak, LLC*, 799 F.3d 1364, 1368-69 (Fed. Cir. 2015). The district court violated this rule by disregarding the specification's disclosure that a central processor can be implemented with multiple computers.

Nothing in the specification suggests that "all the functions assigned to the central processor that are necessary for the MPS to process a given message" must be performed by one computer. Rather, the specification teaches that the invention can be run using multiple computers. *See, e.g.*, Appx175 at 37:59-61 ("With a large number of users and/or requesters, the central processor may actually comprise a number of computers."); *see also id.* at 38:26-30. Furthermore, the software run on the central processor can be "varied to suit the particular hardware embodied by the invention," Appx176 at 39:52-55, and can be split across multiple computers. *See id.* at 39:57-60 ("Further, the software may be executed by a single computer, such as a Windows-based PC, or *may be executed by a larger number of computers*.") (emphasis added).

Moreover, nothing in the specification suggests that a single message only should be processed by a single computer. Rather, the specification discloses an alternate embodiment where the processing steps assigned to the central processor

in the claims ***is*** split between computers. In that embodiment, "the Internet Server may retrieve unconverted message files stored in the storage area by the central computer and convert the files into the appropriate webpage(s)." Appx175 at 38:47-50. Accordingly, the specification discloses a second computer (the Internet Server) performing the "convert[ing]" functions, contrary to the district court's construction. *See also* Appx15 n.13 (noting that the specification "discloses that an Internet server connected to the 'central processor' can perform several of the MPS's claimed functions, such as retrieving unconverted messages stored by the central computer and converting them into the webpages").

**2. The District Court Erred By Limiting The Invention Based On A Perceived Purpose In The Specification.**

Rather than properly construe "central processor" based on the scope of the invention disclosed in the specification, *Inline Plastics*, 799 F.3d at 1368-69, the district court construed the term in order to fit a perceived purpose for the multiple computers disclosed in the specification. The district court reasoned that "it strains logic and the language of the patents to conclude that a computer is part of the 'central processor' if it performs at least one function required of the 'central processor' to process a given message, while another computer performs another function" because "the purpose of having several computers is to assist in handling the demand for message-processing capacity, not to distribute the handling of each

individual function to one computer or another."[5] *See* Appx15. That reasoning is both contrary to the principles of claim construction and logically flawed.

This Court has held that "[t]he court's task is not to limit claim language to exclude particular devices because they do not serve a perceived 'purpose' of the invention. Rather, the district court's function is to interpret claims according to their plain language unless the patentee has chosen to be his own lexicographer in the specification or has clearly disclaimed coverage during prosecution." *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003). Here, not only does the district court improperly construe the claims based on the purpose it inferred from the specification, it does so despite explicitly recognizing that "[t]he specification *never* disclaims a distributed server architecture in which the several computers comprising a 'central processor' each perform only a subset of the functions required by the claims." Appx15 (emphasis added).

Moreover, having multiple computers "to assist in handling the demand for message processing capacity" does not conflict with "distribut[ing] the handling of each individual function to one computer or another." Distributing processing steps among multiple computers is actually a common way to handle large

[5] The court also suggested that EasyWeb's construction rendered the word "central" superfluous. Appx15. But "central processor" is the term used in the specification when Codignotto explained that it could "actually comprise a number of computers." Appx175 at 37:59-61. Parsing each word separately would contradict the specification.

numbers of users and messages. *See* Appx1565 at 116:23-117:23, Appx1566 at 118:10-121:4.

Because the district court's reasoning runs counter to the specification and improperly limits the claim based on a perceived purpose, "central processor" should be construed according to the meaning disclosed in the specification: "one or more computers as part of a system."

### C. The District Court's Summary Judgment Of No Infringement Should Be Reversed On Both Grounds.

#### 1. The District Court's Ruling That Twitter's Authentication Mechanisms Do Not Depend On The Format Of The Message Relies On A Flawed Construction Of "Format" And Should Be Reversed.

The first ground on which the district court granted summary judgment of no infringement—that "Twitter's authentication mechanisms do not depend on the 'format of the message,'" Appx38—should be reversed, because it is based on a flawed construction of "format." The court's conclusion is based on its finding that "Twitter does not select a different identification/authorization mechanism depending upon whether it receives text or JPG-, GIF-, or PNG-formatted image,"—i.e., the authentication method does not depend upon the tweeted *file format*. *Id.* Under the correct claim construction, the district court's observation is irrelevant, because the authentication mechanism may instead depend on the message type.

In fact, the district court found that Twitter *does* use a different authentication mechanism for each *type* of tweet:

> Tweets from a browser or mobile application are authenticated through the sender's username and password, with are associated with a cookie (for web tweets) or an OAuth token (for mobile tweets). SMS and MMS tweets are authenticated using the phone number transmitted with the user's message.

*See* Appx38 (internal citations omitted). Because the authentication method depends upon the type of tweet, i.e. the message type, the authentication method must also depend upon the "format of the message." *See Alcon Research*, 687 F.3d at 1367 (Fed. Cir. 2012) (holding that an independent claim must "cover at least that range" covered by a dependent claim).

While the district court's findings alone would suffice to demonstrate that summary judgment is inappropriate, EasyWeb also provided the testimony of its technical expert, Dr. Polish, to demonstrate that Twitter's system uses an authentication scheme that depends upon the format of the message. Dr. Polish testified that Twitter uses a different message format for tweeting "hello" via SMS, via the web through Twitter.com, and via the Twitter mobile application. Appx1550-1551 at 56:8-12, 58:4-20, 60:17-61:4. And it is undisputed that Twitter employs a different authentication scheme for each of these formats. *See, e.g.*, Appx1398 ¶¶ 10, 14; Appx1337 ¶ 179. Thus, Twitter meets the limitations

requiring that authentication depend upon the format of the message, and summary judgment of no infringement should be reversed.

**2. The District Court's Finding That Twitter Lacks A Central Processor Relies On A Flawed Construction Of "Central Processor" And Should Be Reversed.**

The district court also granted summary judgment of no infringement based on its finding that "no single machine in the data center identifies the sender of the message and performs an additional required function;" instead, "the computers are 'logically organized into groups called … clusters according to the function that they perform.'" Appx38. But the fact that "no single machine" identifies a sender and performs another processing step is irrelevant under the proper construction of central processor. Instead, the Twitter data center computers are connected together to perform the claimed functions. Appx39. Furthermore, the data center is specifically designed with many computers in clusters so that it "allows Twitter to handle a tremendous volume of messages." Appx1400 ¶ 25; *see also* Appx1293-1296 ¶¶ 48-49, 53. In other words, Twitter uses many computers in order to "to assist in handling the demand for message-processing capacity," the purpose the district court perceived in the specification's inclusion of multiple computers in the central processor. *See* Appx15. In short, the Twitter data center is a centralized set of computers that collectively perform the functions recited in the asserted claims and thus, in the terminology of the patents-in-suit, is a "central

processor." Accordingly, summary judgment of no infringement should be reversed.

## II. The District Court Erred In Construing "First Format" And "Second Format."

Several of the asserted claims require a "first format" (for the original message) and a "second format" (the format that is ultimately published). *See, e.g.*, Appx100 at 45:20-21, Appx139 at 44:37-38, Appx178 at 43:60-61. In the district court, the parties agreed that the "first format" must be different from the "second format." Appx11-13. The only disputed issue before the district court was whether an extra limitation—requiring the "first format" to be "non-webpage-compatible"—should be read into the claim language in addition to the ordinary meaning of "first" and "second" referring to two different formats. *Id.* EasyWeb proposed construing the terms according to the ordinary meaning of "first" and "second." Appx3038. Twitter contended that the first format must be non-webpage-compatible, because converting messages into webpages "*was the entire point of the invention*" and if the first format was already webpage-compatible, there would be no reason to convert it into a second format. Appx927 (emphasis in original).

Recognizing that the same limitation Twitter sought to read in was recited in a dependent claim—claim 24 of the '247 patent requires that the first format be

"non-webpage reviewable" and the second format be "web page reviewable"—the district court rejected Twitter's proposal. Appx12.

But rather than use the ordinary meaning, the district court read in additional limitations of its own, modifying Twitter's proposal to fit the "purpose" it perceived in the specification, just as it did with the "central processor" limitation. Appx12-13. Specifically, the court construed "first format" to mean "a format that is not webpage-compatible at least in part and that is different from the format in which the message is posted to the Internet" and "second format" to mean "a format that is wholly webpage-compatible and different from the first format." Appx13.

### A. The District Court Erred By Reading Dependent Claim Limitations Into The Independent Claim.

As the district court recognized when it rejected Twitter's proposal, *see* Appx12, dependent claims limit the "first format" to "a non-web page reviewable format" and "second format" to "a web page reviewable format." *See, e.g.*, Appx179 at 45:6-8. Consequently, "first format" must be broader than "a non-web page reviewable format" and "second format" must be broader than "a web page reviewable format." *See* 35 U.S.C. § 112 ¶ 4. Nonetheless, the district court construed "first format" to be "not webpage-compatible *at least* in part," which is not materially different in scope than the dependent claim. And it construed "second format" to be "*wholly* webpage-compatible," which is potentially

narrower than the "web page reviewable format" claimed in the dependent claim. Thus, despite the district court's slight modifications to Twitter's proposal, the construction still improperly reads the limitations from the dependent claims into the independent claims. *See* 35 U.S.C. § 112 ¶ 4; *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) (holding that "where the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest").

**B. The District Court Erred By Imposing Limitations Based On Its Perceived Purpose Of The Invention.**

The district court attempted to justify its narrowing construction by reasoning that "[c]onversion to a wholly webpage-compatible format thus is essential to the invention" and "[t]o construe 'first format' without considering this purpose would ignore the purported advantages of the claimed invention." Appx13. That reasoning violates the principles of claim construction and is inconsistent with the specification.

First, a district court commits error when it reads limitations into the claims in order fit a "purpose" it sees in the invention. *See E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370.

Second, the "purpose" that the court believes it is reading into the claim—"converting the message into a format that could be published on the Internet"—is already present in the claims that contain both the "first format" and "second

format" limitations. Indeed, "converting" is explicitly recited in the independent claims of three of the asserted patents. *See* Appx178 at 43:60-61 (reciting software to "*convert* at least a second portion…"), Appx100 at 45:20-21, Appx139 at 44:37-38.

Third, the district court's narrowed "purpose"—"[c]onversion to a wholly webpage-compatible format," Appx13—is contradicted by the specification. Nothing supports the court's leap from a system that allows "virtually anyone to automatically create a new website" to the conclusion that the second format must be "*wholly* webpage-compatible." Appx13. In fact, the opposite is true: the specification teaches that an email message could contain file attachments "such as database, spreadsheet and program files" that may be linked to "the email messages' webpage and/or the emails' TOC webpage." Appx172 at 32:23-44. And such files cannot themselves be viewed on a webpage. *Cf. id.* at 32:32-35 (noting that the linked files "may be labeled with the name of the file attachment" in order "[t]o allow a reviewer to discern one file from another"). Thus, the preferred embodiment itself discloses an example where the converted webpage, the second format, is not "wholly webpage-compatible." As such, the specification demonstrates that the district court's reasoning and construction is incorrect. *See* *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (excluding the preferred embodiment is "rarely, if ever, correct").

## III. The District Court Erred In Concluding That EasyWeb's Patents Claim Ineligible Subject Matter.

### A. The District Court Erred In Determining That EasyWeb's Patents Address An Abstract Idea (Alice Step One).

The first step in determining whether a patent claims ineligible subject matter, such as an abstract idea, is to determine "whether the claims at issue are directed to a patent-ineligible concept." *Alice Corp. Pty Ltd. v. CLS Bank Int'l*, 134 S.Ct. 2347, 2355 (2014). Here, the district court concluded "that EasyWeb's patents are directed to an abstract idea of authentication" and therefore "directed to a patent-ineligible concept." Appx34. But in making such a determination, "it is often useful to determine the breadth of the claims in order to determine whether the claims extend to cover a fundamental practice long prevalent in our system." *In re TLI Commc'ns LLC Patent Lit.*, No. 2015-1372, slip op. at 7 (Fed. Cir. May 17, 2016) (citations omitted). The court did not do so here. Instead, it set aside most of what is claimed and focused on a single phrase in a single limitation that overstates the breadth of the claims. The claims themselves demonstrate that the patents are not merely directed toward "authentication."

This Court "recently clarified that a relevant inquiry at step one is 'to ask whether the claims are directed to an improvement in computer functionality versus being directed to an abstract idea.'" *TLI*, slip op. at 8 (citing *Enfish, LLC v. Microsoft Corp.*, No. 2015-2044, slip op. at 11 (Fed. Cir. May 12, 2016)). That is

undoubtedly the case here, as the patents claim Codignotto's invention, a message publishing system that authenticates, converts, and publishes multiple message formats to the Internet.

**1. The District Court's Identification Of The Allegedly Abstract Idea—"Authentication"—Is Incorrectly Based On A Single Element In The Claims.**

The district court's determination that the patents are directed toward "authentication," Appx34, or "format-based authentication," Appx33, is flawed because it focuses on a single phrase in the claims and fails to account for the nature of the claims in their entirety. "Under step one of *Mayo/Alice*, the claims are considered *in their entirety* to ascertain whether *their character as a whole* is directed to excluded subject matter." *Internet Patents Corp. v. Active Networks, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015) (emphasis added); *see also Diamond v. Diehr*, 450 U.S. 175, 188 (1981) ("claims must be considered as a whole"). The district court's analysis, however, starts from the premise that "the claims at issue involve format-based authentication and a central processor," Appx32, despite the presence of numerous other limitations. In fact, by focusing on "format-based authentication," Appx33, the district court limits its analysis to just one phrase in one limitation of the independent claims. *See, e.g.*, Appx178 at 43:47-64 (emphasis added):

> 1. A message publishing system (MPS) operative to process a message from a sender in a first format, comprising:
> a central processor;
> at least one sender account;
> at least one storage area configured to store at least a first portion of the message; and
> software executing in the central processor to configure the processor so as to:
> identify the sender of the message as an authorized sender based on information associated with the message in comparison to data in the sender account, wherein the identification is dependent upon the first format;
> convert at least a second portion of the message from the first format to a second format; and
> publish the converted second portion of the message so as to be viewable in the second format only if the sender has been identified as an authorized sender.

The district court focuses on this particular phrase to support its conclusion that "[t]he inventive (and non-obvious) concept in the patents-in-suit, however, is the format-based authentication system, *not* the message publishing system itself." Appx33. But this narrow focus is improper at step one of the *Alice* analysis. *See Internet Patents*, 790 F.3d at 1346. Furthermore, by "focus[ing] on the inventiveness of the format-based authentication element," Appx33, the district court engages in a methodology prohibited by the Supreme Court: "dissect[ing] the claims into old and new elements and then ignor[ing] the presence of the old elements in the analysis." *See Diamond v. Diehr*, 450 U.S. 175, 188 (1981). Thus, the district court's *Alice* step one analysis is improper because it fails to address the claims in their entirety, instead focusing on the allegedly single new element.

That flawed analysis leads the district court to a flawed conclusion: that the patents are directed to an "idea of authentication." Appx33-34. But the claims are far more detailed and precise than that, a fact that the district court recognizes in other parts of its opinion. For example, when construing claims, the district court described "the 'essence' of the invention" without ever mentioning format-based authentication. Appx13. Instead, the district court characterized the invention as a system designed "to allow 'virtually anyone to automatically create a new website … using just a telephone or fax machine' by converting the message into a format that could be published on the Internet." *Id.*; *Cf. id.* at 12 ("Converting a message's format is integral to the system."). An abstract idea that omits "the 'essence' of the invention" cannot be an idea that captures the claimed invention's "character as a whole." *See Internet Patents*, 790 F.3d at 1346.

In a footnote to its opinion, the district court states that "considering EasyWeb's claims as a message publishing system would not change the analysis because a message publishing system is also an abstract idea." Appx33 n.22. But the court does not support this alternative conclusion, which also disregards the limitations of the claims and ignores the Court's mandate to "be careful to avoid oversimplifying the claims." *TLI*, slip op. at 7. "Describing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *See Enfish*, slip op. at 14.

Like the "idea of authentication," it omits the conversion elements that the district court identifies as the "'essence' of the invention." *See* Appx13. Consequently, the district court's abbreviated analysis of a generic "message publishing system" also is incorrect.

### 2. EasyWeb's Patents Claim A Message Publishing System That Authenticates, Converts, And Publishes Messages On The Internet.

Rather than the idea of "authentication" or a generic message publishing system, EasyWeb's patents claim a specific message publishing system, one able to authenticate multiple message formats and then convert and publish them on the Internet. *See, e.g.*, Appx178 at 43:47-64. Like the self-referential database model claimed in *Enfish*, the message publishing system here is "an improvement to computer functionality," a technical solution to the problem of publishing content on webpages on the Internet, not an abstract idea. *See Enfish*, slip op. at 12.

As the specification details, at the time of Codignotto's invention, "publishing a message on the Internet [was] a daunting task." Appx157 at 2:65-66. In order to do so, a publisher needed "a computer, web publishing software, an Internet web server" and the required technical knowledge; even then, "they [were] limited to the features, capabilities and the manner by which the web publishing software operates." Appx157-158 at 2:67-3:12. Although a number of "systems [had] been developed that allow a message to be reviewed on the Internet," the

prior art systems all had significant defects. *See* Appx158 at 3:22-4:10. For instance, the specification describes one system ("Bobo") in which only a "single user can review the messages" and that "would allow any unauthorized person to post an undesirable message in anyone's inbox." *Id.* at 3:23-38. Another prior art system ("King") "requires the sender to have the necessary tools and skills to create the webpage" and to send the webpage to the system via email "in a special format that is required by the receiving server machine." *Id.* at 3:51-61. And a third ("Freishtat") allowed "a non-technical person to alter a websites' content using a typical telephone," but could not "create the website, webpages and content." *Id.* at 3:62-4:10. Codignotto's invention, however, provides a solution to that "daunting task" that improves on these prior art systems. For example, the claimed system improves on Bobo by publishing messages, rather than sending them to a single person, and by restricting unauthorized postings. *See, e.g.*, Appx176 at 39:34-37 (messages "can be reviewed by multiple simultaneous requestors"); Appx161 at 10:59-64 (employing a "security scheme"). And the claimed system improves on King and Freishtat through its use of conversion software that can create webpages. *See, e.g.*, Appx168 at 23:19-29 (describing what occurs "when the system generates a webpage for a message"). Thus, the specification's identification of technical problems with prior art systems that the claimed invention solves demonstrates "that the claims are directed to an

improvement of existing technology," not an abstract idea. *See Enfish*, slip op. at 15.

Furthermore, the claimed invention is not a generic or abstract "message publishing system;" rather, it is a specific implementation. *See Enfish*, slip op. at 18 (holding that claims "directed to a specific implementation of a solution to a problem in the software arts" are not directed to an abstract idea). As in *Enfish*, the claims are not directed to *any* message publishing system. Instead, they are directed to a specific type of message publishing system, that can receive multiple message formats, authenticate based upon the format of the message, convert the message, and publish it on the Internet. *Cf. Enfish*, slip op. at 14 (finding claims not abstract where they are "not simply directed to *any* form of storing tabular data, but instead are specifically directed to a *self-referential* table for a computer database") (emphasis original).

That specific implementation is described with a wealth of technical details in an extensive specification. For instance, when teaching how a message is converted to a webpage, the specification describes how a webpage can be generated from a template using keywords, provides a sample template, discloses a naming convention, and teaches how individual HTML references in the sample template are used. Appx170 at 27:17-28:9, 28:31-60. As another example, when discussing how to prepare images to be added to a webpage, the specification

recommends particular software development kits, i.e. code libraries, and identifies specific image processing routines to use. *See* Appx169 at 26:8-39. Thus, unlike the patent found abstract in *TLI*, where "[t]he specification fails to provide any technical details" and succinctly describes claimed components with "'standard features'" or as "'the type which is known,'" the limitations in EasyWeb's claims are neither generic nor "merely a conduit for the abstract idea." *Cf. TLI*, slip op. at 9.

Finally, the claimed message publishing system is not analogous to any well-known business practice or method of organizing human behavior previously found abstract. The claims at issue, in contrast to the claims found abstract in *Alice*, do not simply add generic computer components to a well-known practice like intermediated settlement. *See Alice*, 134 S.Ct. at 2358-60. Nor do they address other business practices found to be abstract, such as "determining a price," *Versata Dev. Grp. v. SAP Am., Inc.*, 793 F.3d 1306, 1333-34 (Fed. Cir. 2015), "anonymous loan shopping," *Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324-25 (Fed. Cir. 2016), "budgeting," *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015), "offer-based price optimization," *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015), "using advertisement as an exchange or currency," *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014), or "creating a

contractual relationship." *See buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014). Nor does it claim a method of organizing information. Unlike an "abstract idea of classifying and storing digital images in an organized manner," *TLI*, slip op. at 10, the "concept of data collection, recognition, and storage," *Content Extraction & Transmission LLC v. Wells Fargo, N.A.*, 776 F.3d 1343, 1347 (Fed. Cir. 2014), or the abstract idea of "organizing information through mathematical correlations," *Digitech Image Techs., LLC v. Electrs. For Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014), the claimed invention creates and publishes websites. *See, e.g.*, Appx167 at 22:28-38. It does not merely sort and store information. And the claims do not recite an abstract mathematical formula, such as a "formula for converting BCD numerals to pure binary numerals," *see Gottschalk v. Benson*, 409 U.S. 63, 71-72 (1972), or the purely conventional implementation of "a formula for computing an updated alarm limit." *See Parker v. Flook*, 437 U.S. 584, 586 (1978). The claimed system is not analogous to any claims previously found abstract.

### B. The District Court Erred In Determining That EasyWeb's Patents Lack An Inventive Concept (Alice Step Two).

Under *Alice* step two the district court must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S.Ct. at 2355 (quoting *Mayo Collaborative Servs. v.*

*Prometheus Labs., Inc.*, 132 S.Ct. 1289, 1297 (2012)). Here, the district court concluded that the asserted claims lacked an inventive concept because the "central processor" recited in one limitation was a "'generic computer,'" and thus could not transform the abstract idea into a patent-eligible invention. Appx35. Again, the district court only analyzed a single limitation, not every element of each claim. *Id.* But taken as a whole, EasyWeb's patents do not attempt to monopolize the idea of authentication. Instead, the claimed invention is non-conventional and a "technical solution to a problem unique to the Internet," like that found eligible in *Bascom* and *DDR*. *See Bascom Global Internet Servs., Inc. v. AT&T Mobility LLC*, No. 2015-1763, slip op. at 12 (Fed. Cir. Jun. 27, 2016) (citing *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257-59 (Fed. Cir. 2014)).

#### 1. In Determining The Claims Lacked An Inventive Concept Because They Recite A Generic Computer, The District Court Failed To Address The Claims As A Whole.

In its examination of patent eligibility, the district court reduces the claimed invention to two elements: a central processor and the allegedly abstract idea of format-based authentication. *See* Appx32 ("Here, the claims at issue involve format-based authentication and a central processor."). Having thus disregarded the other limitations, the district court concludes that "the central processor is a generic computer, which cannot transform a patent-ineligible abstract idea in to a patent-eligible invention." Appx35 (internal quotations omitted). To support its

conclusion, the court notes that it construed "means for identifying"—a means plus function element from the '030 and '606 patents—to be the "central processor" and states, without evidence, that it performs only conventional activities. *Id.* That concludes the district court's *Alice* step two analysis.[6]

But the analysis cannot end there, because it does not "consider the limitations of each claim both individually and as an ordered combination." *See, e.g.*, *Versata*, 793 F.3d at 1332. If a court chooses to "defer [its] consideration of the specific claim limitations' narrowing effect for step two," *Bascom*, slip op. at 13, it must then actually consider the specific claim limitations' narrowing effect in the step-two analysis. The district court did not do so. Taking claim 1 of the '247 patent as an example, the district court failed to address the preamble or the limitations addressing a "sender account," a "storage area," software to "identify

[6] The district court also found the invention failed the machine-or-transformation test, reasoning that "converting a message from one format to another" was "'mere manipulation or reorganization of data,'" not a transformation. Appx36 (quoting *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1370 (Fed. Cir. 2011)). The court's logic, however, is based on its flawed construction of "format" as a file format. In the preferred embodiment, conversion transforms a message into "one or more webpages," Appx159 at 5:38-40, with additional information from the user's account, other embedded information, and links to other relevant pages. Appx170 at 28:46-29:4. It is not "mere manipulation or reorganization of data." Furthermore, this Court has now moved away from the machine-or-transformation test in recent decisions, recognizing that it is a poor framework for evaluating advancements to computer technology and "improvements to software that, by their very nature, may not be defined by particular physical features but rather by logical structures and processes." *See, e.g.*, *Enfish*, slip op. at 17-18.

the sender," software to "convert at least a second portion of the message," or software to "publish the converted second portion." *See* Appx178 at 43:47-64. Not only did it fail to consider those limitations individually, the district court entirely failed to address the claims as an ordered combination or to provide any "explanation of a reason to combine the limitations as claimed." *See Bascom*, slip op. at 15. Even if the court believed each element of the claims were known in the art, "[a]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *See id.*; *see also KSR Int'l Co. v. Teleflex*, 550 U.S. 398, 401 (2007) ("[I]nventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known."). Thus, the district court erred in its failure to consider the entire claim in assessing the inventive concept.

#### 2. EasyWeb's Patents Describe And Claim An Inventive, Technical Solution That Addresses The Problems Of Publishing Messages On The Internet By Combining Conventional And Novel Technology In A Novel Manner.

When read in their entirety, EasyWeb's patents describe and claim a specific message publishing system with an inventive concept found in a non-conventional combination of conventional and non-conventional technologies. *See Bascom*, slip op. at 15. That inventive concept is the combination of novel conversion software—capable of transforming messages in multiple formats into webpages—

with inventive format-dependent authentication software and conventional publishing mechanisms and computer hardware. *See, e.g.*, Appx178 at 43:47-64.

**a. The claimed invention includes non-conventional technology to "convert at least a second portion of the message from the first format to a second format."[7]**

Unlike traditional web publishing software, Codignotto's conversion software does not require a user to have "technical knowledge." Appx157 at 2:67-3:8. Rather, it enables users to publish messages "without special equipment or technical expertise." Appx158 at 4:45-47. In the preferred embodiment, users can publish "a facsimile message, an audio message or an email message" by sending it to the system "using the facsimile machine 120, the telephone 150 or the computer 140." Appx161 at 10:29-35. The system then automatically transforms it into webpages using Codignotto's novel conversion software.

The specification does not describe that conversion in "abstract functional terms." *Cf. TLI*, slip op. at 14 (finding "vague, functional descriptions of server components" insufficient to show an inventive concept). Rather, like the patent in *DDR*, it provides a detailed description, "necessarily rooted in computer technology," of how the conversion software operates to automatically convert messages to webpages, "a problem specifically arising in the realm of computer networks." *See DDR*, 773 F.3d at 1257. The specification describes how a

[7] Appx178 at 43:47-64.

webpage can be generated from a template using keywords, provides a sample template, discloses a naming convention for the files in the website, and teaches how individual HTML references in the sample template are used. Appx170 at 27:17-28:60. It also discloses how to create default pages and a main table-of-contents page for each user. Appx171 at 29:56-30:55. Furthermore, the specification discloses the format-specific steps used for conversion of each of the message types received by the preferred embodiment. For fax messages, it describes how to prepare the received fax images, recommending particular software development kits, and identifies specific image processing routines to use. *See, e.g.*, Appx169 at 26:8-39. If the fax message has multiple pages, the specification details how to process multiple pages and create a table-of-contents page for the message. *See* Appx171 at 29:9-51. For audio messages, it teaches how to process the audio—including removing artifacts and optimizing volume—specifies a programming tool that can be used to do the processing, and describes the inclusion of a preview audio sample to the webpage. Appx171-172 at 30:66-31:31. For email messages, it describes how to process the email and extract commands, attached files, and body text, before converting the message to a webpage using a template. Appx172-173 at 31:63-32:67. Thus, the conversion software does not perform "well-understood, routine, conventional activit[ies]" or simply "require a generic computer to perform generic functions." *Alice*, 134 S.Ct.

at 2359. It differs radically from traditional web-publishing software used by web designers to create websites and thus constitutes an inventive concept.

**b. The claimed invention includes non-conventional "identification and security" technology.**

The claimed invention employs identification and security software that uses format-based authentication to identify the message sender. *See* Appx161-162 at 10:59-11:3, Appx178 at 43:53-59 (reciting "software … to: identify the sender … wherein the identification is dependent upon the first format"). The district court itself describes this format-based authentication system as an "inventive (and non-obvious) concept." Appx33.

Moreover, that "identification and security" software is not generic. It applies different identification techniques to different message formats in order to "balance[] between security and convenience," Appx163 at 13:21-25, and takes advantage of information specific to each message format. *See, e.g.*, *id.* at 14:11-30 (noting a "fax terminal ID is only transmitted when the fax message is being transmitted"). As with the conversion software, the specification provides technical details on how format-based authentication may be implemented, which details are "necessarily rooted" in telecommunications technology and which solve problems "specifically arising" in the realm of telecommunications. *See DDR*, 773 F.3d at 1257; *cf. TLI*, slip op. at 9. For instance, it details how to identify the sender of an audio message, *see* Appx162 at 11:33-12:7, Appx165 at 17:52-18:22,

a fax message, Appx162 at 11:14-32, 12:41-49, Appx163 at 13:13-20, 14:11-30, and an email message, Appx162 at 12:49-42, Appx172 at 31:32-62, the three types of messages received by the preferred embodiment. It also teaches that the invention can take advantage of identification information in IP packets for network-based technologies and virtual printing. Appx162 at 12:8-40. And it discloses how different message formats can be identified, such as by using a fax calling tone to distinguish between telephone audio and fax messages, Appx165 at 17:66-18:5, or by considering the method used to receive a message from the Internet, such as a POP3 or other common email protocol, to identify an email message. *Id.* at 17:27-32. The claimed format-dependent authentication does not simply "require a generic computer to perform generic functions," *see Alice*, 134 S.Ct. at 2359, and thus constitutes an inventive concept.

#### c. The claimed invention combines the conversion software and format-dependent authentication system with more conventional elements of the claims.

In addition to creating technology that can "automatically create a new website" from audio, fax, and email messages, by combining it with software to publish and host the webpages on the Internet, the invention removes the need for users to individually have access to "a computer" and "an Internet web server and have the technical knowledge to use all these items." Appx157 at 2:65-3:3. Instead, users may simply send messages to the system, which not only transforms

them into webpages, but also seamlessly makes them available on the Internet. Appx173 at 33:32-35 (noting that "the conversion and publishing processes" may occur "at the time the message is received by the system").

Authentication is necessary to "prevent a valid user from deleting, modifying or adding to another valid user's published messages" as well as preventing "an unauthorized person from deleting, replacing or posting an undesired message." Appx161 at 10:59-66. Consequently, the format-dependent authentication—which allows the invention to authenticate multiple message formats with "a good balance between security and convenience," Appx162 at 11:14-17—also allows the system to secure the websites and provide access to multiple valid users.

Only when these claimed features are harnessed together are the full benefits of the system realized, as a system that "'allows virtually anyone to automatically create a new website, complete with multiple webpages, by using just a telephone or fax machine' or email." Appx3 (citing Appx178 at 43:37-45). Thus, the combination itself is an inventive concept. *See Bascom*, slip op. at 16 (finding inventive the combination of "associating individual accounts with their own filtering scheme and elements" and "locating the filtering system on an ISP server").

**d. Like the inventions in *Bascom* and *DDR*, the claims here recite "a technical solution to a problem unique to the Internet."**

The goal of the invention was to allow "virtually any person or organization to easily publish a message on the Internet" and to do so without "special equipment or technical experience." Appx158 at 4:41-47. In order to address that Internet-specific need, the invention claims a system that authenticates, converts, and publishes messages on the Internet. Like the patents in *DDR* and *Bascom*, that system is not "a business method *per* se" but instead is a "technical way to satisfy an existing problem" for business owners and would-be web publishers. *Bascom*, slip op. at 18. It is "a software based invention that improves the performance of the computer system itself," *id.*, improves upon the prior art web publishing software, and thus is patent-eligible. *See Research Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010) (noting that "inventions with specific applications or *improvements to technologies in the marketplace* are not likely to be so abstract that they override the statutory language and framework of the Patent Act") (emphasis added).

**3. Lack Of Preemption Further Demonstrates That EasyWeb's Patents Are Patent Eligible.**

The narrow scope of EasyWeb's patents relative to the alleged abstract idea of authentication further demonstrates they are inventive and patent eligible. "The Supreme Court has made clear that the principle of preemption is the basis for the

judicial exceptions to patentability." *See Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015) (citing *Alice*, 134 S.Ct. at 2354). In evaluating patent eligibility, the guiding principle is that "patent claims should not prevent the use of the basic building blocks of technology—abstract ideas, naturally occurring phenomena, and natural laws." *Id.* Here, however, the district court never considered whether EasyWeb's claims preempt the idea of "authentication." *See* Appx32-36.

EasyWeb's patents do not claim the entire idea of authentication, nor the idea of format-dependent authentication. They specifically claim a "message publishing system," *see, e.g.*, Appx178 at 43:47-64, and the specification only discusses a message publishing system. *See* Appx141-178. Authentication is a vast concept that encompasses numerous other fields, which EasyWeb does not claim. Of course, simply limiting the claims to authentication in a message publishing setting would not, itself, make them patent eligible. *Cf. OIP Techs.*, 788 F.3d at 1362-63. But EasyWeb's patents go further. They do not "merely recite the abstract idea of [authentication] along with the requirement to perform it on the Internet, or to perform it on a set of generic computer components" and are "'more than a drafting effort designed to monopolize the [abstract idea].'" *Bascom*, slip op. at 16-17 (quoting *Alice*, 134 S.Ct. at 2357).

For example, EasyWeb's claims require the system to identify the sender "in comparison to data in the sender account." *See, e.g.*, Appx178 at 43:55-59. A system that does not maintain sender accounts or rely on them for authentication falls outside of the scope of the claims. Several claims also require that the system "convert at least a second portion of the message." *See, e.g.*, *id.* at 43:60-61. A system that leaves a message entirely unchanged, such as a fax broadcasting system, falls outside the scope of those claims as well. Furthermore, EasyWeb's claims require that the system actually "publish the converted second portion of the message." *See, e.g.*, *id.* at 43:62-63. A system that receives and stores messages without publishing them, such as an answering service or an email service, also falls outside the scope of those claims. EasyWeb's patents do not purport to restrict all authentication in the field of message publishing.

EasyWeb's patents only foreclose the use of authentication in the context of the particular message publishing system that Codignotto invented: a system that receives messages, identifies the sender using format-dependent authentication in comparison to information maintained about the sender accounts, converts the message, and publishes the message on the Internet. *See* Appx178 at 43:47-64. As such, the "claims of the [patents-in-suit] do not preempt the use of the abstract idea of [authentication] on the Internet or on generic computer components performing conventional activities," *Bascom*, slip op. at 19, and are patent eligible.

## CONCLUSION

For the foregoing reasons, this Court should construe the disputed terms as proposed by EasyWeb, reverse the district court's grant of summary judgement, and remand this case to the district court for trial.

Respectfully submitted,

July 29, 2016

*/s/ Jeffrey S. Seddon, II /s/*

Alan S. Kellman
Jeffrey S. Seddon, II
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
(212) 351-3400
akellman@desmaraisllp.com
jseddon@desmaraisllp.com

*Counsel for Plaintiff-Appellant*
*EasyWeb Innovations, LLC*

# ADDENDUM

# TABLE OF CONTENTS
## Addendum

**Page(s)**

Memorandum And Order Re Claim Construction And Summary Judgment, Filed March 30, 2016 .................................... Appx1-Appx40

Judgment, Filed March 31, 2016 .................................................................. Appx41

U.S. Patent No. 7,685,247 ......................................................... Appx141-Appx179

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

№ 11-CV-4550 (JFB)(SIL)

---

EASYWEB INNOVATIONS, LLC,

Plaintiff,

VERSUS

TWITTER, INC.,

Defendant.

---

**MEMORANDUM AND ORDER**
March 30, 2016

---

JOSEPH F. BIANCO, District Judge:

Plaintiff EasyWeb Innovations, LLC ("EasyWeb") brings this patent infringement action against defendant Twitter, Inc. ("Twitter"), alleging that Twitter directly and indirectly infringes asserted claims in five patents assigned to EasyWeb: U.S. Patent No. 7,032,030 ("the '030 Patent"), titled "Message Publishing System and Method"; U.S. Patent No. 7,596,606 ("the '606 Patent"), titled "Message Publishing System for Publishing Messages from Identified, Authorized Senders"; U.S. Patent No. 7,685,247 ("the '247 Patent"), titled "System for Publishing and Converting Messages from Identified, Authorized Senders"); U.S. Patent No. 7,689,658 ("the '658 Patent"), titled "Method for Publishing Messages from Identified, Authorized Senders to Subscribers"; and U.S. Patent No. 7,698,372 ("the '372 Patent"), titled "System for Publishing Messages from Identified, Authorized Senders to Subscribers" (collectively, the "patents-in-suit"). The asserted independent claims are Claims 1 and 17 of the '030 Patent, Claims 1 and 18 of the '606 Patent, and Claim 1 in '247, '658, and '327 Patents.

Three motions are before the Court. First, the parties move for the construction of the disputed claims in the patents-in-suit. The Court construes the most significant and dispositive language below. Second, the parties move for summary judgment pursuant to Federal Rule of Civil Procedure 56. Twitter contends that summary judgment is warranted because (1) Twitter does not infringe the patents-in-suit under the proper construction of the claims; (2) EasyWeb has no admissible evidence of damages; and (3) under certain claim constructions, the asserted claims of the patents-in-suit are invalid as anticipated, obvious, for lack of written description, and for claiming abstract ideas. EasyWeb, which also moves to strike the Declaration of Christopher Butler ("the Butler Declaration") proffered by Twitter to authenticate documents generated from the Internet Archive's Wayback Machine, moves for partial summary judgment on Twitter's

invalidity defenses of anticipation, obviousness, lack of written description, lack of enablement, and lack of patentability for claiming abstract ideas.

The Court first concludes that summary judgment in favor of Twitter is warranted as to Twitter's patentability of abstract ideas defense because the patents-in-suit are directed to a patent ineligible concept and do not include an inventive concept sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself. Even assuming that the patents-in-suit were patentable, the Court concludes, in the alternative, that Twitter did not infringe EasyWeb's patents. A patent may cover different or after-arising technology through its literal terms or the "doctrine of equivalents," which allows patentees to gain exclusivity beyond the literal claims. A court, however, cannot ignore the actual scope of what a patentee has invented. This litigation involves an assignee attempting to rewrite patent claims to capture technology outside the claims' proper scope—a scope the assignee recognized in earlier lawsuits against different companies—without intrinsic or extrinsic support for such interpretations. For the reasons set forth below and, specifically, because of the proper construction of the terms "format" and "central processor," the Court grants summary judgment of noninfringement to Twitter. The uncontroverted evidence establishes that Twitter's system does not authenticate senders based on the "format of the message," and its distributed server architecture does not read upon the proper construction of "central processor." Therefore, it is irrelevant whether EasyWeb has admissible evidence of damages. Moreover, in light of the Court's holdings on nonpatentability and noninfringement, the Court need not address the other defenses raised by Twitter.

## I. Background

### A. Factual Background

In this section, the Court broadly details the patents-in-suit and Twitter's accused technology. The Court takes the facts set forth herein from the patents-in-suit, and the parties' declarations, depositions, exhibits, and Rule 56.1 Statements of Fact. Unless otherwise noted, each fact is undisputed or the opposing party has not pointed to any contradictory evidence in the record. Where a party's Rule 56.1 Statement contains specific citations to the record as support, the Court cites to the Rule 56.1 Statement, rather than the underlying citation to the record. As to each cross-motion, the Court construes the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).

#### 1. The Patents-in-Suit

Beginning in 2006, the U.S. Patent & Trademark Office ("USPTO") issued the patents-in-suit to John Codignotto ("Codignotto"), who assigned them to EasyWeb. (*See* '030 Patent, Li Markman Decl. Ex. A; '606 Patent, Novikov MSJ Decl. Ex. 24; '247 Patent, Li Markman Decl. Ex. B; '658 Patent, Novikov MSJ Decl. Ex. 26; '327 Patent, Novikov MSJ Decl. Ex. 27.) Codignotto conceived of the underlying idea no earlier than January 23, 1998. (Def. 56.1 ¶1.) As far as he knew, people could publish information on the Internet in two ways: (1) own or have access to a computer, web publishing software "that is specifically capable of working with webpages" (*i.e.*, HTML-type files), and an Internet server; and have the technical knowledge to use these items; or (2) hire a "webmaster" to create, publish, and maintain the content. ('030 Patent

at 2:60–3:15; *see* Codignotto Dep. at 76:1–5, Novikov MSJ Decl. Ex. 1.) This could be "a daunting task," and Codignotto wanted to find a solution "[t]o truly allow virtually anyone to publish a message on the Internet." ('030 Patent at 2:59–60, 4:30–32; Codignotto Dep. at 73:8–9.) Codignotto first determined that the invention could be practiced with a fax machine. Upon receiving a fax, the invention "would handle the process of . . . tak[ing] the fax, convert[ing] it into a digital format[, t]hen convert[ing] it into a webpage[, t]hen post[ing] it on a web server on the internet."[1] (Codignotto Dep. at 73:10–74:12.) Codignotto soon decided that the system could be extended to allow posting of email and telephone voice messages to the Internet as well. (*Id.* at 81:21–82:15.) Thus, "in essence, the invention allows virtually anyone to automatically create a new website, complete with multiple webpages, by using just a telephone or fax machine" or email. ('030 Patent at 44:61–64.)

The '030 Patent discloses a "Message Publishing System ("MPS") and method," whereby a user of the MPS sends the message to be published to the MPS; the MPS verifies that the sender is an authorized user before publishing the message; and the MPS "converts the received message into one or more formats, preferably webpage(s) for display on the Internet." ('030 Patent at Abstract.) The message is stored in a network storage area, and "[w]hen the MPS receives a request for the message, it retrieves the requested message from the storage area and sends it to the requester for review." (*Id.*) "It is a primary object of the invention to allow virtually any person or organization to easily publish a message on the Internet that can be simultaneously reviewed by a mass number of people from around the world. (*Id.* at 4:36–39.) The other patents-in-suit disclose a similar invention, with subtle distinctions.

2. Twitter's Technology

EasyWeb alleges that Twitter, a social networking site created in 2006 by Jack Dorsey, Evan Williams, and Biz Stone (Def. 56.1 ¶ 27), infringes the patents-in-suit through the operation of its "twitter.com" website and service. Twitter.com allows users to publish "tweets," which are messages of 140 characters or less. (*Id.* ¶ 32.) According to Twitter's expert, Paul Clark ("Clark"), "Twitter accepts messages for publication from a user in one (or a combination) of four formats: Tweets may be in text, and/or in one of the three supported image formats, JPG, PNG, and GIF." (Clark Noninfringement Report ¶ 163, Clark MSJ Decl. Ex. B.) Users can send tweets using a web browser, mobile applications, SMS ("Short Messaging Service"), or MMS ("Multimedia Messaging Service"). (Def. 56.1 ¶¶ 35, 44, 50.)

To send a tweet using a browser, a user must first log in to twitter.com. (*Id.* ¶ 36.) When a user loads twitter.com, the browser receives a cookie, which is an alphanumeric text string. (*Id.* ¶¶ 37–38.) To send a tweet, the user must type the text of the tweet (if any) into a box. (*Id.* ¶ 39.) When a user clicks the "Tweet" button, the browser places the text of the tweet (if any) into a HTTP ("Hypertext Transfer Protocol") POST wrapper—a data structure that permits a browser to submit data to a remote server over the World Wide Web. (*Id.* ¶¶ 40–41.) The HTTP POST wrapper has a header that contains a cookie. (*Id.* ¶ 42.) Upon receiving an HTTP POST wrapper, Twitter's servers in its data center in Sacramento, California extract the text of the tweet (if any)

---

[1] Codignotto's prototype of his invention was a software program to receive faxes and post fax pages to the Internet, which ran on a single computer with a fax modem and an Internet connection. (Def. 56.1 ¶¶ 2–4.)

in the form of plain text. (*Id.* ¶ 43.)[2] The data center contains approximately 480 server clusters, with between 1 and 3300 servers in each cluster. (*Id.* ¶ 60.) The clusters perform specific, different functions during the message publishing process: one cluster receives the tweet, another cluster authenticates users, a separate cluster stores the tweet, and a separate cluster publishes the tweet. (Contreras Decl. ¶ 22.)

A user also can tweet using a mobile application, such as Twitter for iOS or Twitter for Android. (Def. 56.1 ¶ 44.) The first time a user loads a mobile application, she is prompted to input a username and password, which is transmitted to Twitter. (*Id.* ¶ 15.) After Twitter receives the username and password, it issues an OAuth token—a set of letters and numbers that uniquely identifies the user—to the mobile device. (*Id.* ¶¶ 46–47.) Twitter issues a different OAuth token for each application or third party website that a user uses to tweet. (Contreras Decl. ¶ 16.) A mobile tweet is sent in an HTTP POST wrapper. (Def. 56.1 ¶ 48.) It is entered and transmitted in the same way as a web tweet, except that the header of its HTTP POST wrapper does not include a cookie, but instead an OAuth token. (*Id.* ¶ 49.) According to Contreras, "[c]ookies and OAuth tokens are simply ways that a web browser or application can prove that it's the same web browser or application into which the user entered their username and password when they logged in." (Contreras Decl. ¶ 17.)

A user also can tweet using a mobile phone by sending an SMS text message to a special, designated phone number. (Def. 56.1 ¶ 50.) According to Clark, when a user sends an SMS tweet, the mobile device encodes the message as a string of bytes and transmits the message over the cellular radio link to the cellular telephone carrier. (*Id.* ¶ 51.) A computer at the carrier then sends the message to a Twitter facility in Seattle, Washington, where the servers run software called Cloudhopper. (*Id.* ¶¶ 52, 53.) The messages are forwarded to Twitter using either the SMPP ("Short Message Peer-to-Peer") protocol or the HTTP protocol. (*Id.* ¶ 54.) Cloudhopper then sends to Twitter's servers the text of the tweet, along with the user's telephone number, in an HTTP POST wrapper. (*Id.* ¶ 55.) In Sacramento, Twitter's software receives the tweet, looks at the telephone number in the HTTP POST wrapper to determine which user sent the tweet, and posts the tweet to the user's timeline.[3] (*See id.* ¶ 56; Clark Noninfringement Report ¶¶ 177–80.)

---

[2] EasyWeb claims there is insufficient evidence of these facts from the declaration of Dana Contreras, a Senior Software Engineer at Twitter (Contreras Decl. ¶ 1). (Pl. 56.1 Reply ¶¶ 40–43.) The Court disagrees. Contreras says she has personal knowledge of these facts, (Contreras Decl. ¶ 2), and EasyWeb proffers no contradictory evidence.

[3] According to Clark, "[m]ost messages from each kind of device"—browser, application, or mobile phone—"use the same web HTTP protocol for organizing and communicating the data that is sent to Twitter. While some SMS messages are received by Cloudhopper by the SMPP protocol, these Tweets are authenticated with the same phone number information received from the carriers that is used for the SMS messages sent via HTTP. The identification does not depend on the protocol." (Clark Noninfringement Report ¶ 179.)

Clark depicts Twitter's architecture as follows:




B. <u>Procedural Background</u>

EasyWeb commenced this action on September 19, 2011. Twitter answered the complaint on November 10, 2011. The Court denied Twitter's motion to change venue on October 16, 2012. Twitter moved for summary judgment and filed its opening claim construction brief on March 1, 2013. EasyWeb moved for summary judgment on March 1, 2013, and filed its opening claim construction brief on March 2, 2013. Twitter filed its responsive papers on April 5, 2013. EasyWeb filed its responsive claim construction brief on April 5, 2013, and its opposition to summary judgment on April 8, 2013. The parties filed their respective replies in support of summary judgment on April 19, 2013. EasyWeb moved to strike the Butler Declaration on April 19, 2013, and Twitter opposed on April 23, 2013. EasyWeb filed a supplemental reply to Twitter's opposition to summary judgment, addressing evidence submitted by Butler, on August 16, 2013. Twitter responded on September 3, 2013. The Court held oral argument on the motions on June 28, 2013.[4] On July 3, 2014, after the Supreme Court issued its decision in *Alice Corp. v. CLS Bank*

[4] Given that the uncontroverted evidence, including the language of the patents and the testimony of EasyWeb's own expert, demonstrates noninfringement, the Court did not hold a *Markman* hearing. "The express purpose of such a so-called '*Markman* hearing is for the court to interpret the claims of a contested patent.'" *Safe-Strap Co. v. Koala Corp.*, 270 F. Supp. 2d 407, 415 (S.D.N.Y. 2003) (quoting *Funai Electric Co., Ltd. v. Orion Electric Co., Ltd.* (S.D.N.Y. Aug. 7, 2002) Nos. 01 Civ. 3501(AGS)(JCF) and 02 Civ. 2605(AGS)(JCF), 2002 WL 1808419, at *11). However, "district courts are not required to follow any particular procedure in conducting claim construction; while 'some courts have found it useful to hold hearings . . . [s]uch a procedure is not always necessary.'" *J.G. Peta, Inc. v. Club Protector, Inc.*, 65 F. App'x 724, 727 n.2 (Fed. Cir. 2003) (alteration in original) (quoting *Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir. 2001)); *see also CIAS, Inc. v. All. Gaming Corp.*, 424 F. Supp. 2d 678, 682 (S.D.N.Y. 2006) *aff'd*, 504 F.3d 1356 (Fed. Cir. 2007) ("A court may, but need not, conduct a *Markman* hearing to determine the scope of the claims."); *Radiancy, Inc. v. Viatek Consumer Products Grp., Inc.*, No. 13-CV-3767 (NSR)(LMS), 2015 WL 221063, at *1 (S.D.N.Y. Jan. 14, 2015) ("A *Markman* hearing is unnecessary, for example, if the Court is able to determine the scope of the claims based on intrinsic evidence, dictionaries, and expert reports."); *Revlon Consumer Products Corp. v. Estee Lauder Companies, Inc.*, No. 00-CV-5960 (RMB)(AJP), 2003 WL 21751833, at *14-15 (S.D.N.Y. July 30, 2003) ("A '*Markman* hearing' to interpret the claim language is unnecessary in this case, because the sole disputed claim term—'completely coated'—is neither ambiguous nor highly technical. . . . Here, the Court is able to interpret the claim language based on intrinsic evidence and dictionaries, and has 'heard' expert testimony via written submissions. There is no need for a *Markman* hearing."); *Safe-Strap Co.*, 270 F. Supp. 2d at 415 ("Courts can also interpret the claims on a paper record. . . . In other words, where the parties do

*Int'l*, 134 S. Ct. 2347 (2014), the parties filed letters addressing the decision's impact on this matter. On July 7, 2014, EasyWeb filed a letter informing the Court of a recent decision by the Federal Circuit that relates to Twitter's argument that the Court should exclude the testimony of EasyWeb's damages expert and enter judgment for Twitter based on an alleged failure to establish damages. The parties also have submitted letters addressing decisions by lower courts after *Alice*. The matter is fully submitted.

## II. Claim Construction

The meaning and scope of asserted patent claims is a question of law and precedes the infringement and invalidity analyses. *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1355 (Fed. Cir. 2000); *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc) (citation omitted). The '030 and '606 Patents claims are written in means-plus-function form; the '247 and '372 Patents claims are written as system claims; and the '658 Patent claims are written as method claims. The specifications are almost identical. The Court construes the dispositive disputed claims below, considering the point of view of a person of ordinary skill in the art as of March 11, 1999: an individual with "at least 5–6 years of technical work experience with software and hardware systems in the field of computer systems and networking, or something equivalent thereto." (Polish Validity Report ¶ 40, Novikov MSJ Decl. Ex. 33.)

### A. Legal Standard

Claim construction is "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). Such construction "begins and ends" with the claim language itself, *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998), but the court may consult extrinsic evidence "if needed to assist in determining the meaning or scope of technical terms in the claims," *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1216 (Fed. Cir. 1995); *see Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996) (explaining that the court may rely on extrinsic evidence, including expert and inventor testimony, dictionaries, and learned treaties).

In construing the claim language, the court must begin with the principle that "the words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics*, 90 F.3d at 1582)). This ordinary and customary meaning "is the meaning that the [claim] term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

---

not dispute any relevant facts regarding the accused product but disagree over the meaning of a particular claim, claim construction is amenable to summary judgment." (citations omitted)); *Wi-Lan, Inc. v. LG Elecs., Inc.*, No. 10-CV-432 (LAK)(AJP), 2011 WL 3279075, at *18 (S.D.N.Y. Aug. 2, 2011), *report and recommendation adopted as modified*, No. 10-CV-432 (LAK) (AJP), 2012 WL 760148 (S.D.N.Y. Mar. 7, 2012) *aff'd*, 493 F. App'x 103 (Fed. Cir. 2012) ("Here, the Court is able to determine the scope of the claims based on the intrinsic evidence and has 'heard' expert testimony via written submissions. A *Markman* hearing therefore is not necessary.")

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. "In such circumstances general purpose dictionaries may be helpful." *Id.* In other cases, "determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art." *Id.* In those cases, "the court looks to those sources available to the public that show what a person of skill in the art would have understood the disputed claim language to mean." *Id.* (internal quotation marks and citation omitted). These sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (internal quotation marks and citation omitted).

When the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, the inventor's lexicography governs. *Id.* at 1316. Nevertheless, it is improper to read limitations from the specification into the claim. *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1368 (Fed. Cir. 2005) ("'[I]f we once begin to include elements not mentioned in the claim, in order to limit such claim . . . we should never know where to stop.'" (alteration in original) (quoting *Phillips*, 415 F.3d at 1312)). Thus, the court "do[es] not import limitations into claims from examples or embodiments appearing only in a patent's written description, even when a specification describes very specific embodiments of the invention or even describes only a single embodiment, unless the specification makes clear that 'the patentee . . . intends for the claims and the embodiments in the specification to be strictly coextensive.'" *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005) (internal citations omitted).

## B. <u>Construction of the Disputed Terms</u>

### 1. Non-Means-Plus-Function Terms

Claim 1 of the '247 Patent, which sets forth most of the standard claim terms at issue, recites:

> A message publishing system (MPS) operative to process a **message** from a sender in a **first format**, comprising:
> a **central processor**;
> at least one sender account;
> at least one storage area configured to store at least a first portion of the message;
> and software executing in the central processor to configure the processor so as to:
> identify the sender of the message as an authorized sender based on information associated with the message in comparison to data in the sender account, **wherein the identification is dependent upon the first format**;
> convert at least a second portion of the message from the first format to a **second format**;

and publish the converted second portion of the message so as to be viewable in the second format only if the sender has been identified as an authorized sender.

('247 Patent at 43:47–64 (emphasis added).)

a. Stipulated Constructions

The parties have stipulated to the constructions of "message" and "security scheme"/"identification"/"identifying step is dependent upon the [first] format [of the message]." The patents' claims and specifications support the agreed-upon constructions. Accordingly, the Court construes "message" as "information, data, or content the sender wishes to publish on the Internet"; and "security scheme"/"identification"/"identifying step is dependent upon the [first] format [of the message]" as "the identification or security scheme applied is selected from a plurality of identification or security schemes based on the [first] format of the message." Thus, for example, "wherein the identification is dependent upon the first format" in the '247 Patent reads: "wherein the identification or security scheme applied is selected from a plurality of identification or security schemes based on the first format of the information, data, or content that the sender wishes to publish on the Internet."

b. "format"/"format of said message" ('030 Patent Claims 1, 17; '606 Patent Claims 1, 18; '247 Patent Claim 1; '658 Patent Claim 1; '372 Patent Claim 1)

| EasyWeb's Proposed Construction | Twitter's Proposed Construction |
|---|---|
| message encoding | message encoding that determines how the message is reviewed |

Every asserted independent claim recites that the identification (or security scheme) depends on the "format" of the "message" (the "information, data, or content that the sender wishes to publish on the Internet"). (*E.g.*, '030 Patent at 45:17–18; '372 Patent at 43:47–59.) The construction of "format" is at the heart of the parties' dispute. They agree that "format" is "message encoding," but they dispute the scope of "message encoding." According to Twitter, "format" should be construed as "message encoding that determines how the message is reviewed." (Twitter Markman Brief, at 7–8 (explaining that a PDF file and a DOC file are in different formats because the former is encoded in a way that requires a PDF reader to decode it, while the latter requires a word processor).) EasyWeb contends that "message encoding" includes the file format (*e.g.*, text, jpeg, wav, tif, gif, html) and the transmission protocol (*e.g.*, HTTP), which itself includes the transport encoding and transmission headers—information that accompanies a message and identifies its sender, such as the source and destination. (EasyWeb Markman Brief, at 21–22; *see* EasyWeb Markman Reply, at 2 ("'[M]essage encoding' includes both how the message is transported (e.g., the protocol, transmission headers, transport encoding, etc.) and how the message is reviewed (e.g., the file format).").) Thus, according to EasyWeb, messages with the same content are in different "formats" if they are accompanied by different identification information, are transmitted through different mediums, or both. Applying the principles set forth by the Federal Circuit, the Court finds no support for EasyWeb's construction. Instead, EasyWeb is attempting

to rewrite the claims to cover Twitter's technology, which is impermissible.[5] *See, e.g.*, *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 908 (Fed. Cir. 2005) (holding that construction was flawed because it read "substantially flatted" as "flat," ignoring qualifier "substantially" and thus excluding defendant's product from claims).

As a linguistic matter, the "format" is the characteristic of the message that dictates the identification or security scheme in the first instance. Nothing in the claims implies that the identification scheme depends, even in part, on the format of "the message and any accompanying information." (*See, e.g.*, '030 Patent at 45:12–18 (reciting that the "means for identifying" the sender are "based on information associated with said message in comparison to data in the sender account," and "said security scheme is dependent upon the format of said message").) Nor does anything imply that the "format of the message" depends on the identification scheme or the non-"format" information.[6] Notably, EasyWeb never explains how the *data* in a transmission header, such as the message's sender or recipient, constitutes *encoding* of data. It is implausible to conclude that otherwise identical messages that use the same transport encodings are in different "formats" simply because, for instance, the sender or recipient are distinct, especially because ID signals can be practically anything and can be sent at any time.[7] (*See id.* at 14:9–17 ("Any information accompanying, associated, attached or within a message may be used by the system to identify the sender of a message as a valid user. Additionally, different ID info can be received by the MPS at different times.").) Limiting "format" to the "message encoding that determines how the message is reviewed" also would be consistent with the technical definition of "format" in the 1990s: "a specified arrangement of such things as characters, fields, and lines, usually used for displays, printouts, or files." (1993 IBM Dictionary of Computing, Novikov Decl. Ex. 38, at TWITTER041707.)

The specification supports Twitter's construction. For instance, it teaches that "[a]fter a message is received by the system, it is typically converted into a format compatible to the way it will be reviewed." (*Id.* at 25:53–55.) The sole passage to use the term "format of the message"

---

[5] EasyWeb contends that Twitter impermissibly imports limitations from the specification into the claim term. As discussed *infra*, the Court disagrees. EasyWeb's position also demonstrates why the Court must define the scope of "message encoding." Defining "format" as "message encoding" alone removes no ambiguity in the claim terms, and the Court cannot defer to a jury's definition of "message encoding." *See Markman*, 517 U.S. at 372.

[6] This makes intuitive sense. Different message "formats" may require different transmission protocols (*e.g.*, a telephone call cannot be sent via email), which could affect other information associated with the message. However, the user, not the system, chooses the "format" and message type in the first instance.

[7] EasyWeb's reliance on Claim 4 of the '247 Patent is unpersuasive. Claim 4 recites the system of Claim 1, "wherein the information associated with the message that is used by the software to identify the sender is further dependent upon a protocol of the first network." ('247 Patent at 44:3–7.) That ID information may be "further dependent" on the network protocol does not mean that the "protocol of the first network" is an element of the "format." Further, that Claim 4 exists demonstrates that a message's "format" is distinct from the transmission protocol by which the message is sent. EasyWeb's construction would make Claim 4 superfluous. Even EasyWeb's expert, Dr. Nathaniel Polish ("Polish"), agrees that the transport encoding is not part of the message's "format." (*See* Polish Dep. at 101:22–102:15, Novikov MSJ Decl. Ex. 4 ("Q. Using that definition of transfer encoding [encoding as part of transporting data from one place to another], do you consider transfer encoding that is applied to a message to be part of a message's format? A. I think we covered something very close to that this morning where I think I was saying that the encodings that are done as part of transport and that are then undone on the other side, from the point of view that we are interested in in this analysis, that those don't come into the equation." (objection omitted)).)

states: "Additional information accompanying the message such as the header, packet data, data descriptors, and the *actual format of the message* can also be used to determine the type of message. For example, if an email attachment is named 'TEST.JPG', the attachment is a JPEG image file." (*Id.* at 17:48–53 (emphasis added).) This disassociates the other "additional information" from "the actual format of the message," indicating that the Court should not combine them when construing the claims. *See Autogiro Co. of Am. v. United States*, 384 F.2d 391, 397 (Ct. Cl. 1967) ("[W]ords must be used in the same way in both the claims and the specification."). In addition, the specification teaches that "[i]n a main aspect, the system allows a user to publish a message in its *native format*." ('030 Patent at 8:49–54 (emphasis added).) The transmission protocol is not mentioned. Repeatedly, in fact, the specification uses "format" to refer to encoding that determines how a message is reviewed—not the content of the message or its transmission protocol and headers. (*See, e.g., id.* at 17:39–53 (identifying a "format of the message" as a "JPEG image file"); *id.* at 16:6–8 (referring to "a paging format such as XIO/TAP that is recognized by the paging system"); *id.* at 19:45–49 ("Another audio option may include prompting the user to select whether the published audio message should be in a WAV format, a Real Audio format, or in both formats by creating two separate files of the same message."); *id.* at 25:60–64 ("Converting the message into a common format ensures that the message can be reviewed by a wide range of programs and devices. For example, it is preferred to convert each page of a fax message into a GIF compatible image file."); *id.* at 36:23–27 ("Further, instead of GIF, the facsimile messages may be converted into JPEG, JPEG 2000, BMP, PCX, PIF, PNG . . ., SVG . . ., HTML, ASP or any other suitable type of file format.").)

EasyWeb argues that Twitter's construction improperly limits "format" to preferred embodiments that use the term "file format." (EasyWeb Markman Brief, at 22–23.) Citing Claim 3 of the '247 Patent, which recites, "The MPS of claim 1, wherein the first format comprises the message type" ('247 Patent at 44:1–2), and a disclosure in the specification that "each message type (sound, image, text, etc.) has its own preferred conversion method and file format" (*id.* at 25:32–33), [8] EasyWeb contends that "while the specification may use 'format' as a shorthand for 'file format' in those paragraphs where it unambiguously discusses conversion of file formats, the claim term 'format' is broader than just 'file format.'" (EasyWeb Markman Brief, at 23.)

The Court finds that the patents use "format" and "file format" interchangeably and never associate the transmission protocol with the message encoding. That the message "format" can comprise the message type does not that mean the "format" includes or is affected by the transport encoding or transmission headers. (*Accord* Twitter Markman Brief, at 4–5 (explaining that a fax machine stores data (a message) in the format dictated by an international standard called T.4, and then, the message is encoded into a transport format to be sent to the receiving machine, where it is again stored as an image in the T.4 format (citation omitted)); *see* Polish Dep. at 101:22–102:15 (stating that encodings done as part of transport "don't come into the equation").) Instead, it shows that each message type "has its own preferred conversion method and file format" ('247 Patent at 25:32–33) and that the "format" can determine the "type" irrespective of the additional information associated with the message. EasyWeb's construction also ascribes inconsistent meanings to "format" when it is used in the phrase "first format" compared to the phrase "second format."

[8] Other dependent claims recite that the "first format" can comprise an email ('247 Patent at 46:48–49) and that the message can be a text message (*id.* at 44:28–29). It is unclear whether "text message" refers to an SMS.

Specifically, Claim 1 of the '030 Patent recites that the system comprises, *inter alia*, "means for converting said message from first format to second format." ('030 Patent at 45:19–20.) Dependent Claim 6 recites, "wherein message in said first format is in a non-webpage reviewable format and said converting means converts said non-webpage reviewable format into a webpage reviewable format." (*Id.* at 45:46–49.) Nothing suggests that the patents use "format" to mean one thing in the context of converting and publishing the message to the "second format," and something else in the context of identification or authentication of the sender while the message is in the "first format." EasyWeb renders everything but the file format irrelevant to the "second format." Therefore, the better construction is one that focuses on the format of what the user is interested in converting. (*Cf.* Polish Dep. at 15:7–12 ("[I]n the context of the EasyWeb patent, you're talking about something that receives messages in one format and they get converted to another format and then broadcast and it is the things that you would be interested in converting.").)

Accordingly, the Court construes "format" as "message encoding that determines how the message is reviewed." This comports with the term's ordinary meaning according to the customary understanding of a person of ordinary skill in the art who reads it in the context of the particular claim and the intrinsic record. *See Phillips*, 415 F.3d at 1313.

c. "first format" ('030 Patent Claims 1, 17; '606 Patent Claims 1, 8; '247 Patent Claim 1; '658 Patent Claim 1; '327 Patent Claim 1)

| EasyWeb's Proposed Construction | Twitter's Proposed Construction |
|---|---|
| Option 1: no construction necessary; use ordinary meaning<br><br>Option 2: a format that is different from a second format | a non-webpage-compatible format that is different from the format in which the message is posted to the Internet |

The asserted independent claims require that the MPS receive the message in a "first format." EasyWeb argues that no construction is necessary or that at most the Court should construe the term as "a format that is different from a second format," because construction would involve "little more than the application of the widely accepted meaning of [a] commonly understood" word. *Phillips*, 415 F.3d at 1314. Twitter counters that EasyWeb disregards the purpose of the invention, and that the claims and specification limit the "first format" to a "non-webpage-compatible" format because "Codignotto did not invent simply posting things on the Internet." (Twitter Markman Brief, at 15.) EasyWeb responds that the invention is not limited to publishing messages received in a non-web-reviewable format, because its goal is "to allow virtually any person or organization to easily publish a message on the Internet that can be simultaneously reviewed by a mass number of people from around the world." ('030 Patent at 4:36–39.) EasyWeb also asserts that Twitter's construction violates the doctrine of claim differentiation because, while Claim 1 of the '247 Patent requires that the message be in a "first format," Dependent Claim 24 adds the further limitation "wherein [the] message in the first format is in a non-web page reviewable format and the message in the second format is a web page reviewable format" ('247 Patent at 45:6–8). Thus, according to EasyWeb, the "presence of [that] dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315.

Converting a message's format is integral to the system. The claims either require conversion or recite that the message is received in a "first format," necessarily implying there will be a second. The parties also agree that the "second format" must be webpage reviewable and different from the "first format."[9] Therefore, construction is necessary because it is important to accurately distinguish between the two formats, and "first format" is ambiguous. Here, the claims and specification indicate that Codignotto contemplated the existence of a mixed-format message in the first instance, but they belie the possibility that a message is covered by the patents-in-suit where it is wholly webpage-compatible in the "first format." Thus, although "the interpretative process may not import limitations from the specification into the defining language of the claims," *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1357 (Fed. Cir. 2002), the claims and "the specification manifest[] a clear intent to limit the term by using it in a manner consistent with only a single meaning," *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir. 2011).

The asserted independent claims do not limit the "first format" to a non-webpage-reviewable format, and Claim 24 of the '247 Patent implies that the "first format" is broader than Twitter's proposal, Twitter's claim differentiation counterargument notwithstanding.[10]

Claim 1 of the '247 Patent recites in part that the central processor should be able to "convert at least a second portion of the message from the first format to a second format; and publish the converted second portion of the message so as to be viewable in the second format." ('247 Patent at 43:60–63.) The specification teaches that "[e]ven if a portion of a message doesn't undergo a conversion, the message in its entirety has." (*Id.* at 33:17–18.) It continues:

> For example, let's say a user attaches a GIF [webpage-compatible] image that they wish to publish to an email message. When the system publishes the email message, it may simply just create a webpage to host the attached image and not convert the image file at all. However, even though the image file was not converted, the overall message was converted from an email compatible format into a webpage

[9] There appears to be no material difference between "webpage compatible" and "webpage reviewable." In addition, the second portion of Claim 24 of the '247 Patent is redundant regardless of the Court's construction.

[10] As the Federal Circuit explained in *InterDigital Communications, LLC v. International Trade Commission*, 690 F.3d 1318 (Fed. Cir. 2012), "[t]he doctrine of claim differentiation is at its strongest in this type of case, 'where the limitation that is sought to be "read into" an independent claim already appears in a dependent claim.'" *Id.* at 1324 (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004)) (citing *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) ("Claim differentiation . . . is clearly applicable when there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, and that limitation is the only meaningful difference between the two claims.")). Although the doctrine is "a guide, not a rigid rule," especially with respect to independent claims, *Curtiss–Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006), the Federal Circuit has not foreclosed the possibility that the presumption can be overcome in situations involving independent and dependent claims. *See InterDigital*, 690 F.3d at 1324 (rejecting argument that presumption was overcome without foreclosing possibility that it could be overcome in situation involving independent and dependent claim); *Nystrom v. TREX Co.*, 424 F.3d 1136, 1144–45 (Fed. Cir. 2005) (A patentee is "not entitled to a claim construction divorced from the context of the written description and prosecution history."). Twitter puts forth a persuasive argument, but aspects of the patents-in-suit indicate that the presumption should not be overcome in this case. The Court's construction adequately addresses Twitter's concerns while remaining faithful to the claims and specifications.

Case: 16-2066 Document: 20 Page: 92 Filed: 08/02/2016

compatible format."

(*Id.* at 33:18–25.) EasyWeb does not explain why conversion would be necessary if the message is webpage reviewable in its entirety in the first instance. Why use the system in that case? In such a situation, the "essence" of the invention—to allow "virtually anyone to automatically create a new website . . . using just a telephone or fax machine" by converting the message into a format that could be published on the Internet (*id.* at 44:62–64)—falls away.[11] Conversion to a wholly webpage-compatible format thus is essential to the invention and must be reflected in the claim construction, because Codignotto wanted to obviate the need for web publishing software and specific technical knowledge to publish a message on the Internet. (*See id.* at 4:35–37.) To construe "first format" without considering this purpose would ignore the purported advantages of the claimed invention and sweep within its scope the problems it was intended to solve. *See LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1343–44 (Fed. Cir. 2005) ("While it is true that not every advantage of the invention must appear in every claim, it would be peculiar for the claims to cover prior art that suffers from precisely the same problems that the specification focuses on solving." (internal citation omitted)).

Therefore, although nothing justifies construing "first format" to include a message that is wholly reviewable on the Internet before it even interacts with the invented system, the patents contemplate that a message can have webpage-compatible aspects in the "first format." Accordingly, the Court construes "first format" as "a format that is not webpage-compatible at least in part and that is different from the format in which the message is posted to the Internet."

d. "second format"

| EasyWeb's Proposed Construction | Twitter's Proposed Construction |
|---|---|
| a format reviewable on the Internet that is different from the first format | a webpage-compatible format that is different from the first format |

The parties agree that "second format" should be construed in relation to "first format." Accordingly, for consistency with the construction of "first format," the Court construes "second format" as "a format that is wholly webpage-compatible and different from the first format."

e. "central processor" ('606 Patent Claim 18; '247 Patent Claim 1; '658 Patent Claim 1; '372 Patent Claim 1)

| EasyWeb's Proposed Construction | Twitter's Proposed Construction[12] |
|---|---|

[11] Codignotto even testified that systems where "you entered information, you post on a web page and you viewed [the information] on a webpage" are "the same format" and outside the scope of his invention, because his "invention allowed for submitting various different formats that converted to a web page or something else. Keeping it the same wasn't new." (Codignotto Dep. at 188:6–18.)

[12] In its letter addressing the impact of the Supreme Court's decision in *Alice*, Twitter states that "[i]n the interest of resolving this case cleanly, Twitter hereby stipulates to EasyWeb's construction of the key term 'central processor,' rendering the asserted claims unpatentable." (Twitter July 3 Post-*Alice* Letter, at 3.) The Court rejects this stipulation because, as set forth *infra*, the language in the patents-in-suit does not support EasyWeb's construction. In any event, even the Court adopted EasyWeb's construction of "central processor," the Court still would grant summary judgment

| | |
|---|---|
| Option 1: no construction necessary; use ordinary meaning<br><br>Option 2: one or more computers as part of a system | a computer or set of computers where each computer performs all the functions necessary for the MPS to process a message |

The asserted independent claims of the '247, '658, and '372 Patents explicitly require a "central processor" to perform specific functions. The parties agree that certain means-plus-function claims in the '606 and '030 Patents also require a "central processor." EasyWeb argues that no construction is necessary or that the Court should construe "central processor" as "one or more computers as part of a system." Twitter insists that the "central processor" limitation must be structural. The Court concludes that "central processor" must be construed because its ordinary meaning may not be obvious to a layperson. Nothing in the patents, however, justifies EasyWeb's broad construction, which would divorce the meaning of "central processor" from its structure and capabilities. Twitter's proposal, meanwhile, is too vague.

The "central processor" depicted in Figure 13 of the '247 Patent is a single unit connected to an "input/output" device and a single "Internet server." ('247 Patent at Fig. 13.) The specification discloses that "the central processor may comprise a number of computers or, more precisely, a number of microprocessors with each microprocessor handling a certain number of simultaneous incoming messages or requests." (*Id.* at 38:26–31.) Therefore, the "central processor" is hardware—a computer or set of computers. It also must have certain capabilities. For example, the system in the '247 Patent requires "software executing in the central processor to configure the processor so as to:" identify the sender of the message, convert at least a portion of the message from the first format to a second format, and publish the converted second portion of the message. (*Id.* at 43:53–64.) Claims 14 and 15 add the further limitations, "wherein the software configures the processor to publish the converted portion of the message so as to be accessible through the Internet at a particular URL or at a particular URL plus one or more paths," or "to be part of a web page accessible through the Internet at a URL that is associated with the sender's storage area." (*Id.* at 44:38–45.) The '247 Patent, therefore, contemplates that the "central processor" is capable of and used for performing all the functions necessary for the MPS to receive the message, identify the sender, and convert and publish the message.

Other patents-in-suit require less of the MPS. Claim 18 of the '606 Patent recites in part, "a central processor, wherein at least one of said means utilizes the central processor to perform its recited function." ('606 Patent at 46:28–30.) The said means are to receive a message, identify the sender, convert the message, and provide at least a portion of the message to at least one third party storage area. (*Id.* at 46:12–27.) The parties agree that the '030 Patent requires the central processor to at least receive the message, identify the sender, and send a user's published messages to a third party's web server. (*See* Twitter Markman Reply Appendix A.) The '658 Patent requires the central processor to at least receive the message and identify the sender. ('658 Patent at 43:57–62.) The '372 Patent requires the central processor to identify the sender and publish the portion

to Twitter on the infringement claim, and summary judgment to EasyWeb on the anticipation, obviousness, written description, and enablement invalidity defenses for the reasons set forth *infra*.

of the message so as to be viewable. ('372 Patent at 43:53–62.) Thus, "the functions necessary for the MPS to process a message" vary from patent to patent.[13]

Nevertheless, it strains logic and the language of the patents to conclude that a computer is part of the "central processor" if it performs at least one function required of the "central processor" to process a given message, while another computer performs another function. (Under EasyWeb's construction, if one claim requires a central processor to perform steps A and B, the central processor for purposes of that claim is the group of computers that perform steps A and B, even if only one set performs step A.) The specification never disclaims a distributed server architecture in which the several computers comprising a "central processor" each perform only a subset of the functions required by the claims. However, the specification explains that the number of computers within the "central processor" depends upon the desired capacity for the MPS. ('247 Patent at 37:52–59.) Thus, the central processor may comprise a number of computers when there are a large number of users and/or simultaneous requests. (*Id.* at 37:59–61.) In that case, the input/output device may route the incoming messages to an available computer in the processor. (*Id.* at 37:61–63.) Therefore, the purpose of having several computers is to assist in handling the demand for message-processing capacity, not to distribute the handling of each individual function to one computer or another. (*See id.* at 38:26–30 ("[T]he central processor may comprise a number of . . . microprocessors with each microprocessor handling a certain number of simultaneous incoming messages or requests."). If that were not so, then the term "central" would be superfluous; the qualifier could be removed and the claims would still require a computer system that performs the recited functions.[14] *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("Allowing a patentee to argue that physical structures and characteristics specifically described in a claim are merely superfluous would render the scope of the patent ambiguous, leaving examiners and the public to guess about which claim language the drafter deems necessary to his claimed invention and which language is merely superfluous, nonlimiting elaboration. For that reason, claims are interpreted with an eye toward giving effect to all terms in the claim."). The claim construction must reflect these structural principles.

Accordingly, the Court construes "central processor" as "a computer or set of computers, where one computer performs all the functions assigned to the central processor that are necessary for the MPS to process a given message." As explained *supra*, those assigned functions vary from patent to patent, and two processors cannot handle the same message.

---

[13] The specification confirms that each computer in the "central processor" must only be capable of and used for performing the functions required of the central processor in the claims. For instance, the specification explains that "[t]he central processor uses the various ID signals to identify the user sending the message and store the message in the appropriate storage area." ('247 Patent at 38:24–26.) It also discloses that an Internet server connected to the "central processor" can perform several of the MPS's claimed functions, such as retrieving unconverted messages stored by the central computer and converting them into the webpages. (*Id.* at 38:44–54; *see id.* at 34:58–35:12 (explaining that a message may stay in an unpublished or even unconverted format from the time it is received by the system to when it reaches the requesters' computer or reviewing device, and software on that device would then perform the publishing and/or conversion); *id.* at 40:23–25 ("[T]he MPS has been described as having the central processor for processing messages and the Internet Server 1360 for handling requests.").)

[14] Dr. Polish testified that, under EasyWeb's construction, it would be impossible to design a system in which any of the functions required by the claims were not performed by a "central processor." (Polish Dep. at 126–27.)

2. Means-Plus-Function Terms in the '030 and '606 Patents

The Court next construes the means-plus-function terms in the '030 and '606 Patents. The parties do not dispute the functions of the claims, only the structures.

a. Principles for Construction of Means-Plus-Function Limitations

35 U.S.C. § 112(f), formerly ¶ 6, governs means-plus-function limitations. "A means-plus-function limitation recites a function to be performed rather than definite structure or materials for performing that function." *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003). "In exchange for using this form of claiming, the patent specification must disclose with sufficient particularity the corresponding structure for performing the claimed function and clearly link that structure to the function." *Triton Tech. of Texas, LLC v. Nintendo of Am., Inc.*, 753 F.3d 1375, 1378 (Fed. Cir. 2014) (citing *Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1379 (Fed. Cir. 2013)); *see also Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1317 (Fed. Cir. 2013) ("The trade-off for allowing such claiming is that 'the specification must contain sufficient descriptive text by which a person of skill in the field of the invention would know and understand what structure corresponds to the means limitation.'" (quoting *Typhoon Touch Tech., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1383–84 (Fed. Cir. 2011))). "Such a limitation must be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." *Lockheed Martin*, 324 F.3d at 1318 (citing 35 U.S.C. § 112, ¶ 6). This rule "confines the breadth of protection otherwise permitted by purely functional claiming." *Noah Sys., Inc. v. Intuit, Inc.*, 675 F.3d 1302, 1318 (Fed. Cir. 2012) (internal quotation marks and citation omitted); *see Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009) ("That ordinarily skilled artisans could carry out the recited function in a variety of ways is precisely why claims written in 'means-plus-function' form must disclose the particular structure that is used to perform the recited function.").

To construe a means-plus-function limitation, the court must first identify and construe the claimed function, and then identify the corresponding structure that performs that function. *Lockheed Martin*, 324 F.3d at 1318–20. The function of a means-plus-function claim must be construed to include the limitations contained in the claim language. *Id.* at 1319. "In identifying the function of a means-plus-function claim, a claimed function may not be improperly narrowed or limited beyond the scope of the claim language." *Id.* At the same time, however, "neither may the function be improperly broadened by ignoring the clear limitations contained in the claim language." *Id.* The court should use ordinary principles of claim construction to construe the meaning of the words used to describe the claimed function. *Id.*

In identifying the structure of a means-plus-function limitation, claim elements are construed to cover (1) the structure or material disclosed in the patent's specification that perform the claimed function and (2) equivalents of that disclosed structure or material. *See, e.g.*, *Versa Corp. v. Ag–Bag Int'l Ltd.*, 392 F.3d 1325, 1329 (Fed. Cir. 2004). Thus, the court may construe the claim limitation to "encompass only the disclosed structure and its equivalents." *Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 863 (Fed. Cir. 1991). On the other hand, the "court may not import into the claim features that are unnecessary to perform the claimed function." *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352 (Fed. Cir. 2003). "When multiple embodiments in the specification correspond to the claimed function, proper application of § 112,

¶ 6 generally reads the claim element to embrace each of those embodiments." *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). In addition, multiple claimed functions can share the same corresponding structure or structures. *Intellectual Prop. Dev., Inc. v. UA–Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1320 n.9 (Fed. Cir. 2003). Structural equivalence is met "only if the differences are insubstantial; that is, if the assertedly equivalent structure performs the claimed function in substantially the same way to achieve substantially the same result as the corresponding structure described in the specification." *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999) (internal citation omitted).

b. Exemplary Language and General-Purpose Computers

Two fundamental shortcomings recur in EasyWeb's proposed constructions.

First, EasyWeb repeatedly uses non-limiting language in its proposed constructions (*e.g.*, "software, such as . . .") because it believes the identified structures are "exemplary." Means-plus-function claims are limited to the particular structures the specification describes as performing the recited function (and their statutory equivalents), even if a person of ordinary skill in the art would know what other structures could be employed to perform the function. *E.g.*, *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364 (Fed. Cir. 2012) ("Under § 112 ¶ 6, a patentee is only entitled to 'corresponding structure . . . *described in the specification* and equivalents thereof,' not any device capable of performing the function." (quoting 35 U.S.C. § 112 ¶ 6); *see Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211–12 (Fed. Cir. 2003) (reversing denial of JMOL of noninfringement after ruling that district court erred in including software as corresponding structure for "converting means" limitation, even though one of skill in the art would know how to use the software to perform the function); *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999) (explaining that the knowledge of one of skill in the art may be used to "understand what structure(s) the specification discloses," not to fill in gaps in the disclosure). For instance, "[i]f a patentee chooses to disclose a single embodiment, then any means-plus-function claim limitation will be limited to the single disclosed structure and equivalents thereof." *Metter-Toledo, Inc. v. B-Tek Scales, Inc.*, 671 F.3d 1291, 1296 (Fed. Cir. 2012); *see, e.g.*, *Nomos Corp. v. Brainlab USA, Inc.*, 357 F.3d 1364, 1368 (Fed. Cir. 2004) ("The patent states 'that the means for generating the ultrasound image may be an ultrasound probe, *including* a means for mounting the ultrasound probe to a radiation therapy device.' This language indicates that the invention envisioned and claimed by the applicant included a fixation device that secures the probe to the treatment table. This is the only embodiment of the invention described in the '026 patent. As a result, the corresponding structure is limited to that embodiment, which includes a fixation device, and its equivalents." (internal citation omitted)). Thus, EasyWeb's constructions are not saved by its identification of open-ended structures that "include" but are not limited to the patents' disclosures. Therefore, unless justified by the specification, the Court disregards any exemplary language in EasyWeb's proposed constructions.

Second, EasyWeb's structures frequently recite a general-purpose computer or software, without describing "how the computer [or software] performs the claimed function." *Blackboard*, 574 F.3d at 1384; *see Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340–41 (Fed. Cir. 2008) ("Simply reciting 'software' without providing some detail about the means to accomplish

the function is not enough" to make claims definite.). Where there is a "special purpose computer-implemented means-plus-function limitation," the structure disclosed in the specification must be "'more than simply a general purpose computer or microprocessor.'" *Noah Sys.*, 675 F.3d at 1312 (quoting *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008)). The specification must "'disclose an algorithm for performing the claimed function.'" *Id.* (quoting *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008)); *see Triton Tech*, 753 F.3d at 1378 ("If the function is performed by a general purpose computer or microprocessor, then the specification must also disclose the algorithm that the computer performs to accomplish that function."); *Aristocrat*, 521 F.3d at 1333 (stating that where the disclosed structure is a computer programmed to carry out an algorithm, the disclosed structure is "'the special purpose computer programmed to perform the disclosed algorithm'" (quoting *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999))). The specification can express the algorithm—"a fixed step-by-step procedure accomplishing a given result," *Typhoon Touch*, 659 F.3d at 1385 (citation and internal quotation marks omitted)—"in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Finisar*, 523 F.3d at 1340 (internal citation omitted). Simply reciting software, however, "without providing some detail about the means to accomplish the function," is insufficient. 523 F.3d at 1340–41 (citation omitted). Failure to disclose an adequate structure for a computer-implemented means-plus-function term renders the claim indefinite. *See, e.g.*, *Noah Sys.*, 675 F.3d at 1311–12, 1318–19.

EasyWeb relies on a narrow exception to the algorithm requirement for computer-implemented means-plus-function limitations: when the claimed function can be accomplished by "merely plugging in a general-purpose computer" and does not require special programming. *Ergo Licensing*, 673 F.3d at 1365 ("It is only in the rare circumstances where any general-purpose computer without special programming can perform the function that the cited algorithm need not be disclosed."). In *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303 (Fed. Cir. 2011), the Federal Circuit, focusing on the functions of "processing," "receiving," and "storing" data, held that it is "not necessary to disclose more structure than the general purpose processor" if the function in question "can be achieved by any general-purpose computer without special programming." *Id.* at 1316. In contrast, claims reciting a "processing means . . . for receiving customer number data entered by a caller and for storing the customer number data . . . and based on a condition coupling an incoming call to the operator terminal, the processing means visually displaying the customer number data" were indefinite because no algorithm was disclosed that informed the public "as to the way Katz's invention conditionally couples calls." *Id.* at 1315.

EasyWeb's reliance on *Katz* is unpersuasive. EasyWeb incorrectly assumes that the Court has adopted EasyWeb's construction of "central processor." The Court's construction, on the other hand, recognizes that the functions performed by the central processor are interconnected, weighing against a conclusion that they can be performed by "merely plugging in a general-purpose computer." *Ergo Licensing*, 673 F.3d at 1365. Moreover, as discussed *infra*, the specification describes functions that cannot be accomplished without a computer with special programming, such as receiving messages from a fax or telephone call. *Katz* does not give EasyWeb license to ignore the structure that the specification actually discloses in its claim constructions. *See WMS Gaming*, 184 F.3d at 1348 ("The structure of a microprocessor programmed to carry out an algorithm is limited by the disclosed algorithm.").

c. "means for receiving a message over a network from a sender of said message" ('030 Patent Claims 1, 7; '606 Patent Claims 1, 18)

| EasyWeb's Proposed Construction | Twitter's Proposed Construction |
|---|---|
| Structure: a central processor connected to the Internet or the public switched telephone network | Structure 1: (1) a central processor connected to a network that identifies a user and receives and stores messages for that user, where the messages are received over the network directly from a sender, rather than from an intermediary, and where the messages are received via fax and telephone call over a public switched telephone network or via email over the Internet; and (2) an input/output device that routes data back and forth between an open port of the central processor and either the telephone network or the Internet.<br><br>Structure 2: a central processor that receives messages via fax, phone call, email, or the Internet Printing Protocol |

The claimed function is "to receive a message over a network from a sender of said message." The parties dispute whether the corresponding structure must include how the message is received. EasyWeb, relying on *Katz*, argues that a general-purpose computer can perform the recited function. Twitter counters that the structure must include how the message is received because the specification only discloses receiving messages via email, fax, telephone call, and the Internet Printing Protocol ("IPP").

In the abstract, EasyWeb's construction is correct. The specification provides that the central processor receives the incoming message over the network ('030 Patent at 5:46–51), and, as drafted, the claimed "receiving" function is a basic function of a general-purpose processor. *See Katz*, 639 F.3d at 1316. The problem is that the specification only teaches receiving messages via fax, telephone call, email, or the IPP. (*See* '030 Patent at 39:4–30.) Nothing suggests that receiving messages from the non-email sources is coextensive with the structure of a general-purpose computer. *Compare Asentinel LLC v. Cass Info. Sys., Inc.*, 10-2706-ML/P, 2012 WL 1097337, at *12–14 (W.D. Tenn. Feb. 17, 2012) *report and recommendation adopted*, No. 2:10-CV-02706-JPM, 2012 WL 1097336 (W.D. Tenn. Mar. 30, 2012) (reasoning that claim element reciting "means for importing telecommunications invoices," where function was construed as "to receive (as in data)," required disclosure of specific algorithm explaining "*how* the software performs the function of receiving data"), *with e-LYNXX Corp. v. Innerworkings, Inc.*, 1:10-CV-2535, 2012 WL 4484921, at *19–20 (M.D. Pa. Sept. 27, 2012) *aff'd sub nom. E-Lynxx Corpo. v. InnerWorkings, Inc.*, 592 F. App'x 947 (Fed. Cir. 2015) (concluding that "receiving" an electronic communication is a function that may be performed by any general purpose computer and required no specific algorithm, but functions related to the organization and association of vendors with buyers required the disclosure of an algorithm because vendor data could be organized according to myriad

criteria). Thus, despite the agreed-upon "receiving" function, this cannot be one of those "rare circumstances" in which the recited function requires nothing more than "plugging in a general-purpose computer." *Ergo*, 673 F.3d at 1364–65. This particularly is true because the enumerated transmission methods were critical to overcoming the perceived shortcomings of the prior art. *See Typhoon Touch*, 659 F.3d at 1385 ("[T]he amount of detail that must be included in the specification depends on the subject matter that is described and its role in the invention as a whole."); *Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 889 F. Supp. 2d 677, 690–91 (D.N.J. 2012) *aff'd*, 732 F.3d 1376 (Fed. Cir. 2013) (reasoning that where the recited function is central to the claimed invention, "the algorithm corresponding to this function must be disclosed with significant detail").

Accordingly, the corresponding structure is "a central processor that receives messages via fax, telephone call, email, or the Internet Printing Protocol," which describes how the central processor is programmed to perform the receiving function.

d. "means for identifying said sender of said message as an authorized sender" ('030 Patent Claims 1, 17; '606 Patent Claims 1, 18)

| EasyWeb's Proposed Construction | Twitter's Proposed Construction |
| --- | --- |
| <u>Structure</u>: a central processor that uses identification ("ID") signals to identify a sender by doing a lookup for the account associated with the ID signal, such ID signals including: caller ID signal, fax terminal ID, DTMF ID tones, caller number ID signal describing the number that is being called, source or destination information from the packets of digital data sent over the Internet, data contained in IP packets, barcodes or other optically readable ID contained within a message itself, text within an email message or name of an attachment to an email message, time and date associated with a message, passcode and user account ID, digital signatures, or encryption | <u>Structure</u>: a central processor that receives messages via fax, telephone call, email, or the Internet Printing Protocol (IPP), and that uses a caller ID signal, DTMF tones, the called number ID signal, email headers, or data in fax packets or IPP packets, or optical or speech recognition technology to identify a user. |

The claimed function is "to identify said sender of said message as an authorized sender based on information associated with the message in comparison to the data in the sender account." EasyWeb argues that because "any general purpose processor can perform a lookup or comparison of the ID signals it receives to those it has stored, the linked structure for this function is properly a central processor that is able to process that information." (EasyWeb Markman Reply, at 17.) Twitter believes the corresponding structure must be more limited. The parties also disagree as to the specific ID signals disclosed in the specification.

EasyWeb's construction suffers from the aforementioned shortcomings. First, there is no evidence that a general-purpose computer can use ID signals to identify an authorized user without

special programming. The claimed function is more complex than the "processing" function in *Katz*. *See* 639 F.3d at 1315–17. Second, the Court must limit the claims to the structure identified in the specification, and equivalents. *Noah Sys.*, 675 F.3d at 1318. The specification discloses algorithms for identifying senders of emails, faxes, telephone calls, and IPP print jobs, which underscores the need to clarify the source of the messages. These include caller ID signals ('030 Patent at 11:10–26), DTMF tones (*id.* at 11:40–45), the called number ID signal (*id.* at 11:58–12:16), barcodes or another optically readable ID in a message (*id.* at 12:52–55), email headers, text within an email or the name of an attachment to an email (*id.* at 12:61–62), fax terminal ID (*id.* at 14:21–24), digital signatures (*id.* at 32:48–50), speech recognition technology (*id.* at 12:62–13:3), and a passcode and user account ID (*id.* at 13:58–60). EasyWeb, however, includes signals that the specification does not disclose, such as "data contained in IP packets" and "source and destination information from packets of data sent over the Internet." The portions of the specification EasyWeb relies on actually disclose using the source and destination information from the packets of data making up a fax or voice and video communication (*id.* at 12:17–40) and using data contained in IP packets of an IPP print job (*id.* at 12:48–50). In addition, encryption is used to secure a message, not identify a sender. (*See id.* at 32:48–50 ("[E]ncryption can be used so only the indented recipient can read the email message.").) In addition, the specification describes using cookies as a means to save a reviewer's preferences only, not as an ID signal. (*Id.* at 25:30–52.)

Accordingly, the corresponding structure is "a central processor that, after receiving a message via tax, telephone call, email, or the Internet Printing Protocol (IPP), identifies the sender using a caller ID signal, DTMF tones, the called number ID signal, email headers, text within an email message or name of an attachment to an email message, fax terminal ID, digital signatures, data in fax packets or IPP packets, or optical or speech recognition technology."[15]

e. "means for converting said message from said first format to a second format" ('030 Patent Claims 1, 17; '606 Patent Claims 1, 18)

| EasyWeb's Proposed Construction | Twitter's Proposed Construction |
|---|---|
| <u>Structure</u>: a network server using software, such as virtual printer drivers, optical recognition programs, speech recognition technology, Active Server Pages and CGI, and fax-gateway devices, that converts fax, text, image, video, audio, or email information into webpage formats including Standard Generalized Mark-Up Language such as the HTML, XML, and DHTML. | <u>Structure</u>: software running on the Internet server that converts fax, telephone call, email, or Internet Printing Protocol-transmitted messages from a non-webpage-reviewable format into a webpage-reviewable format by processing images, video, or audio contained in the message, and rendering the images, video or audio in a format publishable on a webpage by using optical character recognition, speech recognition, or audio, video, or image conversion software |

[15] This construction slightly modifies Twitter's proposal, but it includes the only message types whose senders the specification teaches how to identify. Any inadvertent omission by the Court of a particular identification algorithm is not material to the infringement and invalidity issues pending before the Court.

The claimed function is "to convert said message from said first format to a second format"; that the corresponding structure requires software; and that the software processes text, image, video, or audio. The parties dispute the construction of "first format," which must be "not webpage-compatible at least in part." The parties also dispute what algorithms are disclosed for converting to the second format, and whether the software should be limited to those algorithms. First, EasyWeb's "exemplary" claiming of conversion methods is improper. *See, e.g.*, *Noah Sys.*, 675 F.3d at 1318. Second, EasyWeb, citing *Medical Instrumentation*, argues that the proper linked structure is "software running on the network server" because "the types of formats are not structures to be limited based on § 112 ¶ 6" because "one of ordinary skill in the art would know what programs to use to convert the message format from fax, text, image, video, audio, or email messages into webpage formats." (EasyWeb Markman Brief, at 14.) The Court disagrees.

In *Medical Instrumentation and Diagnostics Corporation v. Elekta AB*, the alleged infringer argued that the district court improperly included software for digital-to-digital conversion as corresponding structure for the claimed "converting means." Medical Instrumentation's expert never pointed to any disclosure of structure for digital-to-digital conversion in the specification; he explained that such conversion was not disclosed or discussed in the specification presumably because it was well-known in the art and required no explanation. 344 F.3d 1205, 1212 (Fed. Cir. 2003). The Federal Circuit held that the district court erred in identifying software as a corresponding structure, because "[t]here is nothing in the specification or prosecution history that clearly links or associates software with the function of converting images into a selected format." *Id.* at 1211. The court emphasized that the "correct inquiry is to look at the *disclosure* of the patent and determine if one of skill in the art would have understood that *disclosure* to encompass software for digital-to-digital conversion and been able to implement such a program, not simply whether one of skill in the art would have been able to write such a software program. "*Id.* at 1212 (citations omitted); *see also id.* at 1313–14 ("[W]e have been generous in finding something to be a corresponding structure when the specification contained a generic reference to structure that would be known to those in the art and that structure was clearly associated with performance of the claimed function.").

Relatedly, in *Biomedino, LLC v. Waters Technologies Corp.*, the Federal Circuit considered whether a means-plus-function claim involving control means for operating valves disclosed sufficient structure when the specification stated that this function could be performed using known methods and equipment. 490 F.3d 946, 950–51 (Fed. Cir. 2007). The patentee argued that prior art established specific ways to operate the valves, and that a person skilled in the art would identify these prior art structures by way of the "known methods" reference. *Id.* at 951. The Federal Circuit disagreed, finding that the reference to "known methods" cannot satisfy the means-plus-function requirement that there be "corresponding structure . . . described in the specification." *Id.* at 953 (quoting 35 U.S.C. § 112, ¶ 6). The court distinguished *Atmel*, where it held that a structure was sufficiently disclosed when the specification referenced "known . . . techniques" for accomplishing a certain function and then immediately referenced an article that, according to an expert, indicated to persons skilled in the art "the precise structure of the means recited in the specification." *Id.* at 952 (citing *Atmel*, 198 F.3d at 1382). The *Biomedino* court noted the "significant difference" between a patent specification that expressly included an article describing a structure for accomplishing the known technique and a patent specification that merely referenced that "known techniques or methods can be used." *Id.* at 952–53.

Therefore, *Biomedino* and *Medical Instrumentation* simply teach that the corresponding structure of a means-plus-function limitation must be adequately disclosed in the specification in order for the claim to not be indefinite. The disclosure can be supported by expert testimony, and the specification is interpreted as read by one of skill in the art. *Accord Function Media*, 708 F.3d at 1318–19 (affirming judgment of indefiniteness for claim reciting a "means for transmitting" where the parties agreed that the means software, but the specification never explained how the specific software performs the transmission function, and rejecting any reliance on knowledge of one of skill in the art "to fill in the gaps"); *DE Techs., Inc. v. Dell, Inc.*, 428 F. Supp. 2d 512, 520 n.4 (W.D. Va. 2006) ("*Medical Instrumentation*, in combination with *Harris*, requires that 'software' must at least be identified as software known to those of skill in the art in the specification." (internal quotation marks and citations omitted)). Twitter does not contend that the specification here does not at least suggest that software programs known to those of skill in the art can perform the first-to-second format conversion.

Nevertheless, that the means-plus-function claims may not be indefinite does not mean their structure can still be boundless. The Federal Circuit has not held that the knowledge of one of skill in the art excuses a court from construing a corresponding structure to encompass only the disclosed structure and its equivalents. *Cf. SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 878 (Fed. Cir. 2004) ("Method and apparatus claims not written in means-plus-function format are not necessarily limited to that disclosed in the specification but rather are defined by the language of the claims themselves."); *Alitiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1376 (Fed. Cir. 2003) ("[M]erely pointing out that the relevant structure is software rather than hardware is insufficient. As stated above, because 'commands' (*i.e.*, software) is so broad as to give little indication of the particular structure used here and is described only functionally, one must still look to the specification for an adequate understanding of the structure of that software."); *WMS Gaming*, 184 F.3d at 1348–49 (overruling district court's finding that corresponding structure disclosed in specification was an "algorithm executed by a computer" and finding that the structure disclosed for the "means for assigning" limitation is a microprocessor programmed to perform the algorithm illustrated in one of the figures in the patent). EasyWeb's construction, which does not link the steps by which the software performs the conversion to the software itself, attempts to capture any possible software means for conversion. Section 112 is intended to prevent such pure functional claiming. *Aristocrat*, 521 F.3d at 1333.

Therefore, the type of message being converted, the type of software performing the conversion, and the steps the software takes must be reflected in the corresponding structure. The specification only teaches how to convert certain formats, and the disclosed conversion algorithms are specific to those formats. (*See, e.g.*, '030 Patent at Fig. 8 (fax conversion), 12:67–13:3 (telephone call into text).)[16] The specification does not disclose any algorithms (or software) that can be used to convert any type of message into a webpage-compatible format. Therefore, "a network server running software," standing alone, is not "clearly associated with performance of the claimed function." *Med. Instrumentation*, 344 F.3d at 1213–14. In addition, in the context of

[16] Several of EasyWeb's "exemplary" conversion methods are incorrect. The specification describes "Active Server Pages and CGI" as a means to publish messages, not convert them. (*See* '030 Patent at 35:41–47.) "Fax gateway devices" are used to convert fax images into packets of data capable of being transmitted over the Internet, and then back into a fax. (*See id.* at 12:20–25.) The format conversion occurs later.

the '030 and '606 Patents, an Internet server performs the conversion. Although the specification teaches that a "network server . . . converts the messages into one or more webpages" ('030 Patent at 5:51–53), and that "the Internet Server need not be connected to the Internet but may be connected to other types of networks," such as "a large private network . . . established for a large corporation" (*id.* at 40:22–26), the means-plus-function claims at issue claim an "Internet message publishing system," (*e.g.*, *id.* at 45:5). Comparatively, the '247 Patent claims a "Message Publishing System" without the Internet modifier.

Accordingly, the corresponding structure is "an Internet server that converts fax, telephone call, email, or Internet Printing Protocol-transmitted messages from a format that is non-webpage compatible at least in part into a wholly webpage-compatible format by processing text, images, video, or audio contained in the message, and rendering the text, images, video, or audio in a format publishable on a webpage by using optical character recognition, speech recognition, or text, audio, video, or image conversion software."

f. "means for storing said message in at least one storage area" ('030 Patent Claims 1, 17; '606 Patent Claim 1)

| EasyWeb's Proposed Construction | Twitter's Proposed Construction |
| --- | --- |
| Structure: a central processor or network server connected to a storage area, such as an Internet web server, a mail server, a database, a directory, or a disk directory | Structure 1: a central processor connected to an Internet server and to a disk directory or database<br><br>Structure 2: a central processor connected to a disk directory or database |

The claimed function is "to store said message in at least one storage area." EasyWeb's proposed structure is exemplary, while Twitter's is too narrow. The central processor and the network server can store messages. ('030 Patent at 38:59–61 (central processor); *id.* at 5:51–54 (providing, in the "Summary of the Invention," that in one aspect, "[a] network server retrieves the message from the storage area, converts the message into one or more webpages, and places the message in the storage area"). The "storage area" can be a "disk directory" or "database" (*id.* at 42:15–17), or the Internet server (*id.* at 36:36–40 ("Preferably, an Internet server is used for the storage area because it is perfectly suited for," among other things, "storing the message.")). The Internet server also can perform other functions, such as "retriev[ing] unconverted message files stored in the storage area by the central computer and convert[ing] the files into the appropriate webpages." (*Id.* at 39:53–57.) Contrary to EasyWeb's proposal, however, the "network mail server" is not a "storage area," but where messages are held before the receiving step is complete. (*See id.* at 10:52–56 ("An alternative destination that is on or always accessible is therefore needed to receive email messages when they are sent form a sender. Typically, this is the role of a network mail server.").) Therefore, it cannot be part of a post-receipt structure.

Accordingly, the corresponding structure is "a central processor or network server connected to a disk directory, database, or Internet server."

g. "means for receiving a request for at least a portion of said message from a requestor, said request being made over the Internet" ('030 Patent Claims 1, 17; '606 Patent Claim 1)

| EasyWeb's Proposed Construction | Twitter's Proposed Construction |
|---|---|
| Structure: a network server that receives a request for the message, such as a request for a Universal Resource Locator address or web address, over the Internet | Structure 1: an Internet server connected to a central processor that receives a request for the Universal Resource Locator associated with the published message via the user's hypertext web browser<br><br>Structure 2: an Internet server connected to a central processor that receives a request for the Universal Resource Locator associated with the published message |

The claimed function is "to receive a request for at least a portion of said message from a requestor, said request being made over the Internet." EasyWeb's proposed construction is exemplary, and it recites a general-purpose computer that parrots the claimed function. *See Keithley v. Homestore.com, Inc.*, 636 F. Supp. 2d 978, 991–93 (N.D. Cal. 2003) (reasoning that a "server" is equivalent to a general-purpose computer). The specification teaches one way of accomplishing the function: by receiving requests for the URL associated with the published message from a reviewer's hypertext browser. (*See* '030 Patent at 17:1–8 ("[T]he reviewer accesses, with a hypertext web browser, the Universal Resource Locator ('URL') associated with the published message. . . . The Internet server of the MPS receives the request for the message from the reviewer at step 320.").) Thus, the corresponding structure must be limited to that embodiment, and equivalents. *See, e.g.*, *Nomos*, 357 F.3d at 1367. In addition, while EasyWeb claims this function can be accomplished using a "network server," the server that receives a request for a message over the Internet must be connected to the Internet. A network server without that qualifier may not be able to perform the recited function. (*See* '030 Patent at 40:22–26.)

Accordingly, the corresponding structure is "an Internet server connected to a central processor that receives a request for the Universal Resource Locator associated with the published message."

h. "means for retrieving at least the portion of said message from said storage area, in response to receiving said request" ('030 Patent Claims 1, 17; '606 Patent Claim 1)

| EasyWeb's Proposed Construction | Twitter's Proposed Construction |
|---|---|
| Structure: a network server, such as an Internet server, that retrieves the message from a storage area in response to a request for the message, including requests by a unique ID | Structure: a central processor connected to an Internet server and to a disk directory or database that retrieves the message using a unique message ID |

The claimed function is "to retrieve at least the portion of said message from said storage area in response to receiving said request." EasyWeb's proposal is unpersuasive because it is exemplary and claims a general-purpose computer performing the claimed function. Twitter's

proposal must be modified in light of the Court's other claim constructions. First, the specification teaches that an Internet server connected to the central processor retrieves messages from a storage area in response to a request received over the Internet. (*See* '030 Patent at 38:3–4, 39:50–52 ("The Internet Server is connected to the central processor, such as through a local area network, and has access to the storage area."), 40:11–15, Fig. 13.) A network server is not enough. (*See id.* at 40:22–26.) Second, EasyWeb claims that "the unique ID limitation is not a proper restriction on the structure," because it "is not required for the recited function of retrieving the message." (EasyWeb Markman Brief, at 17.) The specification, however, only discloses retrieving messages using a unique message ID: the message's "Retrieval Address." ('030 Patent at 38:3–6.) Thus, when a requester requests the message by a unique ID, the system must retrieve the message from the storage area using that ID. The system has no other information about how to retrieve the message. Therefore, the Court must limit the corresponding structure; the Court cannot broadly construe the structure as retrieving the message in response to any type of request. *See Nomos*, 357 F.3d at 1368.

Accordingly, the corresponding structure is "an Internet server connected to a central processor that retrieves the message using a unique message ID."

i. "means for sending at least the portion of said message to said requester over the Internet only if said sender has been identified as an authorized sender" ('030 Patent Claims 1, 17; '606 Patent Claim 1)

| EasyWeb's Proposed Construction | Twitter's Proposed Construction |
|---|---|
| Structure: an Internet server connected to the Internet | Structure 1: a central processor and Internet server connected to the Internet and a public switched telephone network that publishes the message using the algorithm disclosed in Fig. 3 of the specification<br><br>Structure 2: a central processor and Internet server connected to the Internet that publishes the message using the algorithm disclosed in Fig. 3 of the specification |

The claimed function is "to send at least a portion of said message to said requester over the Internet only if said sender has been identified as an authorized sender." EasyWeb's construction is inadequate on its face. It constitutes nothing more than a general-purpose computer performing the claimed function. *See, e.g., Keithley*, 636 F. Supp. 2d at 991–93; *see also Ergo*, 673 F.3d at 1363–64 (concluding that "recitation of 'control device' provides no more structure than the term 'control means' itself, rather it merely replaces the word 'means' with the generic term 'device'"). Further, the function of sending a message to a requester only after the sender is identified as an authorized sender requires special programming, not "merely plugging in a general-purpose computer." 673 F.3d at 1365. Here, the only identified algorithm for sending a

Case: 16-2066 Document: 20 Page: 106 Filed: 08/02/2016

message to a requester is disclosed in Figure 3 of the specification.[17] Pursuant to Figure 3, the Internet server receives the request for the message from the reviewer, and the system then checks to see if the requested message is scheduled to be reviewable. ('030 Patent at 16:55–17:9.) If the message is scheduled to be reviewable, the requested message is retrieved from the user's storage area. The system then will determine if the message is public or private and, if private, whether the reviewer is authorized to review the message. (*Id* at 17:18–37.) The specification does not indicate that the corresponding structure requires the central processor to be involved in the publishing of the message.

Accordingly, the corresponding structure is "an Internet server connected to the Internet that publishes the message using the algorithm disclosed in Fig. 3 of the specification."

j. "means for testing said received message for compliance with said security scheme" ('030 Patent Claim 1)

| EasyWeb's Proposed Construction | Twitter's Proposed Construction |
|---|---|
| Structure: a central processor that discards messages or terminates calls if they are not from a valid user, including where the system cannot identify the sender as an authorized user based on identification ("ID") signals | Structure: a central processor that receives messages via fax, phone, email, or the Internet Printing Protocol, and that uses a caller ID signal, DTMF tones, the called number ID signal, email headers, or data in fax packets or Internet Printing Protocol (IPP) packets, or optical or speech recognition technology to identify a user |

The claimed function is "to test said received message for compliance with said security scheme." Per the specification, the system tests for compliance with the security scheme by comparing the ID signals received with the message to the ID signals stored in the system to identify the user, similar to the algorithm for identifying the sender of a message as an authorized sender. (*See* '030 Patent at 10:65–13:50.) Thus, in the absence of a different disclosure in the specification, the Court adopts the same corresponding structure as for the "means for identifying" term: "a central processor that, after receiving a message via tax, telephone call, email, or the Internet Printing Protocol, identifies the sender using a caller ID signal, DTMF tones, the called number ID signal, email headers, text within an email message or name of an attachment to an email message, fax terminal ID, digital signatures, data in fax packets or Internet Printing Protocol packets, or optical or speech recognition technology."[18]

---

[17] That a person of ordinary skill in the art "would know how to use off-the-shelf software running on an operating system . . . to implement such application programs" (EasyWeb Markman Reply, at 27) does not mean that the patentee can avoid claiming a specific algorithm in this case. *See Med. Instrumentation*, 344 F.3d at 1213–14.

[18] This construction renders the "means for testing" element superfluous, but nothing in the specification distinguishes it from the "means for identifying" limitation. EasyWeb's structure also is not an adequate alternative; it only describes what happens after a message is tested: the central processor discards the message if it fails the test. This structure is insufficient because it fails to "describe[] how the function is performed," and instead "describes the outcome of performing the function." *Aristocrat*, 521 F.3d at 1334; *see also Encyclopaedia Britannica, Inc. v. Alpine Elecs., Inc.*, 355 F. App'x 389, 395 (Fed. Cir. 2009) ("At best, the specification . . . discloses only the functional result claimed by

k. "means for providing at least a portion of said message to at least one third party storage area only if said sender has been identified as an authorized sender" ('606 Patent Claim 18)

| EasyWeb's Proposed Construction | Twitter's Proposed Construction |
|---|---|
| Structure: a central processor that sends a user's published messages to a third party's web server using a protocol | Structure 1: a central processor that receives messages via fax, telephone call, email, or the Internet Printing Protocol, and that sends a user's published messages to a third party's web server using the FTP protocol, and that supplies a username and password to the third party server each time that a message is transferred to the third party server<br><br>Structure 2: a central processor that receives messages via fax, telephone call, email, or the Internet Printing Protocol, and that sends a user's published messages to a third party's web server using the FTP protocol, and that supplies a username and password to the third party server each time that a message is transferred to the third party server if the third party server requires a username and password before it will accept any files |

The parties agree that the claimed function is "to provide at least a portion of said message to at least one third party storage area only if said sender has been identified as an authorized sender." They also agree that the central processor must send the published messages. EasyWeb relies on *Katz* to avoid identifying anything beyond a "central processor" as the corresponding structure, and it uses exemplary language. That approach is, again, incorrect.

First, *Katz* does not apply whenever a claim requires "sending" data. In *Function Media*, the Federal Circuit held a claim reciting a "means for transmitting" invalid as indefinite because the specification failed to describe "how the software performs the transmission function." 708 F.3d at 1318 (noting that, at most, the "specification discloses that the structure behind the function of transmitting is a computer program that transmits"); *see also Personalized Media Commc'n, LLC v. Motorola, Inc.*, 2:08-CV-70-CE, 2011 WL 4591898, at *40–41 (E.D. Tex. Sept. 30, 2011) (rejecting application of *Katz* exception to functions of transferring information from a decoder to a processor and selecting receiving television programming from a receiver or storage device). Thus, the structure cannot be "'simply an abstraction that describes the function' to be performed." *Function Media*, 708 F.3d at 1318 (quoting *Blackboard*, 574 F.3d at 1383). Second, the specification only discloses one protocol for sending messages to a third party server: the FTP protocol. ('030 Patent at 42:63–66 ("The system could be configured to save the users' published messages to the third party's web server by sending the message to the third party server using a

---

this limitation. . . . Thus, Britannica's proposed one-step algorithm amounts to pure functional claiming, which does not comply with the disclosure requirement of § 112 ¶ 6.").

protocol such as FTP (file transfer protocol).").) The corresponding structure therefore is limited to structures using that protocol, and equivalents. *Lockheed Martin*, 324 F.3d at 1318. The specification also teaches that "[i]f the third party server requires a username and password before it will accept any files, the system could be figured to supply such info each time that a message file needs to be transferred to the third party server." ('030 Patent at 42:67–43:3.) The corresponding structure must reflect that disclosure as well.

Accordingly, the corresponding structure is "a central processor that receives messages via fax, telephone call, email, or the Internet Printing Protocol, and that sends a user's published messages to a third party's web server using the FTP protocol, and that supplies a username and password to the third party server each time that a message is transferred to the third party server if the third party server requires a username and password before it will accept any files."

#### l. Nature of the Claims in the '247 and '372 Patents

Twitter argues that the asserted claims of the '247 and '372 Patents are means-plus-function claims. Because this is immaterial to the Court's infringement and invalidity analyses, the Court need not determine the nature of the '247 and '372 Patents at this juncture.

## III. Motions for Summary Judgment

Having construed the relevant disputed claim terms, the Court now addresses the parties' summary judgment motions on the issues of invalidity and infringement. Throughout this analysis, the Court applies the pre-America Invents Act version of Title 35 of the U.S. Code.

### A. Standard of Review

The well settled standard for summary judgment under Federal Rule of Civil Procedure 56 applies in patent cases. *E.g.*, *Becton Dickinson & Co. v. C.R. Bard. Inc.*, 922 F.2d 792, 795–96 (Fed. Cir. 1990).[19] Pursuant to Rule 56(a), a court may grant a motion for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). The moving party bears the burden of showing that he is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored

---

[19] When deciding issues in a patent case, a district court applies the law of the circuit in which it sits to non-patent issues and the law of the Federal Circuit to issues of substantive patent law. *E.g.*, *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1368 (Fed. Cir. 1999); *Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 856 (Fed. Cir. 1999). A "procedural issue that is not itself a substantive patent law issue is nonetheless governed by Federal Circuit law if the issue 'pertain[s] to patent law,' if it 'bears an essential relationship to matters committed to [the Federal Circuit's] exclusive control by statute,' or if it 'clearly implicates the jurisprudential responsibilities of [the Federal Circuit] in a field within its exclusive jurisdiction.'" *Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1359 (Fed. Cir. 1999) (en banc) (internal citations omitted); *accord Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1303 (Fed. Cir. 2001) (The Federal Circuit "appl[ies] the law of the regional circuit to which the district court appeal normally lies unless 'the issue pertains to or is unique to patent law,' in which case [the Federal Circuit] will apply [its] own law to both substantive and procedural issues 'intimately involved in the substance of enforcement of the patent right.'" (quoting *Flex–Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1365 (Fed. Cir. 2001)).

information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties alone will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

### B. Invalidity of the Patents-in-Suit

The parties cross-move for summary judgment on Twitter's claim that the patents-in-suit are invalid, pursuant to 35 U.S.C. § 101, for claiming abstract ideas. As discussed below, the Court concludes that the inventive (and non-obvious) element in the claims—the format-based authentication—is not patentable, and thus, grants summary judgment to Twitter on its claim that the patents-in-suit are invalid.[20]

[20] Twitter also moves for summary judgment that the patents-in-suit are anticipated or rendered obvious by the DialWeb system and a patent issued to Gregg Freishtat ("Freishtat"), and lack a written description. EasyWeb cross-moves for partial summary judgment on those invalidity defenses, arguing that (1) numerous alleged prior art references are not prior art; (2) the claimed inventions are not anticipated under Twitter's claim constructions; and (3) Twitter's evidence of obviousness, lack of written description, and lack of enablement is insufficient as a matter of law. However, because the Court concludes that the patents-in-suit are invalid under § 101, the Court need not, and does not, reach Twitter's alternative arguments for invalidity. *See, e.g.*, *Exergen Corp. v. Thermomedics, Inc.*, No. CV 13-11243-DJC, 2015 WL 5579800, at *7 (D. Mass. Sept. 15, 2015) ("As the asserted claims are invalid under § 101, the Court need not reach Defendants' alternative arguments for invalidity on the grounds of anticipation and obviousness under §§ 102 and 103."); *Hemopet v. Hill's Pet Nutrition, Inc.*, No. CV-12-01908-JLS(JPRx), 2014 WL 10317302, at *3 (C.D. Cal. Nov. 24, 2014) *aff'd*, 617 F. App'x 997 (Fed. Cir. 2015) ("[B]ecause the Court finds that all four patents are invalid under 35 U.S.C. § 101, we need not address Defendant's § 102 and non-infringement

1. Legal Standard

"A patent shall be presumed valid," and "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282. An invalidity defense must be proven by clear and convincing evidence. *Microsoft Corp. v. i4i P'ship*, 131 S. Ct. 2238, 2242 (2011).

Under Section 101 of the Patent Act, the scope of patentable subject matter includes "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. §101. However, the Supreme Court has "long held that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (internal quotation marks and citation omitted); *see also Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012). In applying the Section 101 exceptions, courts "must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more," with only the latter being eligible for patent protection. *Alice*, 134 S. Ct. at 2354 (internal alterations and quotation marks omitted) (citing *Mayo*, 132 S. Ct. at 1303).

The Supreme Court has "set forth a framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Id.* at 2355; *see also Mayo*, 132 S. Ct. at 1296–97. In particular, the Court must follow the following framework:

> First, [the court] determine[s] whether the claims at issue are directed to one of those patent-ineligible concepts. If not, the claims pass muster under § 101. Then, in the second step, if [the court] determine[s] that the claims at issue are directed to one of those patent-ineligible concepts, [it] must determine whether the claims contain an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.

*Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714 (Fed. Cir. 2014) *cert. denied sub nom. Ultramercial, LLC v. WildTangent, Inc.*, 135 S. Ct. 2907 (2015) (internal quotation marks, citations, and alteration omitted); *see also DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1353 (Fed. Cir. 2014). In considering the second step of the analysis, a court must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S.Ct. at 1298, 1297); *see also buySAFE, Inc.*, 765 F.3d at 1353.

In the context of computer-implemented technology, the Supreme Court has cautioned that

arguments."); *Telebuyer, LLC v. Amazon.com, Inc.*, No. 2:13-CV-1677-BJR, 2015 WL 4493045, at *5 n.3 (W.D. Wash. July 23, 2015) ("Because this Court finds that these patents are not valid under Section 101, it will not address Amazon's Section 112 arguments.")

> [T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention. Stating an abstract idea "while adding the words 'apply it'" is not enough for patent eligibility. Nor is limiting the use of an abstract idea "'to a particular technological environment.'" Stating an abstract idea while adding the words "apply it with a computer" simply combines those two steps, with the same deficient result. Thus, if a patent's recitation of a computer amounts to a mere instruction to "implemen[t]" an abstract idea "on . . . a computer," that addition cannot impart patent eligibility. Given the ubiquity of computers, wholly generic computer implementation is not generally the sort of "additional featur[e]" that provides any "practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself."

*Alice*, 134 S. Ct. at 2358 (internal citations omitted); *see also buySAFE, Inc.*, 765 F.3d at 1354 ("The Court in *Alice* made clear that a claim directed to an abstract idea does not move into section 101 eligibility territory by 'merely requir[ing] generic computer implementation.'" (alteration in original) (quoting *Alice*, 134 S. Ct. at 2357)).

2. Analysis

As a preliminary matter, the Court will analyze the claims together because there is no meaningful distinction between the asserted "system," "process," and "means-plus-function" claims for purposes of the Section 101 analysis. *See Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1276–77 (Fed. Cir. 2012). The Court looks "not just to the type of claim but also 'to the underlying invention for patent-eligibility purposes.'" *Id.* at 1276 (quoting *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1374 (Fed. Cir. 2011)). Thus, "the form of the claims should not trump basic issues of patentability." *DDR Holdings, LLC v. Hotels.com, L.P.*, 954 F. Supp. 2d 509, 527 (E.D. Tex. 2013), *aff'd in part, rev'd in part and remanded on other grounds*, 773 F.3d 1245 (Fed. Cir. 2014) (citing *Parker v. Flook*, 437 U.S. 584, 593 (1978)). Here, the claims at issue involve format-based authentication and a central processor. There is little material difference between these categories of claims for purposes of the patentability analysis. *See Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1007 (Fed. Cir. 2014) ("[W]e agree with the district court that there is no meaningful distinction between the method and system claims or between the independent and dependent claims. The system claims recite the same basic process as the method claims, and the dependent claims recite only slight variations of the independent claims." (internal citation omitted)); *DDR Holdings, LLC*, 773 F.3d at 1257 n.4 ("The parties do not dispute that the asserted system and method claims of the '399 patent, for the purposes of § 101, are no different in substance. . . . Thus, the form of the asserted claims (system or method) does not affect our analysis of their patent eligibility." (citing *Alice*, 134 S.Ct. at 2360)).

Twitter argues that the patents-in-suit are directed to the abstract idea of "authenticating a user based on the format of the user's message," just like the "idea of structuring an insurance claims processing system to generate tasks automatically in response to events."[21] (Twitter July 3, 2014 Post-*Alice* Letter, at 1.) It further argues that language of the claims "adds nothing to the

[21] Twitter did not specifically identify the abstract idea in its pre-*Alice* briefing.

abstract idea of format-dependent authentication"; each function performed by the central processor is "purely conventional"; and that, "[u]nder the logic of *Alice*, if 'one or more computers' collectively performing a set of conventional functions is unpatentable, a single computer performing the same set of conventional functions is not patentable either." (*Id.* at 2–4.) EasyWeb argues that the patents "claim a concrete Internet-based message-publishing system that is capable of publishing information received in a variety of forms and adapting its security scheme to the formats of that information," allowing automated publishing to a website. (EasyWeb July 3, 2014 Post-*Alice* Letter, at 1, 3.) It further argues that "[h]umans alone do not and cannot implement" the identification and conversion components of the patents-in-suit; the patents cannot claim an abstract idea merely because they are implemented with a computer; and, under either parties' construction, the central processor is a concrete and necessary part of the inventive implementation. (*Id.* at 3–5.) [22] Having reviewed the claims at issue, the Court concludes, under the first step of the analysis, that the inventive claims are directed toward a patent-ineligible concept.

EasyWeb presents a broad conception of its invention, which is designed to allow "virtually anyone to automatically create a new website, complete with multiple webpages, by using just a telephone or fax machine" or email, without needing technical knowledge of web publishing software ('030 Patent at 44:61–64; '247 Patent at 2:65–3:21). The inventive (and non-obvious) concept in the patents-in-suit, however, is the format-based authentication system, *not* the message publishing system itself. As noted *supra*, Polish concedes that Codignotto's invention was not particularly innovative. (*See* Polish Dep. at 168:25–169:1 ("I'm not exactly sure that I know what is new here, but I think Mr. Codignotto's contributions have to do with organizing existing pieces of technology in new ways.").) "[W]hen determining whether [the patents-in-suit] contain[] an adequate inventive concept, the Court must factor out conventional activity" because "where a claim recites tangible steps, but the only new part of the claim is an abstract idea, that may constitute a claim to an abstract idea." *McRo, Inc. v. Atlus U.S.A.*, No. SACV 13-1870-GW(FFMx), 2014 WL 4772196, at *9 (C.D. Cal. Sept. 22, 2014) (citing *Alice*, 134 S. Ct. at 2358; *Mayo*, 132 S. Ct. at 1297–98); *see also Mayo*, 132 S. Ct. at 1297–98 (claim step calling for administration of drug only disregarded because it "refers to the relevant audience, namely doctors who treat patients with certain diseases with thiopurine drugs"; claim step of determining level of relevant metabolites disregarded because it was "well known in the art"). Nevertheless, the Court must "consider the invention as a whole, rather than 'dissect[ing] the claims into old and new elements and then . . . ignor[ing] the presence of the old elements in the analysis.'" *Bilski v. Kappos*, 561 U.S. 593, 611 (2010) (quoting *Diamond v. Diehr*, 450 U.S. 175, 188 (1981)). Thus, the Court must focus on the inventiveness of the format-based authentication element, without ignoring the asserted claims as a whole.

The Supreme Court has declined to "delimit the precise contours of the 'abstract ideas' category." *Alice*, 134 S. Ct. at 2357; *see also Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) *cert. denied*, 136 S. Ct. 119 (2015).

---

[22] In its December 15, 2014 letter, EasyWeb takes issue with Twitter's characterization of its claims as "directed to the abstract idea of authenticating a user based on the format of the user's message," arguing that "EasyWeb's patents recite a 'message publishing system,' not a user authentication system." (EasyWeb Dec. 15 Letter, at 2–3.) However, the Court agrees with Twitter, that considering EasyWeb's claims as a message publishing system would not change the analysis because a message publishing system is also an abstract idea, for the reasons discussed *supra*.

Courts have previously recognized that "mathematical algorithms, including those executed on a generic computer" as well as "fundamental economic and conventional business practices," are abstract ideas. *DDR Holdings, LLC*, 773 F.3d at 1256 (citing *Gottschalk v. Benson*, 409 U.S. 63, 64 (1972); *Bilski*, 561 U.S. at 611–12; *Alice*, 134 S. Ct. at 2356). However, the Federal Circuit has indicated that the abstract ideas category is broad, *see, e.g.*, *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1350 (Fed. Cir. 2014) ("The Supreme Court recently reaffirmed that fundamental concepts, by themselves, are ineligible abstract ideas."), and courts have held that claims that do "not neatly fit into these precedents" nevertheless were directed to abstract ideas, *Morales v. Square*, 75 F. Supp. 3d 716, 724 (W.D. Tex. 2014) (collecting cases). "Taken together, the case law suggests that a claim is directed to an abstract idea when it describes a fundamental concept or longstanding practice." *Id.* at 724 (citing *Cal Inst. Of Tech. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974, 981–84, 985–89, 991–92 (C.D. Cal. 2014)).

Although EasyWeb argues that its patents "claim a solution 'necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks,' i.e., on-demand Internet publishing," (EasyWeb Dec. 15, 2014 Letter, at 2 (quoting *DDR Holdings, LLC*, 773 F.3d at 1257)), the Court concludes that EasyWeb's patents are directed to an abstract idea of authentication. Courts have previously found that patents involving the transformation and transmission of information in one form to another form constituted abstract ideas. For example, in *Content Extraction & Transmission LLC*, the Federal Circuit affirmed the district court's determination that patents at issue, which involved a method of extracting data from hard copy documents (*i.e.*, checks) using a digitized unit such as a scanner, recognizing that information, and populating certain data fields with that information in the computer's memory, fell within the excluded category of abstract ideas. 776 F.3d at 1345, 1347. In making this determination, the Federal Circuit specifically rejected the argument that the claims were not abstract "because human minds are unable to process and recognize the stream of bits output by a scanner," noting that "the claims in *Alice* also required a computer that processed streams of bits, but nonetheless were found to be abstract." *Id.* at 1347. Similarly, in *Morales*, the district court found that the patent at issue, a system that allowed television viewers to respond to offers for products displayed on the television with a remote control and transmitted a signal accepting the offer to a repeater station where it was relayed to a central data collection system to be processed, "encompasse[d] an abstract idea because it describe[d] the fundamental concept of relaying a signal containing the sender's identity" and "simply describe[d], at a high level of generality, the concept of transmitting data from one source to another" through either radio frequency or telephone lines. 75 F. Supp. 3d at 725; *see also Parus Holdings, Inc. v. Bank*, - - F. Supp. 3d - -, No. 14-CV-1427 (SLR), 2015 WL 5886179, at *9 (D. Del. Oct. 8, 2015) (finding that "automated tasks of (1) receiving messages via a phone or Internet connection and then transmitting those messages to a subscriber by phone or Internet; and (2) receiving a message from a subscriber by phone or Internet and then forwarding that message based on rules established by the subscriber" had "pre-Internet analogs" and thus, "suggest[ed] methods of organizing human (business) activity and, therefore, an abstract idea."). Thus, the Court finds EasyWeb's claims are directed to a patent-ineligible concept.

Turning to the second step of the *Alice* framework, the Court concludes that EasyWeb's claims do not include an inventive concept "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 134 S. Ct. at 2355. "To answer the second question, [a court must] consider the limitations of each claim both

individually and as an ordered combination to determine whether the additional limitations transform the nature of the claim into patent-eligible application of a patent-ineligible concept." *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1332 (Fed. Cir. 2015) (citing *Alice*, 134 S. Ct. at 2355). These additional limitations must be "more than simply stating an abstract idea while adding the words 'apply it' or 'apply it with a computer.' Similarly, the prohibition on patenting an ineligible concept cannot be circumvented by limiting the use of an ineligible concept to a particular technological environment." *Id.* (citing *Alice*, 134 S. Ct. at 2358).

EasyWeb argues that its patents "claim computer-implementation as a necessary component of the invention, not merely as a convenient platform for reduction. The necessity of the computer-implementation provides, in part, the 'inventive concept' of the patents-in-suit." (EasyWeb July 3, 2014 Post-*Alice* Letter, at 4.) EasyWeb further argues that its patents "direct the practitioner to do far more than merely 'implement the abstract idea . . . on a generic computer.'" (*Id.* (citing *Alice*, 134 S. Ct. at 2359).) However, the Court has construed the "central processor" as "a computer or set of computers, where one computer performs all the functions assigned to the central processor that are necessary for the MPS to process a given message." *See supra* at II.B.1.e. Under such a construction, the central processor is a "generic computer," which "cannot transform a patent-ineligible abstract idea in to a patent-eligible invention." *Alice*, 134 S. Ct. at 2358; *see also id.* at 2360 ("[W]hat petitioner characterizes as specific hardware—a 'data processing system' with a 'communications controller' and 'data storage unit,' for example, . . . —is purely functional and generic. Nearly every computer will include a 'communications controller' and 'data storage unit' capable of performing the basic calculation, storage, and transmission functions required by the method claims. As a result, none of the hardware recited by the system claims offers a meaningful limitation beyond generally linking the use of the method to a particular technological environment, that is, implementation via computers." (internal quotation marks and citation omitted)).[23] Further, although the Court has limited the "means for identifying" element to a "central processor that, after receiving a message via tax, telephone call, email, or the Internet Printing Protocol (IPP), identifies the sender using a caller ID signal, DTMF tones, the called number ID signal, email headers, text within an email message or name of an attachment to an email message, fax terminal ID, digital signatures, data in fax packets or IPP packets, or optical or speech recognition technology," *see supra* II.B.2.d., such functions are "well-understood, conventional, routine activity," *Mayo*, 132 S. Ct. at 1298; *see also Morales*, 75 F. Supp. 3d at 726–27 ("The listed devices [antennae to send and receive radio frequencies, computers to verify and process data, VSAT equipment to allow for satellite communication, modems for telephonic communication, and conventional electronics included in answering device] are included in the claimed process for their generic purposes, and as such represent well-understood, conventional, routine activity." (internal quotation marks and citation omitted)).

Further, EasyWeb's claims also fail to satisfy the machine-or-transformation test. Under the machine-or-transformation test, "[a] claimed process can be patent eligible under § 101 if '(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing.'" *Ultramercial, Inc.*, 772 F.3d at 716 (quoting *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008) (en banc), *aff'd on other grounds*, 561 U.S. 593). "While the Supreme Court has held

---

[23] The Court notes that even under EasyWeb's proposed construction of "central processor" as "one or more computers as part of a system," the central processor would constitute a generic computer.

that the machine-or-transformation test is not the sole test governing § 101 analyses, . . . that test can provide a 'useful clue' in the second step of the *Alice* framework." *Id.* (quoting *Bilski*, 561 U.S. at 604)). EasyWeb's claims are not "tied to any particular novel machine or apparatus, only a general purpose computer," which the Federal Circuit has held to be insufficient "to save the patent under the machine-or-transformation test." *Id.* (citing *CyberSource*, 654 F.3d at 1370). Further, "[a]ny transformation from the use of computers or the transfer of content between computers is merely what computers do and does not change the analysis." *Id.* To the extent that EasyWeb argues that it satisfies the transformation prong by converting a message from one format to another, the Federal Circuit made clear in *CyberSource* that "mere manipulation or reorganization of data . . . does not satisfy the transformation prong." 645 F.3d at 1375; *see also Glory Licensing LLC v. Toys R Us, Inc.*, No. 09-CV-4252 (FSH), 2011 WL 1870591, at *4 (D.N.J. May 16, 2011) (holding a "'mere transfer' of data from an electronic or hard copy document to an application program" did not constitute transformation of the underlying data); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, No. 12-CV-2501 (MAS)(TJB), 2013 WL 3964909, at *13 (D.N.J. July 31, 2013), *aff'd*, 776 F.3d 1343 (Fed. Cir. 2014) (rejecting the argument that the patents at issue passed the transformation prong by using a "scanner to transform ink-on-paper into bit-mapped pixels" and using a computer to transform "the bit-mapped pixels into machine-readable variable (or field) values stored in targeted memory locations.") The Court is not persuaded by EasyWeb's argument that "by adding hypertext formatting, EasyWeb's patents go beyond manipulating, reorganizing, or collecting data by actually adding a new subset of numbers or characters to the data, thereby fundamentally altering the original information." (EasyWeb Dec. 15, 2014 Letter, at 5 (internal quotation marks and citation omitted).) If such a notion was true, any conversion of material from one form to a different electronic form, would constitute a transformation, an outcome clearly at odds with the Federal Circuit's determination that "mere manipulation or reorganization of data . . . does not satisfy the transformation prong." *CyberSource,* 645 F.3d at 1375. Thus, EasyWeb's conversion of a message from one format to another for publication is insufficient to satisfy that transformation prong of the machine-or-transformation test.

Because EasyWeb's claims are directed to a patent ineligible concept and do not include an inventive concept sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself, the Court grants summary judgment to Twitter on its claim that the patents-in-suit are invalid, pursuant to 35 U.S.C. § 101, for claiming abstract ideas that are not patentable.

C. Infringement of the Patents-in-Suit

Even assuming EasyWeb's patents-in-suit were patentable, the Court concludes, in the alternative, that Twitter's technology does not infringe EasyWeb's patents. Twitter moves for summary judgment of noninfringement on the grounds that its authentication mechanisms do not depend on the "format of the message," it does not have a "central processor" because each step in its message publishing process is performed by a separate cluster of computers in the Sacramento data center, and its system does not read upon the means-plus function claims either literally or under the doctrine of equivalents. As construed by the Court, the patents-in-suit claim an authentication mechanism that depends on "message encoding that determines how the information, data, or content the sender wishes to publish on the Internet is reviewed." In addition,

all the functions assigned to the central processor that are necessary for the MPS to process a given message must be handled by one computer. EasyWeb also concedes that Twitter does not infringe the means-plus-function claims if the Court adopts Twitter's corresponding structures for those terms. Therefore, as discussed below, the Court concludes that Twitter's technology does not infringe the patents-in-suit as matter of law.

1. Legal Standard

Pursuant to 35 U.S.C. § 271(a), an actor is liable for direct infringement if she commits all the elements of infringement, such as the making, using, or selling of a patented invention. *See Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech*., 709 F.3d 1348, 1362 (Fed. Cir. 2013); *see also Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993). The inquiry has two steps: first, the court must construe the asserted patent claims—a question of law. *Cybor Corp.*, 138 F.3d at 1454. Second, the court must determine "whether the claims, as properly interpreted, cover the accused device or process"—a question of fact. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1998). The actor must perform each and every step or element of a claimed method or product; if any claim limitation is absent from the accused device or method, there is no literal infringement as a matter of law. *Cephalon, Inc. v. Watson Pharm., Inc.*, 769 F. Supp. 2d 729, 746 (D. Del. 2011) *aff'd in part, rev'd in part on other grounds*, 707 F.3d 1330 (Fed. Cir. 2013) (citations omitted). The patentee or assignee has the burden of proving infringement by a preponderance of the evidence. *SmithKline*, 859 F.2d at 889. Infringement may be shown through direct and circumstantial evidence. *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986).

Literal infringement of a means-plus-function claim requires that the relevant structure in the accused device (1) perform the identical function recited in the claim and (2) be identical or "otherwise insubstantially different" to the corresponding structure in the specification. *Kemco Sales, Inc. v. Control Papers Co., Inc.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000) (citation omitted). An accused structure is statutorily equivalent if it "performs the claimed function in substantially the same way to achieve substantially the same result." *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999). If a component of an accused product is not a structural "equivalent" to the corresponding structure of a means-plus-function limitation for purposes of the literal infringement analysis, then the same structure cannot be equivalent for purposes of the common law doctrine of equivalents, "unless the component constitutes technology arising after the issuance of the patent." *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1381 (Fed. Cir. 2001) (citing *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1311 (Fed. Cir. 1998)). Nevertheless, infringement under the doctrine of equivalents is not automatically precluded if the finding of noninfringement "is premised on an absence of identical *function*." *Id.* at 1381–82 (citing *WMS Gaming*, 184 F.3d at 1353). "That is because infringement under the doctrine of equivalents may be premised on the accused and the patented component having *substantially* the same function, whereas structure corresponding to the disclosed limitation in a means-plus-function clause must perform the *identical* function." *Id.* at 1382 (citing *WMS Gaming*, 184 F.3d at 1353).

2. Analysis

It is undisputed that Twitter receives every message from a web browser, mobile application, or mobile phone in a text, gif, jpg, or png format, or a combination thereof. (Clark Noninfringement Report ¶¶ 163–66.) Tweets from a browser or mobile application are authenticated through the sender's username and password, which are associated with a cookie (for web tweets) or an OAuth token (for mobile tweets). (*Id.* ¶ 168.) SMS and MMS tweets are authenticated using the phone number transmitted with the user's message. (*Id.*) Clark opines that "Twitter does not select a different identification/authorization mechanism depending on whether it receives text or JPG-, GIF-, or PNG-formatted image" as a tweet. (*Id.* ¶ 164.) He also explains that "pictures in any of the supported formats may be posted (without conversion) from" any of the transmission methods. (*Id.*) Even if Clark's opinion were inadmissible, EasyWeb has no evidence that Twitter's authentication mechanism depends on the "format of the message" as construed by the Court. EasyWeb relies on Polish's infringement opinion, but that is premised on a construction of "format" that encompasses the transport protocol and transmission headers applied to the message when it is sent to Twitter. Because "evidence based upon a mistaken construction of a patent is irrelevant," *Chicago Mercantile Exch., Inc. v. Tech Research Grp., LLC*, 782 F. Supp. 2d 667, 673 (N.D. Ill. 2011), a rational jury cannot rely on Polish's expert opinion to find that Twitter's system satisfies the "format of the message" limitation.[24] *See Intellectual Sci. & Tech., Inc. v. Sony Elecs., Inc.*, 589 F.3d 1179, 1183 (Fed. Cir. 2009) ("To satisfy the summary judgment standard, a patentee's expert must set forth the factual foundation for his infringement opinion in sufficient detail for the court to be certain that features of the accused product would support a finding of infringement under the claim construction adopted by the court, with all reasonable inferences drawn in favor of the non-movant."); *ASUS Computer Int'l v. Round Rock Research, LLC*, Case No. 12-cv-02099 JST (NC), 2014 WL 1463609, at *5 (N.D. Cal. Apr. 11, 2014) ("It is . . . appropriate to exclude expert opinion based on an incorrect claim construction." (citing, *inter alia*, *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1224 n.2 (Fed. Cir. 2006))). Therefore, because Twitter's authentication mechanisms do not depend on the "format of the message," its system does not infringe the asserted claims of the patents-in-suit as a matter of law. *See Cephalon*, 769 F. Supp. 2d at 746.

Similarly, no rational jury could conclude that Twitter's data center reads upon the "central processor" limitation. It is undisputed that Twitter uses a distributed architecture and that no single machine in the data center identifies the sender of the message and performs an additional required function. (*See* Clark Noninfringement Report ¶¶ 193–95.) According to Contreras, one cluster in the data center receives tweets, a separate cluster authenticates users, and a separate cluster sends tweets to recipients. (Contreras Decl. ¶ 21.) She testified that, although she does not know how any of the computers are "connected or how many there are," the computers are "logically organized into groups called clusters . . . according to the function that they perform."[25] (Contreras

[24] For example, Polish opines that "the sending of the cookie along with the message is part of the format." (Polish Dep. at 68:6–7.) He concludes that a tweet sent by the web is in a different format than that sent by a mobile application because one uses cookies for authentication and one uses an access token. (*Id.* at 67:15–68:2.) That assumes a difference in format because the authentication mechanism varies, not because the format is different.

[25] EasyWeb argues that Contreras's testimony should be disregarded because she testified that she "know[s] next to nothing about the hardware setup." (Contreras Dep. at 135:2–3.) The Court disagrees. Contreras indicated that the "architecture" of the data center could be the hardware architecture or software architecture—"the physical setup

Dep. at 135:9–18, Li Decl. Ex. I.) EasyWeb does not raise a genuine dispute of material fact as to whether any single data center cluster performs all the functions required of the central processor by the respective claims. It only argues that the data center is the "central processor" because the computers are indisputably connected together to perform the claimed functions, such as receiving tweets, authenticating users, and sending tweets to be published. (EasyWeb MSJ Opp., at 21.) Other than with respect to Claim 18 of the '606 Patent, which only requires "at least one of said means [to] utilize[] the central processor to perform its recited function" ('606 Patent at 46:28–30), that is insufficient. *See Intellectual Sci. & Tech.*, 589 F.3d at 1183–84. Nevertheless, Twitter's technology cannot infringe even the '606 Patent, because the data center does not receive messages via fax, phone call, email, or the IPP.

Finally, EasyWeb concedes that Twitter does not infringe the means-plus-function claims under Twitter's claim constructions, which the Court mostly has adopted. (*See* EasyWeb MSJ Opp., at 24 & Appendix A.) The means-plus-function language also cannot be stretched to cover the web-to-web or text-to-web publishing that EasyWeb concedes was "well known in the art as of the filing date" (EasyWeb MSJ Brief, at 35), because structural equivalence is determined at the time the patent issues, not at the time of infringement. *See Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1320 (Fed. Cir. 1999) ("An equivalent structure or act under § 112 cannot embrace technology developed after the issuance of the patent because the literal meaning of a claim is fixed upon its issuance.").

Therefore, because Twitter's system does not read upon the Court's constructions of "format" or "central processor," or the means-plus-function claims, Twitter's system does not infringe any of the asserted independent or dependent claims of the patents-in-suit as a matter of law. Accordingly, the Court grants summary judgment of noninfringement to Twitter.[26]

---

versus the logical setup." (*Id.* at 134:2–7.) EasyWeb focuses on the physical setup, but the language of the claims and Contreras's testimony indicate that it is the software setup that dictates what functions the computers perform. Thus, the evidence is admissible.

[26] In the alternative, assuming *arguendo* that Twitter infringes the patents-in-suit, Twitter argues that the Court should exclude the analysis of EasyWeb's damages expert, Michael Wagner ("Wagner"), and, consequently, grant summary judgment to Twitter because EasyWeb has no admissible evidence of damages. Courts cannot "apply a different claim construction for computation of damages than for infringement liability." *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1364 (Fed. Cir. 2004). Thus, EasyWeb cannot carry its burden to "'sufficiently [tie the expert testimony on damages] to the facts of the case.'" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993)) (alterations in original); *cf. Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315–16 (Fed. Cir. 2014) (reversing district court's exclusion of proposed expert testimony on damages because, *inter alia*, court based its damages analysis on incorrect claim construction), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). However, the Court need not address this issue in light of the finding of non-infringement.

## IV. CONCLUSION

For the foregoing reasons, the Court grants summary judgment to Twitter on the patentability of abstract ideas defense pursuant to 35 U.S.C. § 101, and also grants summary judgment of noninfringement to Twitter. EasyWeb's motion for summary judgment is denied. The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

____________________________
JOSEPH F. BIANCO
United States District Judge

Dated: March 30, 2016
Central Islip, NY

* * *

Plaintiff is represented by Alan Kellman, John Desmarais, and Jeff Seddon of Desmarais LLP, 230 Park Ave., New York, NY 10169. Defendant is represented by Daralyn Durie, Brian Howard, Eugene Novikov, Isabelle Kirshner, and Joseph Gratz of Durie Tangri LLP, 217 Leidesdorff St., San Francisco, CA 94111.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------X

EASYWEB INNOVATIONS, LLC,

Plaintiff,

- against -

TWITTER, INC.,

Defendant.

-----------------------------------------------------------X

**JUDGMENT**
CV 11-4550 (JFB)(SIL)

A Memorandum and Order of Honorable Joseph F. Bianco, United States District Judge, having been filed on March 30, 2016, granting defendant Twitter Inc.'s motion for summary judgment on the patentability of abstract ideas defense; granting summary judgment of noninfringement to Twitter, Inc.; denying plaintiff EasyWeb Innovations, Inc.'s motion for summary judgment; and directing the Clerk of Court to enter judgment accordingly and close this case, it is

**ORDERED AND ADJUDGED** that plaintiff EasyWeb Innovations, Inc. take nothing of defendant Twitter, Inc.; that defendant Twitter Inc.'s motion for summary judgment on the patentability of abstract ideas defense is granted; that summary judgment of noninfringement to defendant Twitter, Inc., is granted; that plaintiff EasyWeb Innovations, Inc.'s motion for summary judgment is denied; and that this case is hereby closed.

Dated: Central Islip, New York
March 31, 2016

DOUGLAS C. PALMER
CLERK OF THE COURT

By: /s/ James J. Toritto
Deputy Clerk

US007685247B2

(12) **United States Patent**
**Codignotto**

(10) **Patent No.: US 7,685,247 B2**
(45) **Date of Patent: *Mar. 23, 2010**

(54) **SYSTEM FOR PUBLISHING AND CONVERTING MESSAGES FROM IDENTIFIED, AUTHORIZED SENDERS**

(75) Inventor: **John D. Codignotto**, Wantagh, NY (US)

(73) Assignee: **Easyweb Technologies, Inc.**, Wantagh, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/567,977**

(22) Filed: **Sep. 28, 2009**

(65) **Prior Publication Data**

US 2010/0017864 A1 Jan. 21, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 11/356,526, filed on Feb. 16, 2006, now Pat. No. 7,596,606, which is a continuation of application No. 09/523,274, filed on Mar. 10, 2000, now Pat. No. 7,032,030.

(60) Provisional application No. 60/123,821, filed on Mar. 11, 1999.

(51) **Int. Cl.**

| | |
|---|---|
| ***G06F 7/00*** | (2006.01) |
| ***G06F 7/04*** | (2006.01) |
| ***G06F 13/00*** | (2006.01) |
| ***G06F 15/16*** | (2006.01) |
| ***G06F 17/30*** | (2006.01) |
| ***G06F 21/00*** | (2006.01) |
| ***H04L 9/32*** | (2006.01) |
| ***H04M 1/64*** | (2006.01) |
| ***H04M 11/00*** | (2006.01) |
| ***H04N 7/16*** | (2006.01) |

(52) **U.S. Cl.** .................. **709/206**; 379/67.1; 379/88.14; 707/6; 707/10; 709/232; 709/246; 710/33; 713/168; 713/185; 726/27

(58) **Field of Classification Search** ................ 709/206, 709/232, 246; 379/67.1, 88.14; 707/6, 10; 710/33; 713/168, 185; 726/27
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,339,361 | A | * | 8/1994 | Schwalm et al. ............ | 713/169 |
| 5,579,472 | A | * | 11/1996 | Keyworth et al. ........... | 715/751 |
| 5,608,786 | A | * | 3/1997 | Gordon ...................... | 370/352 |

(Continued)

*Primary Examiner*—Tonia L Dollinger
*Assistant Examiner*—Daniel C Murray
(74) *Attorney, Agent, or Firm*—Leason Ellis LLP

(57) **ABSTRACT**

A message publishing system operative to process a message from a sender in a first format has a central processor; at least one sender account, at least one storage area configured to store at least a first portion of the message, and software executing in the central processor. The processor is configured to identify the sender of the message as an authorized sender based on information associated with the message in comparison to data in the sender account, wherein the identification is dependent upon the first format. The processor is configured to convert at least a second portion of the message from the first format to a second format. The processor is also configured to publish the converted second portion of the message so as to be viewable in the second format only if the sender has been identified as an authorized sender.

**49 Claims, 14 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,608,874 | A | 3/1997 | Ogawa et al. | |
| 5,675,507 | A | 10/1997 | Bobo, II | |
| 5,710,883 | A | 1/1998 | Hong et al. | |
| 5,727,156 | A * | 3/1998 | Herr-Hoyman et al. | 709/219 |
| 5,742,763 | A * | 4/1998 | Jones | 719/317 |
| 5,794,039 | A | 8/1998 | Guck | |
| 5,802,314 | A | 9/1998 | Tullis et al. | |
| 5,819,032 | A * | 10/1998 | de Vries et al. | 709/250 |
| 5,832,221 | A * | 11/1998 | Jones | 709/206 |
| 5,835,789 | A * | 11/1998 | Ueda et al. | 710/33 |
| 5,848,413 | A * | 12/1998 | Wolff | 707/10 |
| 5,848,415 | A | 12/1998 | Guck | |
| 5,864,870 | A | 1/1999 | Guck | |
| 5,911,776 | A | 6/1999 | Guck | |
| 5,915,001 | A | 6/1999 | Uppaluru | |
| 5,937,162 | A | 8/1999 | Funk et al. | |
| 5,945,989 | A | 8/1999 | Freishtat et al. | |
| 6,044,372 | A * | 3/2000 | Rothfus et al. | 707/10 |
| 6,088,702 | A | 7/2000 | Plantz et al. | |
| 6,119,108 | A * | 9/2000 | Holmes et al. | 705/40 |
| 6,158,007 | A | 12/2000 | Moreh et al. | |
| 6,182,143 | B1 * | 1/2001 | Hastings et al. | 709/231 |
| 6,212,550 | B1 * | 4/2001 | Segur | 709/206 |
| 6,230,156 | B1 | 5/2001 | Hussey | |
| 6,230,168 | B1 | 5/2001 | Unger et al. | |
| 6,230,173 | B1 | 5/2001 | Ferrel et al. | |
| 6,289,382 | B1 | 9/2001 | Bowman-Amuah | |
| 6,350,066 | B1 * | 2/2002 | Bobo, II | 709/206 |
| 6,393,296 | B1 * | 5/2002 | Sabnani et al. | 455/466 |
| 6,445,694 | B1 | 9/2002 | Swartz | |
| 6,449,657 | B2 | 9/2002 | Stanbach et al. | |
| 6,483,899 | B2 * | 11/2002 | Agraharam et al. | 379/88.14 |
| 6,501,562 | B1 | 12/2002 | Nakagiri et al. | |
| 6,526,438 | B1 * | 2/2003 | Bienvenu et al. | 709/219 |
| 6,651,087 | B1 | 11/2003 | Dennis | |
| 6,684,239 | B1 * | 1/2004 | Flepp et al. | 709/206 |
| 7,032,030 | B1 | 4/2006 | Codignotto | |
| 7,103,680 | B1 * | 9/2006 | Holdsworth et al. | 709/246 |
| 7,233,992 | B1 * | 6/2007 | Muldoon et al. | 709/226 |
| 7,266,826 | B2 * | 9/2007 | Katiyar et al. | 719/316 |
| 7,343,168 | B2 * | 3/2008 | Valloppillil | 455/466 |
| 7,383,266 | B2 * | 6/2008 | Stewart et al. | 707/100 |
| 7,461,062 | B2 * | 12/2008 | Stewart et al. | 707/6 |
| 7,487,550 | B2 * | 2/2009 | Todd | 726/27 |
| 2001/0051517 | A1 | 12/2001 | Strietzel | |
| 2001/0054086 | A1 | 12/2001 | Miyahira et al. | |
| 2002/0010794 | A1 | 1/2002 | Stanbach Jr. et al. | |
| 2002/0055995 | A1 | 5/2002 | Beckwith et al. | |
| 2002/0103867 | A1 * | 8/2002 | Schilter | 709/206 |
| 2002/0163423 | A1 | 11/2002 | Kondo | |
| 2003/0005308 | A1 | 1/2003 | Rathbun et al. | |
| 2003/0046391 | A1 | 3/2003 | Moreh et al. | |
| 2003/0131063 | A1 * | 7/2003 | Breck | 709/206 |
| 2003/0149732 | A1 * | 8/2003 | Peled et al. | 709/206 |
| 2004/0019645 | A1 * | 1/2004 | Goodman et al. | 709/206 |
| 2004/0092272 | A1 * | 5/2004 | Valloppillil | 455/466 |
| 2004/0122906 | A1 * | 6/2004 | Goodman et al. | 709/206 |
| 2004/0137921 | A1 * | 7/2004 | Valloppillil et al. | 455/466 |
| 2004/0254993 | A1 * | 12/2004 | Mamas | 709/206 |
| 2005/0044155 | A1 | 2/2005 | Kaminski et al. | |
| 2005/0114523 | A1 | 5/2005 | Barron et al. | |
| 2005/0154887 | A1 | 7/2005 | Birk et al. | |
| 2005/0228899 | A1 | 10/2005 | Wendkos et al. | |
| 2006/0031328 | A1 * | 2/2006 | Malik | 709/206 |
| 2006/0206922 | A1 | 9/2006 | Johnson et al. | |
| 2007/0038717 | A1 * | 2/2007 | Burkholder et al. | 709/206 |
| 2009/0239504 | A1 * | 9/2009 | Turk | 455/412.1 |
| 2009/0307326 | A1 * | 12/2009 | Landsman et al. | 709/206 |

* cited by examiner


MESSAGE
PUBLISHING
SYSTEM
100
110
PSTN /
INTERNET
120
130
140
150

FIG 1


MESSAGE SEND INITIATED
200
CHECK FOR NEW MESSAGE
210
IS THERE A NEW MESSAGE?
NO
220
YES
RECEIVE MESSAGE AND ID INFO
230
IS MESSAGE FROM A VALID USER?
NO
DISCARD MESSAGE
240
250
YES
PUBLISH MESSAGE
SUBMIT MESSAGE TO SEARCH ENGINES
260
280
SEND NEW MESSAGE NOTIFICATION
270

FIG 2


REVIEWER CONNECTS TO INTERNET
300
REVIEWER REQUESTS MESSAGE
310
REQUEST FOR MESSAGE RECEIVED BY MPS
320
IS MESSAGE SCHEDULED TO BE REVIEWABLE?
325
NO
YES
MPS RETRIEVES MESSAGE FROM STORAGE AREA
330
IS REQUESTED MESSAGE PUBLIC?
340
NO
YES
MPS REQUESTS IDENTIFICATION FROM REVIEWER
345
IS REVIEWER AUTHORIZED TO REVIEW MESSAGE?
350
NO
YES
MPS SENDS REVIEW FAILURE MESSAGE TO REVIEWER
355
MPS SENDS MESSAGE TO REVEIWER
360

FIG 3


INCOMING PHONE CALL
400
RECEIVE CALLER ID INFO
410
ANSWER CALL
420
REQUEST IDENTIFICATION
430
FAX TONE DETECTED?
YES
F
FIG. 7
440
NO
RECEIVE IDENTIFICATION
450
ID VALID?
YES
M
FIG. 5
460
NO
MORE THAN "N" ATTEMPTS?
YES
TERMINATE CALL
470
480
NO

FIG 4


M
FIG. 4
PLAY MAIN MENU
500
DTMF DIGIT DETECTED ?
NO
MORE THAN "N" REPLAYS OF MENU?
NO
510
YES
520
YES
TERMINATE CALL
525
IS DIGIT "1"?
YES
PROMPT USER WITH FAX OPTIONS
F
FIG. 7
530
NO
535
IS DIGIT "2"?
YES
PROMPT USER WITH AUDIO OPTIONS
V
FIG. 6
540
NO
545
IS DIGIT "3"?
YES
USER OPTIONS/PREFERRENCES MENU
550
NO
555
PLAY INVALID CHOICE MESSAGE
590

FIG 5


V
FIG. 5
PROMPT FOR AUDIO MESSAGE
600
START RECORDING MESSAGE
610
WAS DTMF DIGIT HEARD?
620
YES
NO
IS DIGIT "*" ?
625
YES
FIG. 5
M
NO
IS DIGIT "#" ?
630
YES
NO
STOP RECORDING AND PROMPT USER WITH OPTIONS
650
CONTINUE RECORDING
635
RE-RECORD MESSAGE?
660
YES
NO
PUBLISH AUDIO MESSAGE
670

FIG 6


F
FIG. 4 & 5
START FAX RECEPTION PROCESS
700
RECEIVE FAX AND ID INFO
710
STORE FAX
720
IS SENDER OF FAX A VALID USER ?
730
NO
DISCARD FAX
740
YES
PUBLISH FAX
750

FIG 7


DOES FAX CONTAIN ONLY ONE PAGE?
800
NO
MP
FIG. 10
YES
EXTRACT THE SINGLE PAGE FROM FAX
810
PERFORM IMAGE PROCESSING AND CONVERSION TO FAX PAGE
820
CREATE WEBPAGES TO HOST THE GIF IMAGES OF THE FAX PAGE
830
MOVE THE RESULTING WEBPAGES AND GIF FILES TO THE USER'S INTERNET SERVER STORAGE AREA
840

FIG 8

# JOE'S DELI

123 Main Street, Anytown NY 11234
(516) 555-1234

*Last Updated: Monday, February 22 1999 at 6:33am*

## TODAY'S SPECIALS

MONDAY 2/22/99

### BREAKFAST

TWO EGGS ANY STYLE ON ROLL — $1.29
W/COFFEE — $1.99

### LUNCH

TUNA ON ROLL W/LETTUCE — $2.49
GRILLED CHEESE SANDWICH — $1.99
ROAST BEEF HERO — $2.99

ZOOM IN

---

Click here to find out how your fax machine can create webpages
(c) 1998-99 EasyWEBS

FIG 9


MP
FIG. 8
SET PAGE COUNTER X TO 1
1000
CREATE NEW TOC FOR FAX MESSAGE
1010
EXTRACT PAGE X FROM FAX
1020
PERFORM IMAGE PROCESSING AND CONVERSION TO FAX PAGE X
1030
CREATE WEBPAGE(S) TO HOST THE GIF IMAGE(S) FOR FAX PAGE X
1040
ADD LINK FOR FAX PAGE X TO THE TOC WEBPAGE
1050
DOES PAGE COUNTER X EQUAL THE TOTAL NUMBER OF PAGES IN FAX?
1060
NO
INCREMENT PAGE COUNTER X BY 1
1070
YES
MOVE THE RESULTING WEBPAGES AND GIF FILES TO THE USER'S INTERNET SERVER STORAGE AREA
1080

FIG 10


CONVERT AUDIO MESSAGE TO STREAMING AND NON-STREAMING AUDIO FILE FORMATS
1100
CREATE WEBPAGE TO HOST THE AUDIO FILE(S)
1110
MOVE THE RESULTING WEBPAGE(S) AND AUDIO FILES TO THE USER'S INTERNET SERVER STORAGE AREA
1120

FIG 11


RECEIVE EMAIL
1200
IS EMAIL FROM A VALID USER?
NO
DISCARD EMAIL
1205
1210
YES
ARE THERE ANY COMMANDS IN EMAIL?
YES
EXTRACT COMMANDS
PERFORM COMMANDS DURING PUBLISHING
1215
1220
1225
1227
NO
ARE ANY AUDIO FILES ATTACHED TO EMAIL?
YES
EXTRACT AUDIO FILE(s) FROM EMAIL
PUBLISH AUDIO MESSAGE(s)
1230
1235
1240
1242
NO
ARE ANY IMAGE FILES ATTACHED TO EMAIL?
YES
EXTRACT IMAGE FILE(s) FROM EMAIL
PUBLISH IMAGE FILE(s)
1245
1250
1255
1257
NO
MORE FILES ATTACHED TO EMAIL?
YES
EXTRACT FILE(s) FROM EMAIL
PUBLISH MISC. FILES
1260
1265
1270
1272
NO
IS THERE ANY BODY TEXT IN THE EMAIL?
YES
EXTRACT BODY TEXT FROM EMAIL
1275
1285
NO
CREATE NEW WEBPAGE AND PLACE EXTRACTED TEXT IN IT
1290
DONE
MOVE THE WEBPAGE TO THE USER'S INTERNET STORAGE AREA
1280
1295

FIG 12


PAGER
1305
PAGING SYSTEM
1300
PSTN / INTERNET
130
100
INPUT / OUTPUT
1320
SOFTWARE
1330
CENTRAL PROCESSOR
1340
STORAGE
1350
INTERNET SERVER
1360
SOFTWARE
1370

FIG 13


1320
TELEPHONY DEVICE
1410
110a
FAX DEVICE
1420
PUBLIC SWITCHED TELEPHONE NETWORK (PSTN)
TELEPHONY DEVICE
1410
FAX DEVICE
1420
130a
130c
MODEM
1450
INTERFACE
1460
110b
INTERNET
130b
INTERNET SERVER
1360
CENTRAL PROCESSOR
1340

FIG 14

# SYSTEM FOR PUBLISHING AND CONVERTING MESSAGES FROM IDENTIFIED, AUTHORIZED SENDERS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation patent application of U.S. patent application Ser. No. 11/356,526, filed Feb. 16, 2006, now U.S. Pat. No. 7,596,606, issued Sep. 29, 2009 which is a continuation patent application of U.S. patent application Ser. No. 09/523,274, filed Mar. 10, 2000, now U.S. Pat. No. 7,032,030, issued Apr. 18, 2006 which claims the benefit of U.S. patent application Ser. No. 60/123,821, filed Mar. 11, 1999, each of which are hereby incorporated by reference in their entirety.

## BACKGROUND

1. Field of Invention

This invention relates to the electronic publication of a message, specifically to a system and method that easily enables a message to be reviewed by a mass audience.

2. Description of Prior Art

Various methods exist to publish a message that allows a large number of people to review it. For example, television and radio can convey messages to a mass number of people tuned into their respective broadcast. However, this type of publishing requires the people's attention at the moment the message is transmitted. If a person is not tuned into the broadcast, or is not paying attention when it is transmitted, the message will not be conveyed. This type of publishing is often referred to as Pushing, meaning that the message is pushed out (transmitted) even if no one is listening or requested the message. A major disadvantage of pushing is the inability for a person to immediately retrieve a specific message when they desire it. Often a person must wait through many undesired messages before the desired message is received. The on-demand method of publishing solves this problem by allowing a person to request (demand), then immediately receive the requested message when it is convenient or desired to do so. To accomplish this, on-demand publishing requires a two-way communication path between the sender of the message and the requester of the message. One communication direction is used by the requester to inform the message sender that a particular message is desired, and the other direction is used to send the message to the requester. On-demand services have existed for many years. Services such as fax-on-demand and airline flight information systems all use a form of on-demand publishing. Some common message types that are published in an on-demand fashion include visual, textual and audio messages.

There are two common forms of on-demand publishing used for audio messages. Both rely on the use of pre-recorded or synthesized audio, but differ in the method they allow reviewers to listen to the message. The first method requires the audio message to reside on equipment connected to the telephone network. Requestors wishing to hear the message would simply dial a telephone number serviced by the equipment, and the equipment would announce the message to the caller. In order to play an audio message for more then one simultaneous caller, multiple telephone lines and associated playback equipment are needed to handle the desired number of simultaneous incoming calls. Obviously, this can become very expensive and difficult to implement, especially when the number of simultaneous callers exceeds a few hundred.



The second method of on-demand audio publishing uses the Internet to distribute an audio message. Typically, a webpage will contain a reference or hyperlink to the audio message file. When a requestor selects the reference, the audio message is sent to the requester and played on the requesters' multimedia PC. Since webpages are typically stored on Internet servers that are designed to handle thousands or even millions of simultaneous requests, a single audio message can be reviewed by a large group of requesters at the same time. However, it is a time consuming and difficult task to put an audio message on a webpage. It includes many steps, which require special software, a computer, and the technical expertise to perform the required steps.

Another publishing method exists that is somewhat between the push and on-demand publishing methologies. Fax broadcasting uses such a method. Fax broadcasting is the sending of a single fax to many recipients. The recipients typically request to be included in a broadcast list (a list of recipients that are to receive the broadcasted fax). In a sense, they have "demanded" the fax. Since most fax machines are left powered on and ready to receiving a fax at any time, it can give the sending fax machine its full attention whenever a fax is being "broadcasted" to it. Most fax machines also print out or store the faxes they receive, allowing the user of the receiving fax machine to review the broadcasted fax when it is convenient to do so. However, fax broadcasting has several major disadvantages. Since a typical fax transmission takes a few minutes to complete, the time required to send a fax to ten thousand recipients could easily take hours or days to complete. To reduce this time, multiple fax devices can be used concurrently, with each fax device sending to a different recipient. This allows the sending of the fax to multiple recipients in the same time as it takes for a single fax device to send one fax to one recipient. Even with multiple fax devices, such a system could still be time consuming and costly to operate and maintain. Another potential disadvantage with fax broadcasting exists with documents such as price lists. Since price lists are typically updated periodically, there exists the potential for a reviewer to accidentally view an old or outdated price list because the reviewer may not know a more current list has been broadcasted or they may be unable to find it. In addition, since most fax machines print out the received faxes on paper even if they are never viewed, a large quantity of paper is consumed and often wasted when broadcasting a fax. In addition, because most fax machines immediately printout any received faxes, confidential documents are often compromised because other people may see the message before it is delivered to the intended recipient or while the message remains next to the fax machine.

The Internet has become a popular source for information and an excellent example of on-demand publishing. Information and messages, often called 'content', can be published on the Internet World Wide Web (WWW) by placing them on a 'webpage'. Once connected to the Internet, a person using a web browser can visit the various locations on the WWW and view all the information and messages contained on its many webpages. To help find what they are looking for, people often use search engines to search for various keywords or phrases related to the topic of interest. Because the Internet is always 'running', the information and messages contained on the webpages are typically available for review at any time. Product information, news, recipes, travel directions, store hours, music, software and other information and items are all available on demand, at any time of the day or night.

However, publishing a message on the Internet can be a daunting task. Currently, there exists two main ways to publish information on the Internet. The first method requires the

publisher to own or have access to a computer, web publishing software, an Internet web server and have the technical knowledge to use all of these items. These requirements severely limit the number of people that can publish content on the Internet. Furthermore, even if someone possessed the equipment and technical knowledge to use web publishing software, they are limited to the features, capabilities and the manner by which the web publishing software operates. A user can not simply use any software program to create and publish content on the Internet. The software program must be specifically capable of working with webpages (i.e. HTML-type files).

The second method involves the hiring of someone skilled in the art of web publishing (often referred to as a webmaster) to create, publish and maintain the content for you. This method can be very expensive, ranging from hundreds to thousands of dollars. In addition, webmasters typically charge for each and every change that you want made to your webpage(s). With either method, the process can be time consuming and expensive, denying many people the benefits of publishing a message on the Internet can bring.

Various systems have been developed that allow a message to be reviewed on the Internet. Once such system is described in U.S. Pat. No. 5,675,507 Charles R. Bobo, II "Message Storage and Delivery System". This patent describes an invention that allows a user 'on the go' to review their own personal inbox of faxes and voice mail messages using a web browser. However, this invention is designed in a many-to-one configuration. Meaning, many third parties (friends, colleagues, clients, anyone, etc) can send a fax or leave a voice message for the one user of the invention. No one other than the single user can review the messages because the invention purposely restricts such review to just the single inbox owner for privacy purposes. Even if the reviewing security was removed from the invention so anyone can review the messages, the inventions' lack of security when accepting messages would allow any unauthorized person to post an undesirable message in anyone's inbox.

There are a few software programs available that use optical scanners to enter documents into a document imaging system and then make the documents available for viewing on the Internet using a web browser. Not only do these programs not handle audio messages, they are typically very expensive and require the user to own one or more computers and have the technical expertise to operate and maintain the entire system. In addition, the user must be physically in front of and using the PC running the document management software to publish a document. This issue alone severely limits the number of people that can use it to publish documents on the Internet.

An additional prior art exists (U.S. Pat. No. 5,710,883 "Hypertext Document Transport Mechanism for Firewall-compatible Distributed World-Wide Web Publishing", Conley B. King Jr.) that allows a user to publish webpages by first packing them into an email and sending the email to a special web server that unpacks the hypertext files and places them in a memory area on a world-wide web server. This method not only requires the sender to have the necessary tools and skills to create the webpage, but they must also create the email in a special format that is required by the receiving server machine.

Another prior art (U.S. Pat. No. 5,945,989 "Method and apparatus for adding and altering content on websites") describes an invention that allows a non-technical person to alter a websites' content using a typical telephone. However, all the various content, webpages and the website itself must already exist prior to the user placing a call to the invention to manipulate such content. Each different item of content must be pre-supplied to the invention and assigned a unique ID number before the invention will allow a caller to use that content. The caller would then call the invention and specify the ID of the content that they wish displayed on the webpage. Not only does this two-step process severely hamper the ability to quickly add new content to a webpage, but also a computer and technical expertise is required to initially create the website, webpages and content before the invention can even work with these items.

Additionally, many systems restrict the ways in which a message can be reviewed, such as publishing the message in a non-standard format, requiring the reviewer to use special hardware or software to review it. For example, Adobe Acrobat™ is often used to publish documents on the Internet. Not only is the publisher required to specially encode the message, the reviewer is required to obtain special Acrobat Reader software so they can review the document.

In addition, most systems that publish messages on the Internet do not keep records of when and who reviews the messages. Such statistics can be very helpful to people such as advertisers who want to know how much exposure an ad got.

Additionally, most systems that publish messages on the Internet do not check the message for inappropriate content; they just blindly publish the message. It is up to the users' [of the publishing program] judgement if a message should be published or not. The invention can optionally provide an automatic publishing restriction means to prevent the publishing of a message containing prohibited content.

Also, most systems can not notify one or more people when a new document has been published. Instead, reviewers are required to constantly check the system to see if a new document has been published.

To truly allow virtually anyone to publish a message on the Internet, a solution must exist that is easy, secure and economical to both publish and review the message.

## OBJECTS AND ADVANTAGES

It is a primary object of the invention to allow virtually any person or organization to easily publish a message on the Internet that can be simultaneously reviewed by a mass number of people from around the world.

It is a further object of the invention to allow a message to be published without special equipment or technical expertise.

It is a further object of the invention to allow such publishing to be easy, secure and economical.

It is a further object of the invention to allow the published message to be reviewed using a typical web browser.

It is a further object of the invention to automatically and quickly publish a message upon receiving the message from a user without any pre or post-action required from the user.

It is a related object of the invention to allow anyone with access to a common fax machine to create and maintain webpages on the Internet.

It is a related object of the invention to allow anyone with access to a common telephone to create and maintain webpages on the Internet.

It is a further object of the invention to help the user maintain and monitor their website.

It is a related object of the invention to allow for posting of timely information.

It is a further object of the invention to allow a user of the invention to obtain statistics related to how, when and who reviewed a published message.

It is yet a further object of the invention to allow a message to be published on the Internet, from a broader range of sources and methods then are currently available today.

It is yet a further object of the invention to optionally restrict access to one or more published messages based on a time or date schedule.

It is yet a further object of the invention to optionally prevent inappropriate messages from being published.

It is yet a further object of the invention to optionally allow only authorized persons to review a published message.

It is yet a further object of the invention to optionally notify one or more people when a new message has been published.

It is a further object of the invention to automatically create webpages that will host the message and allow it to be reviewed on the Internet.

It is a further object of the invention to supplement information that was published using traditional publishing methods.

It is a further object of the invention to automatically submit the published message to one or more Internet search engines, so other people can find the message based on it's contents or topic.

It is a related object of the invention to help the environment by reducing the amount of paper and energy consumed or wasted when publishing a message to a mass audience.

Additional objects, advantages and novel features will become apparent to those skilled in the art upon reading this disclosure or by practicing the invention.

## SUMMARY OF THE INVENTION

To achieve the foregoing and other objects, in accordance with the present invention, as embodied and broadly described herein, a message publishing system receives an incoming message over a network along with one or more identification signals. The message is received and the ID info is used to identify the sender of the message as an authorized user of the system. The message is converted from a first format to a second format, with the second format preferably being one or more webpages. The message is stored within a storage area, preferably an Internet web server, and is retrieved from the storage area when a request for the message has been received from a requester. The message is then transmitted to the requester over a network, preferably the Internet.

In another aspect, a network message publishing system comprises a central processor for receiving an incoming message over a network along with identification signals accompanying the message, for identifying the sender of said message as an authorized user of the system, and for placing the message in a storage area. A network server retrieves the message from the storage area, converts the message into one or more webpages, and places the message in the storage area. When the network server receives a request for the message from a requester over the network, the network server transmits at least a portion of the message over the network to the requestor.

Another aspect of the invention relates to a method of publishing a message for a user. The method comprises the steps of receiving an incoming message over a network along with identification signals. The identification signals are used to identify the sender of the message as a valid user of the method. The message is received in a first format, converted into a second format, and stored in a storage area. When a request for the message is received from a requestor, the message is retrieved from the storage area and transmitted to the requestor. The transmission of the message occurs over a network and the step of converting the message converts the message into one or more webpages.

In a preferred embodiment, the system receives a fax, audio, video or email message, converts it into one or more webpages and places the converted message on an Internet web server, making it accessible and reviewable by anyone using a typical web browser or similar device.

Preferably, the system would have a large number of users. Each user may pay a fee to use some or all of the system's features and services. The cost to use the system could be based on a per-use basis, a limited number of uses for a given time period or unlimited use for a periodic fee. The system could even fax, email or call each user with an account statement or invoice amount when additional money is needed to cover any debt in the users account or when a new billing period is about to start. The increasingly popular Internet "free" business model could be used with the system. With this method, the systems' service could be made available for free (or at a significantly reduced cost) to its users. Revenue is derived or supplemented by the sale of third party advertisements, such as banner ads, that are placed on one or more webpages of a user and seen by each reviewer of that webpage.

In another aspect of the preferred embodiment, the system would allow anyone with access to a fax machine to create webpages from taxed documents. For example, a restaurant or deli could fax their daily specials to the system. The system would then convert the faxed document into one or more webpages and publish the webpage(s) on the Internet. In essence, it allows the publishing and maintaining of an entire website in a manner that is familiar to the user without the need for a computer, special software or a high level of technical expertise.

Additionally, if the faxed document contains images, special image processing can be performed on the document to convert the gradual shades of an image into a dithered or error diffused pattern that will allow a clear and more accurate reproduction of the original document when it is sent as a traditional black and white fax. Software such as Xelec Corp's ClearFax can be used to accomplish this function. However, such image processing may not be necessary if the fax device supported the new ITU-T30e color fax standard. This international format allows the faxing of a document in all its full color content.

In a related aspect of the preferred embodiment, the system would allow a user with a computer to create webpages in ways currently not possible. Currently, a webpage can only be created with software specifically designed to handle HTML (or a derivative format). If a particular software program does not support HTML, it typically can not produce webpages. The system makes possible the creation of webpages using virtually any software program that supports printing to a virtual printer driver. A virtual printer driver acts somewhat like a phantom printer. You can 'print' to it, but instead of the document actually printing on a physical piece of paper, it is either handled or sent somewhere in a digital format. Software products such as WinFax™ by Symantec act as a virtual fax printer device that allows the user to "print" to it, but instead of printing the document on paper, WinFax converts the "printed" document into a digital fax format and faxes the document to another fax device or machine that is designated by the user when the document print command was initiated. Because the system can publish these faxed documents, the user can use virtually any computer program to create webpages by simply printing (i.e. faxing) the programs' output to the system.

Alternatively, instead of faxing the document, the user could print to an alternate virtual printer driver that would convert the printed document into an intermediate digital/data format. This method could also allow the use of a color compatible virtual printer driver so the intermediate format will retain the original document's full color content instead of being converted to black and white as with most virtual fax printer drivers. The resulting color intermediate format could be sent to the system using email or another data transfer method that doesn't require a faxmodem or a telephone line like WinFax typically requires. The system would then convert the intermediate format into one or more webpages, ready to be viewed in full color by reviewers. This method would still allow a user to create one or more webpages from any application by simply printing their document to the special virtual printer driver, even if their computer does not support the faxing of a document.

In yet another related aspect of the preferred embodiment, the system would allow a faxed document to be reviewed by a mass audience faster, less expensive, and more secure then current fax broadcast methods. Currently, fax broadcasting can take hours or days to fax a single document to a mass number of people. In addition, a telephone charge is incurred for each fax sent, which can quickly add up to a significant expense. The system eliminates these disadvantages by publishing the faxed document on the Internet. Cost is virtually eliminated because there are no additional charges to the publisher for each person that reviews the document. The time needed to send the fax to multiple recipients is also virtually eliminated because the document can be simultaneously reviewed by a mass number of people as soon as it is published on the Internet. The recipients could be notified that a new message has been published via voice mail, paging or an email notification. A notification may not be needed. For example, with a price list message, a reviewer could simply check the webpage when they need a price. Because price messages are typically updated continuously by the publisher, the reviewer is assured that the prices contained in the published message are current. In addition, it is unlikely that a reviewer will view an old or outdated price lists because when each new price message is published, it replaces the old price list. The system can also significantly increase the security of a fax message. By designating a fax message as private, the system will only allow a reviewer with the correct passcode to view the fax message. Additionally, the system can greatly help the environment by eliminated the use of paper when publishing a fax message.

In still another aspect of the preferred embodiment, the system makes it possible for a user to create a webpage by simply sending an email to the system. When the system receives the email message, it can convert any text, image, video or sound information within or attached to the email into one or more webpages. In essence, the system allows the creation of webpages using any device that can send email. A PC is not required to send email. Small personal digital devices such as the 3Com Palm Pilot™ allow a user to create and send email without a PC. Some of these devices even support wireless communications, allowing a user to create webpages from virtually any physical location.

In yet another aspect of the preferred embodiment, the system makes it possible for anyone with access to a telephone to create webpages. For example, the system could record a restaurant owner announcing their specials for the day. The audio recording could then be published on a webpage allowing anyone to retrieve and play the audio message. In essence, the system allows the publication of an audio message on the Internet without any special equipment or expertise.

In a related aspect of the preferred embodiment, the system helps to increase a published message's awareness and reviewability by submitting the message to one or more searchable databases so a potential reviewer can find the message based on its contents or topic.

In yet another aspect of the preferred embodiment, the system can supplement or enhance messages or information that is published by non-Internet methods. For example, a furniture store could place a traditional ad in a newspaper. The ad could include the phrase "Visit our website at 'www.furnitureall.com' for out full line of specially priced items". Similarly, a person could place a small classified ad in a newspaper and mention in the ad that further details are available at the owner's webpage. Using this supplemental method, the person placing the ad will not only save money by being able to place a smaller ad, but the potential consumer can easily review a full set of information that otherwise would probably not be included in the printed ad due to cost restraints. Thus, both parties can benefit from the ease-of-use and low cost publishing method that the system offers.

In a related aspect, the system provides features to help the user monitor and maintain their website. For example, the system can send the user statistics on when and who viewed the various published messages, allowing the user to ascertain which messages were popular and which were not. In addition, the user can assign a date and time schedule to a message. For example, a coupon message could be configured so it will only be available for viewing during its valid period, and automatically be made unavailable after its expiration date. In addition, the system can send the user a copy of a currently published message. This will allow the user to verify that the correct messages are being displayed without the need for a PC or Internet access. For example, a user could request that the system send them a copy of the currently displayed specials. The system could then fax a copy of the requested webpage to the user, allowing them to confirm that the correct specials are being displayed to the visitors of their site.

In a main aspect, the system allows a user to publish a message in its native format. No special preparation or modification to the message is needed before it is sent to the system. The System will automatically convert, process and publish the message so it can be reviewed on the Internet by a mass number of people.

In summary, the present invention facilitates the publishing of a message to a mass audience in a manner that is quick, secure, economical and familiar to the user. It is also the intent of the present invention to advance the art for several dissimilar methods with a new, easy to use system and method. By allowing virtually anyone to easily, economically, and securely publish a message that can be easily reviewed by a mass audience, the invention opens a door once closed to many individuals. The disclosed invention incorporates these benefits, and as such, makes it idea for use as a public service, such as for newsletters or lost animal type postings, because with this system, anyone can easily post these types of items on the Internet.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram illustrating the connections of a message publishing system (MPS);

FIG. **2** is an overall flow chart of operation for receiving a message by the MPS;

FIG. **3** is an overall flow chart of operation for retrieving a message stored at the MPS;

FIG. **4** is a flow chart of initial operations for answering a telephone call;

FIG. **5** is a flow chart of operations for interacting with a user's call;

FIG. **6** is a flow chart of operations for receiving an audio message;

FIG. **7** is a flow chart of operations for receiving a fax message;

FIG. **8** is a flow chart of operations for publishing a single page fax;

FIG. **9** is an exemplary display of a published fax page;

FIG. **10** is a flow chart of operations for publishing a multi-page fax;

FIG. **11** is a flow chart of operations for publishing an audio message;

FIG. **12** is a flow chart of operations for publishing an email message;

FIG. **13** is a block diagram of the MPS;

FIG. **14** illustrates a more detailed block diagram of the input/output section.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Reference will now be made in detail to the preferred embodiment of the invention, an example of which is illustrated in the accompanying drawings. The term "fax" will be used interchangeable with the term "facsimile" throughout. In addition, the telephone network will be used interchangeably with the term PSTN (public switched telephone network). The authorized sender of the message to be published by the MPS will hereinafter be referred to as the user of the MPS, since they will be using the services of the MPS to publish their message or other information. The term reviewer and requestor comprise anyone (or anything) other then the above-defined user, and will also be used interchangeably to describe the one or more people (or things) that request and review a published message. In addition, the generalized term of "message" will often used to describe the various information, data or other content that the user wishes to publish on the Internet.

With reference to FIG. **1**, a message publishing system (MPS) **100** is connected to both the Internet and the public switched telephone network (PSTN) **130** using various connections **110** such as PSTN lines, DID trucks, T1, T3, etc. The Public Telephone Network (PSTN) and the Internet **130** have been shown as a single entity. This is because many Internet users connect to the Internet through a telephone line, and in many instances, the Internet uses the same communications pathways as the telephone network.

Preferably, the MPS has multiple telephone lines (**110***a* in FIG. **14**) to the public switched telephone network (**130***a* in FIG. **14**) and a high bandwidth connection (**110***b* in FIG. **14**) to the Internet so that the MPS can simultaneously publish and receive requests for a large number of messages.

Although the Internet (**130***b* in FIG. **14**) has been shown as a single entity, it is actually a conglomeration of computer networks and is a constantly evolving and changing structure. The system therefore is not limited to the current structure or form of the Internet but encompasses any future changes or additions to the Internet. Further, the MPS is shown as being directly connected **110** to the Internet, such as through its own node or portal. The system, however, may be practiced with any suitable connection to the Internet, such as through an intermediate Internet access provider.

The message to be published can be sent to the MPS in a number of different ways. For instance, using a telephone **150**, a user could place a call through the PSTN **130** to a number that is serviced by the MPS and have the MPS record an audio message that is to be published. Similarly, a user could use a fax machine **120** to send a fax message through the telephone network **130** to the MPS. A user could also use a computer **140** to send a text message, audio message or an image to the MPS by emailing it through the Internet **130** to an email addressed serviced by the MPS.

Typically, the facsimile device **120** and the telephone **150** will connect to the MPS through the telephone network **130**, and the computer **140** will connect to the MPS through the Internet **130**. Telephone and fax calls can be made to the MPS using a network other then the telephone network **130**. New network technologies such as Voice-over-IP, IP-Telephony, Internet Telephony, and IP-faxing have been developed to allow such activities over a data network, such as the Internet **130**. Similarly, email messages might travel through the telephone network **130** during its transfer from origination to destination.

Although the fax machine **120**, telephone **150** and computer **140** have been shown on separate lines connected to the Internet/PSTN **130**, one or more of these devices could share a single line. While a single computer **140** is shown in the figure, the single computer may actually represent a local area network that is connected through one of the networks **130** to the MPS.

With reference to FIG. **2** depicting the overall message reception operation of the system, a message transmission to the MPS is initiated by the user at step **200**, for instance by using the facsimile machine **120**, the telephone **150** or the computer **140**. The incoming message may therefore be a facsimile message, an audio message or an email message respectively.

Step **210** comprises a message check loop. Typically, the MPS needs to continually check for new messages because some message transfer methods do not send the message directly to the MPS. Instead the message is stored elsewhere and the MPS must retrieve it. A common example of this occurs with email. Since many computers are not always on or connected to the Internet 100% of the time, it would be impossible to send an email message directly to a computer that is off or inaccessible. An alternative destination that is on and always accessible is therefore needed to receive email messages when they are sent from a sender. Typically, this is the role of a network mail server. The mail server is typically running all the time so it can receive messages for its users at any time. A mail server typically stores the users' messages until they are requested by the user. When it is convenient or desirable to do so, the recipient can turn on their computer, connect to the mail server and obtain any email sent to them since the last time that they checked their email inbox. Step **220** checks to see if there is a new message. If no new message is detected, step **210** is repeated until there is a new message. When a new message has been detected, execution jumps to step **230** where the message is received along with any accompanying ID information.

To prevent an unauthorized person from deleting, replacing or posting an undesired message, it is preferred to have a security means to limit the use of the MPS to just authorized users. This security scheme should also prevent a valid user from deleting, modifying or adding to another valid user's published messages. If a security means wasn't utilized, then anyone could replace, delete or add a message to another user's account or website. The MPS implements this security in various ways to accommodate varying balances between

convenience and security for each user of the MPS. The identification and security means will herein be referred to as I&S.

Typically, when a message is sent to the MPS, it is usually accompanied by one or more identification signals. Some ID signals may indicate from where the message was sent from, and others may indicate the desired destination for the message. Some ID signals are sent before the message is transferred, some are sent within the message itself or during its transfer, and still others can be sent after the message is transmitted. The Telephone Company's caller ID signal is an example of an ID signal describes where the telephone call originated.

For example, if a user typically sends faxes to the MPS from the same fax machine, a good balance between security and convenience can be obtained by using the telephone company's caller ID signal. The caller ID signal is an example of a signal that is sent BEFORE a call is connected, because the telephone company sends the caller ID signal between the first and second incoming telephone rings. When the MPS receives the caller ID signal, it can both identify the sender (by doing a lookup for the account associated with that caller ID number) and be fairly confident that the fax is from the associated user because the phone line for that user is typically within the user's premises. Because this particular security scheme is based on a sending telephone number and not a particular person, any employee of a deli can publish the day's specials, not just the owner. This method will probably be the most often used security means because almost every telephone company supports the sending of the caller ID signal, and most users will typically send a message from the same telephone number.

A more secure means can be obtained by using DTMF ID tones. Using this method, the MPS would answer an incoming call and prompt the caller to enter some unique identification code(s) such as the users account number and preferably a passcode before the MPS will allow the caller to send a message. This method is a good example of an ID signal that is sent after a call is connected, but before the message is transferred. This method offers high security but requires the user to perform the extra step of supplying the ID tones. However, this step can be eliminated by storing the DTMF ID tones within a speed-dial button of a telephone or fax machine so it could be automatically provided to the MPS in one step. This method would also allow a user to send a message to the MPS from any location since the MPS is not relying on any ID information associated with a physical location of where the message is coming from (as is the case when using the caller ID signal), but rather from whom.

A less secure, but faster publishing method can be obtained by using the called number ID signal. This signal describes the number that is being called, not the number were the call came from. Typically, when using this method, a different telephone number is assigned to each user of the MPS. When a call comes in from a user, the MPS can identify the user by what number they used to call the MPS. For an MPS with a small number of users, each physical telephone line to the MPS can be dedicated to a single user's telephone number. It would be a simple matter to determine the called number by what physical line the call came in on, and what user has been assigned to that telephone number. However, this configuration can become both inefficient and costly to dedicate a phone line for each and every user when many users exist. In this instance, DID (direct inward dial) trunks would typically be used. Preferably, the DID trunks would contain many telephone lines that are not assigned to any particular telephone number. Each telephone line is assigned a telephone number only when a call comes in. This would allow a few DID lines to handle calls made to a much higher number of different telephone numbers. When a call comes in, the telephone company routes the call to one of the available DID lines and sends the called number ID signal to the MPS. The MPS uses this ID signal to lookup the account associated with the called number and thus identifies the user.

ID signals are also available when a message is sent over the Internet. For example, IP faxing is the term commonly used to describe the sending of a fax through the Internet. Typically, with IP faxing, a fax is sent from an ordinary fax machine to a fax-gateway device located geographically near the sending fax machine's location. The fax-gateway converts the fax into packets of digital data and sends these packets over the Internet to another fax-gateway device that is located geographically near the destination's fax machine. The destination fax-gateway device converts the data packets back into a normal fax and sends it to the destination fax machine. Since both fax gateways are located geographically near their respective fax machines, the majority of the distance that the fax data travels over is the relatively free Internet, thus the cost for a long distance fax is significantly reduced. Since the MPS is connected to the Internet, it can act as the destination fax gateway device and receive a fax sent through the Internet. Using this method, the MPS can obtain ID information by extracting the source and destination information from the packets of data making up the fax. Similarly, voice-over-IP, IP-Telephony and Internet telephony are other network-based technologies that enable telephone-like communication of voice and video over a data network, such as the Internet to the MPS.

Alternatively, a new protocol called IPP (Internet Printing Protocol) allows one computer user to print to another users' printer through the Internet. All the sender (person who is printing) needs to know is the destination printer's IP address. Since the system is connected to the Internet, it can be configured to receive incoming IPP print jobs. But instead of printing out the document, it will simply publish the document as it would any other message. Data contained in the IP packets can also be used to identify the sender of the message.

The system can also use ID info contained within the message itself. For example, if a fax message contained a barcode or other optically readable ID, an optical recognition program could be used to extract the ID info from the fax message itself. In another example, OCR (optical character recognition) software can be used to convert the graphic text within a fax into computer readable ASCII text data. This ASCII text data could then be searched for a particular keyword or phrase, which would identify the sender. In still another example, ID of the sender could be obtained by text within an email message or even the name of an attachment to an email message. In yet another example, speaker recognition technology (it identifies a particular person by their voice) could be used to identity the user by processing the users voice either as a separate security step, or by processing the actual audio message that the user recorded to be published. Alternatively, speech recognition technology could be used to convert the users voice message into ASCII text data and then search it for keywords or a passcode to identify the user.

Optionally, the extracted ASCII text mentioned above could also be scanned for inappropriate words or phrases. If such content is detected, the system could be configured to reject the message and not publish it. This additional content check could help prevent the misuse of the system. Alternatively, special image processing could be performed on images that the system receives. Such processing could uti-

lize pattern recognition to identify various items present in an image. If inappropriate or restricted items are found, the system could prevent the publishing of the message. Speech recognition could also be used to scan audio messages for inappropriate content. The system is not limited to performing just these processes. For example, if prohibited content is found, the system could simply remove that content from a message and publish the remainder of the message. Each process could have specific criteria of what is considered acceptable and what is not. The system could be configured with different criteria for each type of message and/or for each user.

In even another method, the I&S could be based on an unapparent association, such as a time and date schedule. For example, a I&S system could be configured so that any fax received from a certain caller ID number before noon will be assumed to be one user and any faxes received from that same number after noon will be assumed to be another user. This scheme would eliminate the need for each caller to supply their account number when they call in.

A combination of ID signals can be used to create additional balances between security and convenience. For example, the called number ID method can be used with the DTMF method to allow a quicker and more secure method of identification. With this method, the MPS can use the called number ID to identify the caller so the user does not have to manually inform the MPS of their account number. The user would then only need to enter their passcode via DTMF to verify their identity to the MPS.

It is preferable that the MPS system be able to implement a different I&S for each user. This would allow each user to choose the I&S that best meets their particular I&S needs. Additionally, a user could have different I&S schemes for each type of message that they may send to the MPS. For example, a user's account could be configured to require only a certain password within the subject text of an email message when an email message is being published, but require a DTMF passcode when an audio message is being published, and require only the caller ID number for publishing a fax message.

The system could also be configured to accept messages from an unknown sender, but not publish the message until a valid user OK's the publishing of the message. This would allow a third party to create the message and send it to the system for proofing by the authorized user. If the user OK's the message, they can instruct the system to publish the message.

Additionally, the system could be configured to accept more then one passcode or ID per user account. This would allow a storeowner to give each employee their own ID while still maintaining the one user account. With this configuration, it is preferable that the system keep audit trails of when and who used the account and what they did. This way, if a message was posted by mistake, the audit trail can be used to see what employee published it.

Additionally, identification signals can be used by the system to determine where the incoming message should be stored. When a user publishes a message, the message is typically stored in the user's storage area. However, the storage location for a message could be decided by other means. For example, the sender could inform the system to save page 1 of a fax message in a particular storage area, but save the second page of the same fax message into a different storage area.

The above are only examples of common ID signals. The system is not limited to using just these signals. Any information accompanying, associated, attached or within a message may be used by the system to identify the sender of a message as a valid user. Additionally, different ID info can be received by the MPS at different times. Due to the large number of permutations that can exist by using different combinations of ID signals, methods and when they occur, it would be impractical and confusing to describe them all here. However, it is preferable that a caller not be allowed to operate the MPS or publish a message until the MPS has sufficient ID information to identify the sender of a message as an authorized user of the MPS.



For example, lets say a users' account is setup to use the fax terminal ID (an ID signal sent from the sending fax machine and usually set to the fax machines' telephone number) for I&S. The fax terminal ID is only transmitted when the fax message is being transmitted. Because of this condition, the system could allow the reception of a fax message even though it has not identified the sender yet. After the fax message has been received, the system would then check whether the fax is from a valid user. If it is not from a valid user, the fax is discarded. However, if instead of sending a fax message, the user tries to select another option, such as the users' preferences menu, the system would immediately prompt the caller to identify him or herself. This would happen because since a fax message has not been sent yet, the system does not know who the caller is, and thus should not let the caller access the system until they have been identified as an authorized user of the system. In other words, the system will not publish a message or let a caller operate the MPS until it has been determined that they are an authorized user of the system.

Alternatively, the security means can be provided by a company's own LAN. In this example, the LAN could be configured to allow company use only, thus limiting use of the system to just employees of the company.

Additionally, the system may not need a security means. For example, if there is only one user of the system, then all messages received can safely be assumed to be from that one user.

With reference again to FIG. **2**, at step **240** the MPS uses any ID information contained within, associated or accompanying the received message to identify the sender of the message as an authorized user of the MPS. If the sender can not be identified as an authorized user, the message is discarded at step **250** and the system returns to step **210**, waiting for a new message.

Once the sender has been identified as a valid user of the system, step **260** publishes the message. A more detailed discussion of this step will be discussed later with reference to publishing each type of message.

When publishing a message, it is preferable that the system allows the user to specify whether a published message should be public or private. A public message can be reviewed by anyone requesting it. A private message is one that should only be viewed by one or more authorized persons. When a message is designated as private by the user, a passcode is required to review it. Typically, the user would specify the passcode when they publish a private message. Later, when the private message is requested, the system will prompt the requestor to enter the passcode. If the passcode that the requestor entered is the same as the one the user assigned for the private message, the message is then transmitted to the requestor. If the requester did not supply the correct passcode, they are denied access to the message. A typical example of a private message could be a wholesale price list. Using this method, the user would publish the wholesale prices and inform all their dealers of the message's passcode. Only those who where informed of the passcode would be able to view

the private price list. A private message could have only one passcode or multiple passcodes that would allow it to be reviewed. If a private message has only one password, anyone using that password would be allowed to view the message. However, it may be desirable to issue a different password to each potential reviewer. By giving each reviewer a different password, it can be easily determined who reviewed a message by what passwords were used to view the message and who was assigned those passwords. Using separate passwords for each reviewer would also allow one or more reviewers to be denied access to a private message by simply deleting their respective passwords from the "approved" list. There would be no need to reassign passwords to the already existing approved reviewers.

Private publishing can also be used to replace or augment fax broadcasting. As described previously, traditional fax broadcasting can be time consuming and expensive. By using the system to publish a fax message, both the cost and the time required for multiple recipients to review the message is greatly reduced. The cost is reduced because multiple, possibly long distance phone charges are eliminated by using the Internet to review the message. The time is reduced because the message can be reviewed by thousands of recipients within a few minutes of when it is published. For example, when a user publishes a private fax message, the system could instantaneously notify all the desired recipients that a new message has been posted (published). Each recipient could then review and/or print out the message at their convenience.

Step **270** notifies one or more potential reviewers that a new message has been published. This notification could not only be used to alert one or more people to the possibility that important information has been published, but it could save a potential reviewer much time because they would not have to keep checking for a new message, they would simply wait to be notified when a new message has been published and is available for review.

Typically, people would subscribe to a notification list associated with a particular user or message on the MPS. For example, customers of a deli could subscribe to the deli's notification list so they will be notified when the day's specials are published. Notifications could be performed via email, paging, voice mail or many other ways. Email notification is preferable because it can simultaneously notify multiple people virtually instantly. Typically, an email listserver would be used to handle the task of emailing all the subscribers on a user or messages' notification list. In addition, most reviewers will likely have an email account because they will often review the messages through the Internet using their computer and ISP.

With reference to FIG. **13**, the MPS may also be connected to a paging system **1300** through a network such as the Internet or the PSTN. Upon the publishing of a new message, in addition to email and other notification methods, the MPS could page one or more reviewers by activating the reviewers' pager **1305** or other notification device. In this manner, one or more potential reviewers could receive almost instantaneous notification that a new message has been published by the MPS. The paging system is preferably one that transmits alphanumeric characters so that a message may be relayed to the reviewer's pager, perhaps even part of the published message itself. The MPS would use the software **1330** to generate a paging format such as XIO/TAP that is recognized by the paging system.

In addition, the notification itself could contain a portion or the complete message that was published, serving as an alternate or additional method of publishing the message. For example, the text of a published email message could be sent within an email notification to reviewers, eliminating the need for the reviewer to view the message's webpage. Each notification method may require the published message to be converted into a format that is compatible with the notification method. For example, if a fax message was published, OCR technology can be used to convert the fax image's text into ASCII text data, which can then be paged to reviewers via alphanumeric pagers. Another example could convert the text of an email message into spoken words using Text-to-Speech technology, and the resulting audio message could be announced to reviewers via a telephone call notification or voice mail.

The amount and type of information that may be sent to the potential reviewers may vary according to the capabilities of the notification means and may provide a greater or lesser amount of information than the examples provided.

It is preferable that a published message can be found when a potential reviewer is searching for messages containing specific words or related to a specific topic. The system allows such search and retrieval by automatically submitting the user's messages to one or more Internet Search Engines. Search engines are used by most surfers to find webpages or other content related to a specific topic of interest. Typically, an Internet user will enter keywords that are related to the topic of interest, into one of the many search engines available on the Internet. The keywords are typically chosen based on the high chance that they will be included in a webpage of the desired topic, but at the same time have a low chance of being included in a webpage of an undesired topic. For example, if a user wanted to search for webpages related to the ocean, they wouldn't want to initiate a search that includes the word "The" because almost every webpage in existence includes this word and thus will be included in the search engine's "hit list" (results). A more effective search could be performed by submitting the keyword "ocean", or if they are really looking for information on lobsters, then they should submit the word "lobster" to limit the search engines' results to just webpages containing the word "lobster" in it. Step **280** submits the published message to one or more search engines so a potential reviewer can find the message by performing a keyword or topic search of the message.

With reference to FIG. **3**, after the MPS publishes a message, it is ready to be reviewed. One or more reviewers can then communicate with the MPS at any time and from any location in which they can connect to the Internet and request the message stored on the Internet server (**1360** in FIG. **13**). At step **300**, the reviewer first connects to the Internet, such as with a personal computer **140** (in FIG. **1**) which may be connected to the Internet in any suitable manner, such as through its own portal or node or through some intermediate access provider. The personal computer is not limited to a single computer but may instead comprise a network of computers, such as a local area network within an office.

Once connected with the Internet, at step **310**, the reviewer accesses, with a hypertext web browser, the Universal Resource Locator (URL) associated with the published message. The reviewer may use any suitable hypertext browser, such as Netscape Navigator or Internet Explorer to access the message. The Internet server **1360** of the MPS receives the request for the message from the reviewer at step **320**. At step **325**, the system checks to see if the requested message is scheduled to be reviewable. The reviewability of a message will be discussed later in greater detail with reference to the various times at which the publishing process may occur. If step **325** determines that the message is not scheduled to be reviewable, then the process is routed to step **355**, which reports the review failure to the requestor. If the requested

message is scheduled to be reviewable or does not have any time restraint of being viewable, the process is routed to step **330**.

At step **330**, the requested message is retrieved from the user's storage area. At step **340**, the MPS checks to see if the message is public, meaning that the user (sender) of the message designated that it can be reviewed by anyone requesting it. If the message was determined to be public, the MPS sends the message to the requester at step **360** through the Internet. If the message is private, the MPS at step **345** requests identification from the reviewer. The reviewer then supplies their ID and/or password. At step **350**, the MPS checks to see if the reviewer is authorized to review the private message. If the reviewer is found to be authorized to review the message, the MPS sends the message to the reviewer at step **360**. If the reviewer is not authorized to review the message, the MPS sends a review failure message at step **355** to the reviewer. Also, if for any reason the request is invalid, such as when a hacker is attempting to gain unauthorized access to a message or the system, the request for the message will be terminated. Once the message is received by the reviewer, the message can be displayed, played, printed out or saved for further review.

Since the MPS can receive messages of various types, such as a facsimile, audio or email messages, the MPS typically needs to determine the type of message that is being received so that it can publish the message accordingly. For messages received over the Internet or another data network, this can be easily accomplished by the method used to receive the message. For example, if a POP3 or other common email protocol was used to receive a message, the message would therefor be an email message. If an IP fax protocol was used, the message is a fax and so on. Additional information accompanying the message such as the header, packet data, data descriptors, and the actual format of the message can also be used to determine the type of message. For example, if an email attachment is named "TEST.JPG", the attachment is a JPEG image file. As will be apparent to those skilled in the art, the system is not limited to any particular method used to identify the type of message. Preferably, the MPS would continually monitor for new messages being received over the Internet or other data network. When an incoming message is detected, the system would receive the message and publish it according to its type. These publishing methods will be discussed in further detail with reference to FIG. **8**, FIG. **6**, and FIG. **12** respectively.

While the MPS monitors for messages coming in over the Internet, it also monitors for incoming telephone calls. An incoming phone call could be an incoming fax message, an audio message or simply a user wishing to access their account information or preferences.

With reference to FIG. **4**, when an incoming phone call is detected at step **400**, the MPS attempts to receive the caller ID info if it is present at step **410**. The MPS then answers the call at step **420**. If a caller ID signal was received and it is associated with a valid user of the MPS, the MPS may simply prompt the caller, at step **430**, to enter their passcode using the DTMF keys on their touch-tone phone. If the caller ID information was missing or it did not match up to any known users of the MPS, the MPS may prompt the caller, at step **430**, for their MPS account number as well as their passcode. It is preferable for the system to use any information it can obtain about a caller, such as the caller ID, to identify the caller and thus eliminate the need for the caller to manually identify himself to the system.

While the MPS is waiting for the user to identify himself, it is also monitoring for a fax calling tone (CNG) at step **440**.



A fax calling tone may indicate that a fax is being sent to the MPS. If a fax calling tone were heard, the MPS would route the call to and initiate the fax receival process (via circled "F") which will be discussed in further detail with reference to FIG. **7**. If no fax tone is heard, the MPS attempts to receive the ID info at step **450**. Step **450** would typically wait a certain amount of time, preferably ten seconds, for the user to enter their ID info via DTMF digit key presses. Step **460** then checks to see if the available ID information confirms the caller as an authorized user of the system. If the caller has been identified as an authorized user of the system, the MPS routes the call to the systems' main IVR menu (via circled "M") which will be discussed in detail with reference to FIG. **5**.

If a fax tone was not detected and the ID info was invalid or not supplied, the system, at step **470**, will repeat the identification prompt at step **430**. If after n attempts no fax tone has been detected or a valid ID has not been entered, the system jumps execution at step **470** to step **480** which disconnects the call and returns to waiting for a new message. The specific number "n" may be three so that the call is terminated after three failed attempts.

With reference to FIG. **5**, once the caller has been identified as an authorized user of the MPS, the main IVR (interactive voice response) menu is announced to the user at step **500**, prompting them for a selection. The main menu would typically include the options for the user to; 1) publish a fax, 2) publish an audio message or 3) enter the user mode.

If the user presses the "1" digit, this would indicate that they wish to send a fax message to the MPS for publication. Step **530** would detect the "1" digit and route the caller to step **535** which would announce various options associated with publishing a fax message. A typical fax option may included prompting the user to select whether the published fax should replace any existing message in the users storage area, or simply be added to the rest of the existing messages for that user. The replace option would typically be used to update a message, such as a deli's specials, since the previous days specials may no longer be valid and should be replaced with the current days specials. The add option would typically be used to publish a new message without it replacing any existing messages. Preferably, when the user selects the add option, the system will prompt the user for a message ID to be assigned to this new message for future reference. For example, when the deli owner first publishes his breakfast specials, let's say he assigned ID #001 to that message. Then, at a later time, he could replace that message with a new message by simply informing the system of what message ID he wants to replace. Another option could let the user delete an existing message, such as a coupon that expired simply by entering the message ID of the message they want to delete. Alternatively, the system could be configured to automatically assign an ID to all new messages and inform the user of the assigned ID by means such as faxing a listing of all the user's messages along with their respective ID's. Additionally, the system could be configured to automatically delete a message (such as an expired coupon) after a specified number of days after it was published.

Another fax option might allow the user to specify whether the fax message is to be public or private. If a fax message is designated as public, it can be reviewed by anyone requesting it. If a message is designated as private, such as a wholesale price list, the reviewer must submit the correct passcode in order to review it. If the user selects the private option, the system could then prompt the user to enter the passcode that would be required to review the message. Another option could allow the user to specify whether the fax should be

rotated, such as in landscape or portrait mode to allow for proper viewing of such documents.

In addition, there could be an option that allows the user to request a copy of an already published message. When this option is selected, the system would prompt the user for the ID of the message they want a copy of. The system could then read the text of the message to the user using TTS (if the requested message is a non-audio message), play the message to the user if it is an audio message, or even fax a copy of the message to the user for their review. Thus, allowing a user to confirm what is being displayed to surfers, without the need for a PC or Internet connection. Other options will become apparent after reading this disclosure and practicing the invention.

After the user is done specifying options for publishing the fax, the MPS would instruct the user to start sending the fax document [to the MPS] that is to be published. The call is then routed to the fax receival process (via circled "F") which will be discussed in further detail with reference to FIG. **7**.

Returning reference to FIG. **5**, if the user presses the "2" digit, this would indicate that they wish to publish an audio message. Step **540** would detect the "2" key press and route the caller to step **545** which would announce various options associated with publishing an audio message. Options such as add/replace/delete and public/private as mentioned with reference to fax options could also be offered. Another audio option may include prompting the user to select whether the published audio message should be in a WAV format, a Real Audio™ format or in both formats by creating two separate files of the same message. As mentioned previously, other options will become apparent after practicing the invention and reading this document. After the user is done specifying options for publishing the audio message, the call is routed to the audio message recording process (via circled "V") which will be discussed in further detail with reference to FIG. **6**.

To assist the user in replacing an old message with a new message, the system could track each message with a unique ID. This way, if a user wishes to update a message, they only need to supply the ID number of the message they wish to update. The system would then replace the old message (with that ID) with the new message. The system could automatically assign this ID when a user publishes a new message, or the user could manually assign the ID when publishing a new message. For example, the user could assign an ID to a message by using the DTMF digits of a telephone, or by using Speech Recognition, the user can say the ID of the message and the system will record that ID as being associated with that particular message. In addition, data within the message itself could also be used to assign an ID to a message. For example, the contents of the subject field of an email message could be used to track the message. Additionally, the system could assign different IDs to different portions of a message such as each page of a multi-page fax message. The ID number could also be used to delete content by simply providing the system with the ID of the content the user wishes to delete.

There are many possible ways to assign a unique ID to a message or part of and the system is not limited to any particular method. Once an ID number is associated with a specific message or part thereof, it can be used to identify that content throughout the various operations of the system.

The system is not limited to just receiving fax or audio messages via a telephone call. For example, if the caller uses a videophone type device to call the system, they can publish a video message as simply as publishing an audio message. Additionally, with the use of technologies such as voice-over-IP and IP-faxing, telephone-like calls can be placed over a data network, such as the Internet, just as easily as placing a call over the telephone network. Thus, the system is not limited to any particular way of sending a message to, or receiving a message from the system.

Other options for publishing a fax, audio or video message will become apparent to those skilled in the art after practicing the invention and reading this document.

If the user presses the "3" key, this would indicate that the user wishes to enter the user mode. Step **550** detects the "3" key press and directs the caller to the user account menu at step **555**. The system then announces the user menu to the caller, prompting them for a selection. The user menu would typically include options to allow the caller to: 1) Receive statistics related to who, how and when a particular users' message was reviewed, 2) Make a payment (if the MPS charges for its services), 3) Change the I&S scheme or passcode for their account, etc. Other user choices can be added and will be apparent to those skilled in the art after reading this document. User menu option number 1 could announce to the user how many times and when a particular message was reviewed. The count could be announced over the phone using pre-recorded speech segments or with the use of TTS (text-to-speech) processing. In addition, the user could request to have the message reviewing statistics faxed or emailed to them. The capability of reporting statistics will probably prove to be very beneficial to users. For example, if many people review a particular message, the user who published the message might consider publishing more similar messages in the future. In addition, it would be preferable to allow the user to reset the review statistics so when a new message is posted (published), the review statistics will correctly relate to the new message and not for the previous message. Another option could allow the user to make a payment for the use of the system by entering their credit card number via touch-tone key presses. Still another option may allow the user to select the Identification and Security means for each type of message they wish to publish. Other announcements, of course, could also be made at this time. For example, there could be an option that would allow the user to select the storage area for each message or part thereof.

Additionally, it would be beneficial for the non-PC user to be able to view one or more published webpages. This could easily be accomplished using the published messages' ID. For example, an additional user option could prompt the user to enter the ID of the message they wish to review. The system could then either fax the one or more webpages associated with that message ID, or could announce the text from the message's webpage(s) to the user via text-to-speech. By allowing the user to review the published webpages, they can fully verify and maintain their own website.

Any DTMF tones entered that are invalid for the requested prompt will result in the system notifying the caller that they are invalid at step **590** and replaying the main menu at step **500**. If after a select period of time, preferable ten seconds, no selection has been made, step **510** jumps execution to step **520** which checks so see if the number of main menu replays exceeded a selected count, preferably three. If so, the system will disconnect the call at step **525** and return to waiting for new messages. If not, the main user menu is repeated at step **500**.

It is preferable to have several keys be designated to have the same function throughout the interactive voice response system. For example, it is preferred for the "*" (asterisk) key to navigate the user to the previous step or menu, and the "#" to signify that the user has finished responding to the current prompt, such as when the user is done recording an audio message.

Other digits may cause the MPS to take additional actions. For example, the "*" digit is typically used to allow a caller to go back one menu in an IVR system. If the user would press the "*" at the main menu, the system could go back and re-request the caller to identify themselves. This would come in handy if a particular caller has more then one account on the MPS and wishes to publish messages for each account without having to hang-up and recall the MPS. Since the selection of these options with DTMF digits will be apparent to those skilled in the art, the details of this subroutine or subroutines will not be described in further detail.

The system is not limited to the specific interactive voice response system described with reference to FIG. **5**. As discussed above, the system may be responsive to one or more DTMF digits other than those mentioned. Further variations or alterations will be apparent to those skilled in the art after reading this document and practicing the invention.

With reference to FIG. **6**, when the caller wishes to record an audio message, step **600** prompts the user to start their audio message after they hear a recording tone. The system then generates a beep and begins recording the audio message at step **610**. The system continues to record the audio signals until; a) the system hears silence for a predetermined period of time, preferably 5 seconds, b) the user presses the "#" or "*" DTMF keys, or c) the specified maximum recording time has been reached, typically 1-5 minutes. Step **620** checks to see if a DTMF tone was heard during the recording. If one was heard, step **625** checks to see if it was the "*" key, indicating that the user wishes to abort the recording and return to the main IVR menu (via circled "M") which was discussed with reference to FIG. **5**. If the DTMF key was not the "*" key, step **630** checks to see if it was the "#" key, indicating that the caller is done recording the message. The "#" is commonly used to indicate that the caller has finished entering data in response to an IVR prompt. For example, most credit card IVR systems prompt the caller to enter their account number followed by the pound key. The "#" tells the system that the caller has finished entering the account digits, as an alternative to waiting for the input prompt to timeout. It is considered a "I'm done entering my info, now go act upon it". If the "#" key was detected, or the maximum period of silence has been exceeded, or the maximum recording time has been reached, the system stops recording the message and presents the caller with a menu of options at step **650**, such as allowing them to listen to the message to make sure it was recorded as desired, publish the message, or re-recording the message. If the DTMF key was neither the "*" or "#" key, step **635** simply ignores acting upon the key press and continues the recording process. In other words, any DTMF keys that are pressed other then the "*" and "#" will simply be recorded as part of the audio message. This would allow a caller to mix in musical tones, using the other keys of a touch-tone phone, within their audio message. Step **660** checks to see if the user selected the re-record option, and if so, execution is directed back to step **600** and the caller is prompted to record the message again.

Preferably, the system will automatically trim any silence at the start or end of the audio message, as well as any "#" termination tone (if the recording was terminated using it), to create a more professional and efficient message size for storage. After the audio message has been recorded and approved by the caller, step **670** then publishes the audio message, which will be discussed in further detail with reference to FIG. **11**, and returns the user back to the main IVR menu (via the circled "M"). As discussed above with reference to FIG. **5**, other DTMF digits may cause the MPS to take additional steps. For example, step **650** could include an option to abort the entire audio recording process and return the user to the main IVR menu. In addition, if an invalid digit is pressed, the prompt may be repeated for n attempts before automatically returning the user to the previous menu.

With reference to FIG. **7**, the MPS initiates the fax receival process at step **700**, which comprises the use of hardware and/or software to receive the fax message from the user. A hardware fax device is typically used when a fax is being received over a telephone line. Software protocols such as IP-Faxing allow a fax to be received over a data network without requiring special fax hardware. Step **710** receives the fax and any associated or accompanying ID info. Common ID info was discussed in detail with reference to FIG. **2**. If the fax arrived over a telephone line, the call is typically terminated after the fax is received. Step **720** then saves the faxed document into a storage area, such as the user's storage area. Step **730** then attempts to use all of the available ID info for the fax message to identify the sender of the fax as an authorized user of the system. If the system can not identify the sender of the fax to be an authorized user, the fax is discarded at step **740** and the system returns to waiting for a new message. If the sender of the fax has been identified as an authorized user of the system, the fax is published at step **750**, which will be discussed in detail with reference to FIG. **8**.

The preferred method for processing and publishing an email message will be discussed later with reference to FIG. **12**.

In the preferred embodiment, the message is converted and presented for review on one or more webpages. Webpages typically contain hypertext Markup Language (HTML) code, which is the current defacto standard used to create webpages on the Internet World Wide Web. Other markup languages exist such as XML (eXtensible markup language), RPC (Remote Procedure Call) and DHTML (Dynamic HTML) that are also used for creating webpages. The system is not limited to any particular method used to create webpages, any language or method that can present the message on the Internet for review by a requester can be used.

Typically, a potential reviewer of the message will use a web browser type software program or device to view the webpages containing the published message. Webpages typically contain a number of references within it. References are typically an "inline" type or "link" type. Inline references are typically used to display the actual image or other data within the webpage itself when the webpage is displayed to the reviewer. For example, if an inline reference is made to an audio file, the audio file will automatically start playing to the reviewer of the webpage when the webpage is displayed. The reviewer does not have to select the link to start playback.

Link type references (a.k.a. an anchor or hyperlink) allow the reviewer to access information or data contained in another file when the reviewer selects the reference. A reference can be both inline and a hyperlink. For example, a webpage could contain an inline reference that displays a reduced size image of a fax page. And by having the reduce-sized image also be a hyperlink to a full size image of the fax, the reviewer could view the full size image by simply clicking on the reduced size image.

Each message, or part of a message (i.e. a page from a multi-page fax message), can be presented to a reviewer in various ways. For example, a fax page image (or an image file attached to an email message) may be enlarged and/or reduced to accommodate the reviewers' viewing preferences. In this example, the system could generate small, medium and large size images of the message. The system would then create webpages to host each size image and embed each webpage with references to the other size webpages. Using

this method, the user or reviewer could configure the system to first show the medium size image when it is requested. The requester could then select the smaller or larger link from the medium-size webpage if they desire to see the message in a smaller or larger view respectively. There are many reasons for generating reduce sized images of a fax. For one, a smaller image file not only requires less storage space, but it will take less time to transfer a small image as opposed to a full-size image. In addition, a reduced size image may help facilitate the viewing of an image in a smaller window of a web browser by minimize the amount the requestor is required to scroll the message horizontally and/or vertically to view the entire image. Thus, smaller images may give a reviewer the jest of the message without requiring the reviewer to download the bigger full-size image of a message. A full-size view permits the reviewer to clearly discern any comments or details that may be placed in the message, which may not be possible from just a reduced image of the message.

The webpages that host a message could be blank except for the message, or preferably, the webpage would contain other information related to the message or user. For example, when the system generates a webpage for a message, it could automatically insert some of the users account information such as their company name, address, telephone number, etc. into the webpage along with the message. This would eliminate the need for the user to manually include this information in each message they publish. In addition, the system could insert the date and time that the message was published to let reviewers ascertain if this is a new message or an old one.

Alternatively, in addition to (or instead of) displaying a message's graphic image on a webpage, the image could be processed by Optical Character Recognition (OCR) software to convert the text contain within an image into computer readable ASCII data. Similarly, a voice message could be processed by speech recognition (SR) software to convert the voice message into ASCII text. The resulting ASCII text could be placed within the same webpage as the voice or image message or in a separate webpage. Having the extracted ASCII text on a webpage can be very beneficial. For example, it can allow a visually impaired person to review a natively non-text message using a TTS (text-to-speech) screen reader program that reads aloud the extracted ASCII text. Preferably, the webpage containing the extracted ASCII text could be automatically submitted by the system to one or more Internet search engines so when a potential reviewer performs a search for a keyword contained within a users message, the corresponding user's webpage will be included in the search engines' "hit" list. When the reviewer selects the link on the hit list that corresponds to the users webpage, the users webpage will then be presented to the reviewer. If the ASCII text is placed in a separate webpage, it is preferably for the ASCII webpage to have a link to the original voice or image message webpage, so the reviewer can review the message in its original form, thereby eliminating any possible errors in the SP or OCR conversion process. The link to the original page could consist of program code to automatically display the original webpage when the ASCII webpage is requested.

An example of some Java code that can do this is listed below: (where F1P1.htmp is the original webpage)

```
<script language="JavaScript">
bName = navigator.appName;
if (bName == "Netscape" )
window.location="http://F1P1.html";
```

-continued

```
else
window.location="http://F1P1.html"
</script>
```

By allowing the reviewer to review the original image of a message, the system offers the advantage of allowing the reviewer to see items such as hand written text and/or illustrations that OCR software typically has a hard time converting accurately.

In yet another method, the generated ASCII text could be hidden within the graphic image webpage using various methods such as using a very small font size, or having the same foreground and background font color, or embedding the text within a meta tag. These methods will typically allow the hidden ASCII text to be indexed by a search engine but be invisible to a reviewer when the webpage is displayed. The ASCII text from an image or audio message does not have to be placed on a webpage. For example, the generated ASCII words could be indexed and placed into a database. A reviewer could then query the database and find a particular message by searching for keywords that are contained in the message.

When more then one message (or pages of a fax message) exist for a user, the system preferably generates and maintains one or more table-of-contents (TOC) webpages. These webpages would typically contain links to all the messages (and pages) associated with a particular user, group of users or even a particular storage area. Each item in the list would contain a reference to its respective message. A reviewer could either access a message directly if they know the direct message address, or they can view a TOC webpage to find the message they are interested in, select the link, and be presented the message they chose.

The system may not need to create a webpage each time a message is published. For example, a webpage may be created once that includes a reference to the image filename of "1.GIF". Then, when each time a new single-page fax message is received, the system could simply convent the fax page into a standard GIF image with the filename "1.GIF" and store the image file into the users storage location that is addressable by the already existing webpage, thus replacing/updating the previous fax page. When a reviewer requests the webpage, the webpages's reference to "1.GIF" will cause it to be displayed to the reviewer. As you can see, the system may only need to update the image file "1.GIF" to publish a replacement fax message. Using this method, a user could maintain (update/edit) the static portions of their webpages independently from the system. The system would then allow non-technical users to update the webpage's main content with the ease of use that the system provides. Suffice to say, even if the system doesn't create a new webpage for a new message (such as in the case when an existing webpage can be used to host the new message), the message was still converted from a non-webpage reviewable (or retrievable) format into a webpage reviewable/retrievable format.

A users webpage could consist of many parts, where each part can be updated separately by the system depending on the destination and ID of the users message. For example, a user could publish a price list webpage complete with a "today's special" at the top of the page. Then, by having each part (the price list and the daily special sections) addressable separately, the user could update the special without disturbing the price list. For this example, the special section of the webpage could reference the fax image file "1.gif" and the price list

could reference "2.gif". So, when the user publishes a new 'special' message, they would simply tell the system to update item #1.

The various ways that the system could publish and present messages to reviewers may be specified by the user or the reviewer. For example, the user and each reviewer's' preferences may be stored in the users' storage area. Alternatively, the system could use cookies (a type of preference/data file that is created and saved on a reviewers' computer) to save a particular reviewers preferences, such as the preferred image size for viewing a fax page. With this method, each time a reviewer requests to review a message, the system may use the data contained in their cookie file to display the message in the size and/or style they prefer. These preferences could also indicate the default method to present the messages or what messages should be included in the table-of-contents (described below) webpages. For example, if a particular reviewer does not have a means to play an audio message, the system could be configured to omit all audio messages from the TOC webpage. Other options are also available so that the user or reviewer can custom fit the MPS to their own personal preferences or the reviewers' own computer. Alternatively, it may be beneficial to allow certain reviewers preferences to override certain user preferences so as to allow the reviewer to review the messages in a manner that is preferable to the reviewer.

After a message is received by the system, it is typically converted into a format compatible to the way it will be reviewed. Since the preferred embodiment of the system is to allow the message to be reviewed on the Internet World Wide Web, the preferred conversion method converts the message into a one or more webpages. Each message type (sound, image, text, etc.) has its own preferred conversion method and file format. Converting the message into a common format ensures that the message can be reviewed by a wide range of programs and devices. For example, it is preferred to convert each page of a fax message into a GIF compatible image file. The GIF image file format is preferred because most web browsers can display this image format natively, without requiring any additional software to perform this function. However, as new image formats such as JPEG 2000, PNG and SVG become popular and supported, another file format may be the preferred file format in the future. The system is not limited to any one particular file format. Since most computers are capable of playing WAV files, the preferred file format for audio messages is the WAV file format. Another popular audio format is a streaming audio type format, such as Real Audio™. Streaming audio formats have the benefit of allowing a reviewer to start hearing the audio message almost immediately after it has been requested. With WAV files, the requestor must wait for the entire audio file to download to the requesters' computer before they can play the file. The details for these and other conversions will be discussed next. After the message is converted into a common file format, one or more webpages are created to 'host' the converted file format (s) so that the message's file(s) can be presented to the reviewer when they request the message's webpages.

With reference to FIG. **8**, when a fax message has been received, step **800** determines if more then one page exists in the fax message. If more then one page exists, the conversion process proceeds through point MP to step **900** and will be discussed in further detail with reference to FIG. **9**. If the fax message contains only one page, it is extracted from the fax message at step **810** by using software such as FaxPlus™ by Elltech Development. The FaxPlus software development kit (SDK) supports the extraction of one or more fax pages from a fax message into one or more graphic image formats. Image



conversion routines, such as provided by Lead Technologies, may be used to convert a non-GIF file format to the preferred GIF file format if a particular fax SDK does not support the GIF file format. Once the single page is extracted into an image format, it preferably undergoes one or more image processing procedures to enhance and/or enable it to be published.

One such image processing procedure is to straighten up the fax page. Typically, when a fax is manually sent, it may be tilted to the left or right in some manner. While the fax may still be legible, it may be undesirable or appear unprofessional to some reviewers. To correct this, special image processing can be performed such as 'auto deskew', a routine provided by LeadTools' Imaging SDK, that will automatically analyze an image and straighten it up. Additionally, faxes commonly have 'speckles' or undesired dots within them. Other image processing can be performed to remove or reduce these unwanted artifacts. In addition, an image process called trimming can be performed to a fax page to remove one or more sections from the page, such as the top header usually present on each page of a fax. The fax header typically includes the sender's name, telephone number, the date and time the fax was sent, along with a page number. While this information may be helpful to most regular fax recipients, it may be undesirable or unprofessional for a reviewer to see such information.

Preferable, a fax message would also undergo image processing to convert it from a normally two-tone black and white image into an image with a varying gray scale. As is known in the art, a gray scale image of a facsimile page provides a better image than simply a black or white image of a fax page. The image processing may comprise any suitable standard contrast curve method of processing, such as anti-aliasing or a smoothing filter. The image processing may occur concurrently with the conversion process and is preferably performed for both full and reduced size images of the facsimile. In another example, a color fax may be converted to a gray-scale fax to conserve storage space and reduce the time required to transfer the image to the requestor.

Additionally, each page image of a fax could be processed by OCR (optical character recognition) to extract ASCII text data from the image of the page. The extracted text may then be used to create a text-only version of the fax message and/or the extracted text could be stored in database that would allow the fax message to be found by searching the database for particular keywords or phrases contained in the fax. In another example, software such as Caere's OmniPage Pro 9.0 can not only convert graphic text to ASCII text, but it can automatically distinguish between the text and graphics portions of a message and produce a rich-text-formatted (RTF) document that preserves the layout and appearance of the original page. The resulting RTF document can then be converted into a webpage using. Using this method, a graphic fax page (or any message containing an image of text in it) can be completely converted into a searchable webpage with the text and graphic images positioned virtually identical to the way they were in the original fax image.

The exact image processes used by the system are not limited to the described methods or software described. For example, an additional process could convert the normally black and white color of a fax message into other colors such as a company's logo colors as per the user's preferences. Other image processing and routines will become apparent to those skilled in the art when practicing the invention.

Once the fax page has been extracted, processed and preferably converted into a GIF image file, a webpage is typically used to 'host' the image by including an anchor or reference

to the image file so it is displayed when the reviewer requests the webpage. FIG. **9** provides an example of a webpage displaying a reduced-size GIF image of a sample deli menu. Typically, the main portion of the webpage will contain the published message. As is illustrated, the heading and footer of the webpage can provide information about or related to the user or the message, such as the users business name and contact info. In this example, the bottom of the webpage includes an anchor or link to "Zoom In", allowing the reviewer to view the full-size image of the fax page when they select the link. In addition, information such as when the message was updated, page number, advertisements and a link to a company providing the services of the MPS can also be included on the webpage. Many other items can be placed on the webpage and will become apparent while practicing the invention and reviewing other webpages on the Internet.

For the example in FIG. **9**, the single fax page was converted into two separate GIF files, "F1P1-R.GIF" and "F1P1-F.GIF". These files were named in a manner that provides information about them. For example, the "F1" part of the filename indicates that it is from 'Fax Message #1', The "P1" indicates that the file is Page 1 of the fax message, the "-R" and "-F" indicate the reduced and full-size images (respectfully) of the fax page. Typically, two webpages are used to display these images, one to display the full size image and the other to display the reduced size image. In this example, the webpages files are named "F1P1-F.HTML" and "F1P1-R.HTML" using the same naming convention as previous discussed with reference to the fax images. Each of these webpages include a reference to the other so the reviewer can switch between them by selecting the 'zoom in' or 'zoom out' references respectfully.

An example of the "F1P1-R.HTML" file for generating the sample webpage shown in FIG. **9** is shown in Table 1 below.

TABLE 1

```
<html>
<head>
<title>USERNAME</title>
</head>
<body>
<p align=
"center"><big><strong><big>USERNAME</big></strong></big></p>
<p align="center">   USERADDRESS<br>
USERPHONE</p>
<p align="center">LASTUPDATED</p>
<hr>
<p align="center"><img src="F1P1-R.gif" width="580" <br> <br>
<a href="F1P1-F.HTML">ZOOM IN</a></p>
<hr>
<p align="center"><a href="http://www.easywebs.com">Click here</a>
to find out how your fax machine can create webpages</p>
<p align="center"><small>©1998-99 EasyWEBS</small></p>
</body>
</html>
```

As illustrated in Table 1, the image file "f1p1-r.gif" for the reduced-size image is embedded into the HTML file. Also indicated is that the anchor for "ZOOM IN" directs the MPS to the "F1P1-F.HTML" webpage which contains the full-size image of the fax page and the anchor for "Click here" directs the reviewer to the homepage of the website providing the MPS service.

In the example shown, the first HTML file has an anchor for "ZOOM IN." This anchor is defined as a=<A HREF="F1P1-F.html">ZOOM IN"</a> and will therefore reference the second HTML file 'F1P1-F.HTML' when the reviewer selects the "ZOOM IN" reference. The second HTML file 'F1P1-R.HTML' would have an anchor b for the "ZOOM OUT" and defined as b=<A HREF="F1P1-F.html">ZOOM OUT"</b> so it would direct the reviewer back to the reduced sized webpage. Additionally, the 'zoom in' and 'zoom out' references could be attached directly to the images themselves, allowing the reviewer to simply click on the image to see the full or reduced size image respectively. Example HTML code for attaching the full-size webpage link to the reduced-size image would be <a href="F1P1-F.HTML"><img src="F1P1-R.GIF" width="580"<br></a>.

The system is not limited to any particular file naming method. For example, a deli owner may wish to have the first page of each fax message he published to be named "breakfast.htm" and the second page named "lunch.html". The names for the files could be dictated by pre-defined user preferences or by the user at the time they are publishing the message. Technologies such as OCR and SR can be used to convert the users' fax and voice (respectively) information into ASCII text that can be used to name each file.

Alternatively, the name for a file could be specified by the contents of the message itself. For example, if the first line of text in a fax message is "Today's Specials", OCR could be used to extract the title text from the page and save the fax message as "todays_specials.html". The text used to name the file does not have to be at the top of the page. The user could specify any location on the page to use as the filename, such as the footer or the largest size text present on a page could also be used. In another example, the user could dictate the desired filenames via commands such as "filename=lunch.html", in a email message that they are publishing.

When the system needs to create one or more webpages for a message, it could use a pre-defined set of instructions for creating the webpage(s), or it can preferably create the webpage(s) based on the users or reviewers preferences. For example, the system could use a template webpage as a basis for creating a messages' webpage. In this example, when a message is being published, the system could make a copy of the template webpage, insert the new message into the copy and publish the copy. By using a template webpage, the appearance of many messages can be made consistent by basing them on the same template webpage. This allows the appearance of many messages to be easily changed by simply editing the master template webpage. The system could be configured to use a single template for every user, or a different template for each user, or a different template for each message, or any number of other combinations. In addition, the templates could have keywords embedded within them that could signal the system to substitute the keywords with other information. For instance, in Table 1 the word "USERNAME" is contained in the title of the example HTML document. The system could then scan a messages' webpage for this keyword. When the system comes across this keyword, it would simply substitute it with the user's account name. This way, the resulting webpage will contain the actual user's name of "Joe's Deli" (as in FIG. **9**) instead of the text "USERNAME". Other methods for having the system automatically insert information when the webpage is being generated, such as inserting the date the webpage was created, will become apparent to those skilled in the art after practicing this invention.

Each webpage preferably contains anchors in addition to those relating to "ZOOM IN" and "Click Here." For instance, as mentioned previously with reference to email list servers, a webpage would preferably include a link to a message notification webpage that would allow a reviewer to enter their email address so, when a particular message is updated, they will be notified via email. Other anchors, such as an

anchor to the user's main Table-of-Contents webpage, so a reviewer can be presented with a list of all the user's messages that are available for review, will be apparent to those skilled in the art and may also be provided.

After the full and reduced-size images and webpages for the fax page have been created, they are moved to the users' Internet storage area at step **840**. After this step has been performed, the fax message is available for review.

Reference to FIG. **10** will now be made when more then one page exists in a fax message. When it is determined that more then one page exists in a fax message, step **1000** sets a software page counter variable X to "1". Step **1010** creates a new table-of-contents webpage for the new multi-page fax message. Step **1020** extracts the page contained in the software page counter variable from the fax message. This step is very similar in operation to step **810** in FIG. **8** with the exception that it uses a variable software page counter instead of a fixed "1" for the page number to extract. Steps **1030** and **1040** are similar in operation to steps **820** and **830** in FIG. **8**, with the same exception that they use a variable software page counter to dictate what page number is being processed and in naming the resulting webpage and image filenames. Step **1050** adds a link for the current fax page X to the fax messages' TOC webpage. This link is added to any existing links that may already exist in the fax message's TOC file so, for example, if a fax message has 5 pages, then 5 links will be added to the fax's TOC page, one for each page. This allows a reviewer to not only see how many pages a fax message has, but they can jump directly to any page of the fax message from the fax's TOC page by simply selecting its respective link. Preferable, step **1040** would also add links such as "TOC", "NEXT" and "PREVIOUS" to each of the fax's' webpages so the reviewer can easily navigate through the pages of the fax message. After the full and reduced-size GIF images and the associated webpages have been created for fax page X, step **1060** checks to see if the software page counter equals the total number of pages in the fax. If the software page counter variable does equal the total number of pages in the fax, then all of the pages for the fax message have been processed and execution proceeds to step **1080**. If the current software page counter variable does not equal the total number of pages in the fax message, the software page counter X is incremented by one at step **1070** and execution is looped-back to step **1020**. Previously discussed steps **1020-1050** then process the next page of the fax message and so on. Thus, each page of the facsimile message is converted into one or more webpages. When it has been determined at step **1060** that all pages of the fax message have been processed, the resulting files (gifs, full, reduced and Toe webpages) are then moved to the users' storage area at step **1080**, thus making the fax message available for review.

The system does not have to create a separate webpage for each page of a fax message. Each fax page image can be placed within the same webpage to make navigating through the fax message easier.

As mentioned previously, the user's main TOC webpage will typically contain (among other things) a list all of the messages that exist for the user. Typically, the main TOC webpage might be named "index.html" so it will be the default webpage displayed when a reviewer visits the user's website. For example, if a reviewer does not specify a particular webpage, such as by simply typing www.joesdeli.com, the web server will typically default to presenting the reviewing with the webpage named "index.html". Using this method, the reviewer can easily be presented with a list of available messages on their website. The TOC may group the messages by type (i.e. faxes, email, audio, etc.), sort by the date the message was published, or any number of other arrangements that can be specified by the user or reviewer. In addition, the user may wish to not include certain messages in one or more TOC webpages, such as private messages that are protected by a password and meant to be viewed by certain reviewer's only. Other sorting and display methods will become apparent after practicing the invention.

When a message is received and published by the MPS, the MPS may update one or more of the users TOC webpages to include a link to the newly published message according to the users or reviewers preferences. The MPS may create different TOC webpages for each reviewer according to their preferences. For example, one reviewer may wish to only see a list of the available fax messages and no email or audio messages. Additionally, the system may include a preview of one or more messages, such as a reduced-sized image of a fax message, within the TOC webpage itself. This would allow a reviewer to preview a message without requesting it directly. In addition, the first sentence or a five-second clip of an audio message may be used to preview email and audio messages respectively.

When the reviewer selects one of the messages on a TOC list, the selected message is transmitted to the reviewer's computer **140** through the Internet **130**. The reviewer may also scroll through the TOC listings if all of the messages cannot be displayed at one time on the reviewer's computer. A TOC webpage can contain a link to another TOC webpage, such as the main TOC containing a link to a TOC for a multi-page fax message. Alternatively, the main TOC may contain direct references to each page of a multi-page fax message, allowing a reviewer to review a page directly from the main TOC webpage. Preferably, when a message contains multiple sub-messages, such as with a multiple-page fax or multiple email attachments, the MPS will create a TOC webpage for that message, listing the sub-messages contained in it.

The name for entries contained in the TOC are not limited to simple descriptions such as "Page 1", "Audio Message #2", etc. For example, if an email message had a file attachment named "setup.exe", the System could add an entry and reference of "setup.exe" to the TOC for a file. Using this method, the system could automatically create the TOC link names based upon the actual name of the published message or attached files. A still further option might allow the user to speak the title of the message they are publishing. With this option, the MPS could convert the spoken title into ASCII text using speech recognition (SR) and add the ASCII title to the TOC webpage. Alternatively, OCR processing could convert a section of a fax message, such as the first sentence, into ASCII text and use the ASCII text to name the message.

The TOC webpages would preferably contain other information for each message, such as the date and time each message was published. Other information, such as the number of pages contained in a fax message, may also be provided and will be apparent to those skilled in the art.

Reference to FIG. **11** will now be made when publishing an audio message. There are currently two commonly used methods to send audio messages over the Internet, the downloadable type and the streaming type. Streaming type audio formats such as RealAudio™ allow the requestor to begin hearing the audio message almost immediately after they request it. WAV type audio files require the entire audio file to be first downloaded to the requesters' computer before they can start playing the audio message. The desired audio format may be specified by the user or the requester as per their preferences. When an audio or voice message has been received by the MPS, it is typically recorded to, or already in

an audio file format. Various programming tools, such as Artisoft's™ Visual Voice Tools, can convert an audio message from one format to another. Step **1100** converts the audio to the desired format. Once the audio message has been converted to the desired audio format, step **1110** would create a webpage to host the audio message similar to the methods described previously with reference to publishing fax messages, but instead of creating image files, a reference to the resulting audio file(s) are placed within the message's webpage. Additionally, the system may generate both streaming and non-streaming audio files and include both references in the message's webpage. This would allow a reviewer to select the audio format of their choice.

Preferably, an audio message would undergo processing to remove undesired artifacts from the message. One such processing could remove extended periods of silence, especially at the beginning and ending of the message to reduce it's storage requirements and transfer time. In addition, the volume of the audio message could be raised or lowered to result in an optimal volume for requestors to listen to it.

An entry for the audio message would typically be added to the users' TOC webpage. Additionally, the TOC and/or audio webpage may have additional anchors or references. For instance, each audio message may have an anchor directing the MPS to a file that contains a short sampling of the message. Thus, when the reviewer selects this anchor, the reviewer could receive the first 5 seconds of the message or some other predefined number of seconds. After the audio file(s) and host webpage have been created, they are moved to the users' storage area at step **1120**, making it available for review.

A process for publishing an email message is illustrated in FIG. **12**. The system receives the email message at step **1200**. Typically, an email message contains information indicating who the email is from, who the intended recipient is, the subject of the email and the body or contents of the email. In addition, one or more files may be attached to the email. These attached files can contain images, sounds or any other type of data. Step **1205** uses all the available information associated with or accompanying the email message to determine the identify of the sender, and if they are an authorized user of the system. Information such as that contained in the "From", "To", and "Subject" fields could be used to determine if the sender is an authorized user. To verify the senders' identity, a password or other verification information could be placed within these fields, the body of the email or in an attachment. For maximum security, digital Signatures and encryption could be used. Digital signatures are increasingly being supported in various email programs such as Microsoft's Outlook Express, that allow a recipient to positively know who a particular email message was sent from. In addition, encryption can be used so only the indented recipient can read the email message. The actual contents of the email, or any of its attachments, can also be used to identify the sender as an authorized user. For example, if a particular email has an attached image file named "10023.JPG", the 10023 could correspond to the account number of the user. Other methods to identify the sender as an authorized user of the MPS will become apparent to those skilled in the art after practicing the invention. Regardless of the method used, if the system can not identify the sender as an authorized user of the system, the email message is discarded at step **1210**.

If the sender of the email has been identified as an authorized user of the system, the system checks at step **1215** if there are any commands contained in the email. If there are, they are extracted at step **1220** and saved at step **1225** for use during the processing and publishing of the email. Typical



commands such as "MESSAGE=NEW" could be placed in the 'subject' field of the email to indicate that the email should be added to any existing user messages and to not replace any. After the command(s) have been extracted from the email, execution is directed to step **1230** via execution return path **1227**. Execution return paths **1227**, **1242**, **1257**, **1272** are used to return execution of the email processing to the next stage so that the email is completely processed. Step **1230** checks to see if any audio files are attached to the email message. Audio file attachments may be in any suitable format such as WAV or VOX. If one or more audio files are found attached to the email, they are extracted from the email at step **1235**. Each extracted audio file is then published at step **1240** in the manner as described with reference to FIG. **11**. The system then checks to see if any image files are attached to the email at step **1245**. If one or more image files are found, they are extracted at step **1250**. Each extracted image file is then published at step **1255** in the manner as described for each fax page with reference to FIG. **10**. The system then checks to see if any other files are attached to the email at step **1260**. If one or more files are found, they are extracted at step **1265** and published at step **1270** in a manner that will be discussed next.

It is preferable for the system to allow a user to publish files other then image or audio files. This can be accomplished by; a) extracting the file attachment from the email, b) saving the file in the users storage area, and c) adding a reference for the extracted miscellaneous file to the email messages' webpage and/or the emails' TOC webpage. Using this method, files such as database, spreadsheet and program files can be published using the system. To review or access one of these miscellaneous files, the reviewer would simply select the reference corresponding to the file they desire. To allow a reviewer to discern one file from another, the title of the references listed on the webpage may be labeled with the name of the file attachment. If more then one miscellaneous files are attached to the email, they are extracted one-by-one and published in the manner described above and saved in the users storage area. It is preferable that the system create a TOC webpage if the email message contains multiple parts, such as multiple file attachments. Each reference in the emails' TOC webpage could correspond to each respective sub-message or other part of the email. The webpage used to list the references of the email may be a created from a template webpage as previously discussed.

In addition, the system could publish video files that are attached to the email in a manner similar to the way it publishes audio messages. The video files could undergo processing to convert the video to a common format such as RealVideo™, AVI or MPEG. Additional processing, such as to optimize the video for smooth playback when reviewed on varying connection bandwidths, may also be performed and will be apparent to those skilled in the art. References to the video file(s) could be placed on one or more webpages as discussed with reference to audio file references. The resulting video file(s) and webpage(s) would then be moved to the user's storage area, allowing the video message to be reviewed.

Step **1275** checks to see if there is any text in the body of the email message. If no body text is found within the email, processing of the email message is completed at step **1280**. If body text is found, it is extracted from the email at step **1285**. Step **1290** creates a new webpage and embeds the extracted body text within it. The webpage used to host the body text may be created from a template webpage as previously discussed. The system then moves the resulting webpage(s) and file(s) to the user's storage area at step **1295**, allowing them to be reviewed.

Information contained in the email, the user's preferences or the reviewers' preferences may be used to determine how the email and any attachments are to be published. The user or reviewers preferences could dictate other processes as well. For example, the users account could be setup so that any attached image files should first be processed with OCR to extract ASCII text and publish the extracted ASCII text instead of the image. The command(s) extracted at step **1220** can not only specify simple commands, such as if the message is new or an updated to an existing message, but it can also specify complex instructions. For example, there could be a command that instructs the MPS on what webpage template should be used for publishing each attachment or for publishing the body text of the email. Other commands, processes and variations will become apparent to those skilled in the art after practicing the invention.

Even if a portion of a message doesn't undergo a conversion, the message in its entirety has. For example, let's say a user attaches a GIF image that they wish to publish to an email message. When the system publishes the email message, it may simply just create a webpage to host the attached image and not convert the image file at all. However, even though the image file was not converted, the over-all message was converted from an email compatible format into a webpage compatible format. In addition, if the user later wishes to update the image message, they could simply email the system with an updated image file with the same filename as the first. Because the new image filename is the same as the original, no modification is needed to the hosting webpage. The system could simply replace the original image file with the new one, effectively publishing the new message.

Up until now, the conversion and publishing processes have been described as occurring at the time the message is received by the system. This is commonly referred to as a synchronous mode of operation. Later, when a request for a message is received by the MPS, the message has already been converted into one or more webpages, so the MPS need only retrieve the message file(s) from user's storage area and transmit the message to the requestor. However, the publishing processes can occur at other times as well. For example, when a message is received, it may immediately be stored in its native format, without conversion, into the users storage area. Later, when the message is requested, it could then be converted and published after it is retrieved from the storage area but before it is sent to the requestor. Alternatively, the conversion and publishing processes may occur after the message is sent to the requester. When a message is published after it has been received and stored, the MPS is said to be operating in an asynchronous mode of operation. In this mode, the publishing processes are not immediately performed when it is received. Instead, the publishing processes may occur as a result of some other action or condition, such as when a request is made for the message or some other event or independent process.

The system could be configured to publish or make a message only available on a time and date schedule. For example, a deli owner may wish to fax in tomorrow's breakfast specials now, but doesn't want the fax to be published until tomorrow morning, the appropriate time for it to be made available. Using the scheduled publishing method, the deli owner is free to fax in the specials when it is convenient for him to do so without having to wait until the actual time the fax should be viewable. A delayed publishing schedule can also prevent accidental postings. For example, if the deli owner faxes on Monday the specials for Tuesday, but Monday night realizes that they ran out of one of the items, he can resubmit an updated posting that will supercede the posting he submitted earlier. The reviewers would just see the later-submitted posting on Tuesday and be unaware that the posting was ever corrected.

In addition, the system could be configured to selectively make different messages unreviewable on a date and/or time schedule. Let's say a deli owner has different specials for each day of the week. Lets also say that he submitted all the specials to the system and configure the system to only display the special applicable for each day. The system could then make all non-applicable daily specials unreviewable by requesters by hiding the links to all the non-applicable specials, or by copying the applicable day's special webpage to a default page such as "index.html" so the reviewer will be presented with the appropriate day's special when they visit the deli's website. Alternatively, the system need only maintain the references so only the applicable document for the day is referenced by the "Today's Special" link on the deli's homepage.

The date and/or time to make a particular message unreviewable could be set by the user or automatically set by information contained in or associated with the message itself. For example, the system could scan a message looking for any date or time mentioned in it. If it finds a date or time within the message, it could configure itself to display the message at that date and time. In the example of "Today's Special", if the message contained "Today's specials for Monday, Jan. 5, 1999", the system could automatically display that message for only that day. A repeating schedule could also be setup for any given message. For example, the message MondaySpecials.html can be configured to only be reviewable on Mondays.

The preferred mode of publishing a message depends on various considerations and requirements. For example, when a message is expected to be reviewed a thousand times for each time it is published, it may be more efficient for the publishing processes to occur when the message is received as opposed to when it is requested. This may be preferable because the publishing processes would only need to occur once (when the message is received), rather then the thousand times it will be requested. However, if a message will be updated frequently but reviewed infrequently, it may be more efficient to publish the message when it is requested. Technologies such as Microsoft's ASP (Active Server Pages) and CGI may be used to perform the publishing processes in real-time when a message is requested or as its being send to the requester. Alternatively, it may be desirable to perform some publishing when a message is requested, regardless of how many times it will be published or requested. For example, let us say a beachfront restaurant owner wishes to have a weather report added to his webpage. It would be undesirable to immediately place the weather report into the message's webpage when it is received, because the weather report would only be accurate for the day the message was published. However, if the MPS is configured to add the current weather report to the message's webpage when it is requested, each requestor would then be presented with the current day's weather report.

A message could undergo different publishing processes at different times. Some processing may occur when the message is received but before it is stored, other processing could occur after it is stored but before it is requested, more processing could occur when the message is requested but before it is sent to the requester, and still other processing can occur after the message is sent to the requester. For example, when a fax message is received, it may be converted into its respective full and reduced size images. Later, when it is requested, the webpages to host the full and reduced images could be

created on the fly based upon the user or reviewers preferences. Some publishing processes may even occur on the requesters' computer or reviewing device. In this example, the message may stay in an unpublished format from the time it is received by the system to when it reaches the requesters' computer or reviewing device. Software (such as but not limited to XML RPC Remote Procedure Call) running on the requesters' computer could then perform the publishing and/or conversion, allowing the requester to review the message. The point at which the publishing processes occur can be dictated by the user or requesters' preferences and the system is not limited to any particular method or time period.

As described above, the publishing of a message can occur at anytime from when the message is received by the system up to when it is being reviewed. It will also be apparent to those skilled in the art that the system is not limited to the particular file formats mentioned herein. Any suitable file format can be used. For instance, a fax page may first be converted into an intermediate format, or it may be converted directly into the GIF format. Further, instead of GIF, the facsimile messages may be converted into JPEG, JPEG 2000, BMP, PCX, PIF, PNG (Portable Network Graphics), SVG (Scalable Vector Graphics), HTML, ASP or any other suitable type of file format.

The references or links that are placed within a webpage can be either inline, hyperlinks or both. For example, a non-inline reference to an audio message will require the reviewer to select the link or reference before the audio file is transmitted to the reviewer. However, if an inline reference was instead made to the audio file, the audio file could start playing to the reviewer as soon as they request the webpage that hosts the audio message.

Regardless of when the publishing occurs, the message typically needs to be stored in a storage area and available when a request for it is made. Preferably, an Internet server is used for the storage area because it is perfectly suited for storing the message, receiving requests for the message, and transmitting the message to the requester over the Internets' World Wide Web.

The collection of webpages for a user are commonly referred to as the user's 'Website'. In the preferred embodiment, the files for each user are stored in a separate storage area (or "directory") assigned to just that user. However, it may be preferable to publish messages from different users in the same storage area. For example, lets say the system is being used as a public service such as for posting messages of lost pets. It would be preferable to place such postings in the same area so people have a one-stop place to review the various lost pets. The sender of a new posting could simply specify that their message should go to the area of 'www.easywebs.com/lostpets'. This location could easily be designated by a number ID or other means. The system would then simply add the sender's message to any already existing lost pet postings in that location. This type of centralization makes it very easy for someone to review all the publications related to a specific topic or category.

Each user storage area may also be a sub-directory of another storage area. For example, if the main directory for the system is named "easywebs", and its URL is 'www.easywebs.com', a user directory of "joesdeli" could then be located at 'www.easywebs.com/joesdeli'. Using this method, each user would not have to register and maintain a top-level domain name with a global domain registration service such as Internic. Only the system's single domain name of "easywebs.com" needs to be registered. Each user subdirectory would then be managed by the system itself. The users' storage area, however, may be organized in other ways with the files for one or more users being stored in the same or different directories or locations.

When there is more then one user of the system, an identification means is preferred so the system can determine where and how to publish a message based on the user's preferences or the message being sent. The messages' destination could also be determined from information contained in, accompanying or associated with the message the user is publishing. The various methods of identifying a user and the messages' destination location are explained in more detail throughout this document.

When publishing a message, the MPS would preferably allow the user to publish it as a new message so it is added to the user's existing messages, or publish it as an update so that it would replaced an existing message. In addition, it is preferable for the system to allow a user to delete a message, such as a coupon message that has expired.

When a user wishes to add a new message to their already existing messages, the files for the new message need to have unique filenames so they will not overwrite files of any existing messages. The System may use a simple incremental search scheme to find a unique filename. For example, lets say two audio messages (audio-1.wav and audio-2.wav) already exist in the users storage area, and a new one is to be added. In this example, the system may scan the users' storage area, first searching for an audio file named "audio-1.wav". If it is found, the system increments the filename and tries next scanning for the filename 'audio-2.wav'. If that it found, it searches for 'audio-3.wav' and so on. When the system comes across a filename that does not already exist, it can safely use that filename for the new audio message.

The various files for a message may be identified with any suitable filename. In the preferred embodiment, the first part of the filename describes the type of message, such as "F" for fax messages. The next part of the filename may be sequentially determined according to the number of messages existing for a user. If a message contains more then one part, such as with a multiple page fax, it is preferably that the filename also contains one or more digits describing the portion of the message that the file is part of. For example, the filename "F1P1.GIF" would indicate an image file of page one of the first fax message. Each file of a message may be saved with an extension defined by the format of the file. Thus, the files may end with an extension of ".GIF," ".HTML," ".ASP," ".WAV," or ".RA" according to the format of the particular file.

In another example, if a user wishes to replace an existing fax message with a newer one, the system could simply name the new fax files with the same names as the files for fax message being replaced, so the previous fax files would be overwritten with the newly generated files. In the event that the previous fax message had more pages then the new fax message, the MPS could delete the excess pages of the old fax message. Alternatively, the MPS could simply delete all the files for the previous message before saving the new fax messages' files.

The user could also specify the filenames for the various parts of a message. For example, when using a telephone, the user could specify the filenames using the DTMF digits of the telephone, or by using Speech Recognition, the user can simply say the names of the files. In addition to filenames, the user could even dictate the title for a message that will appear in a table-of-contents webpage. Any hyperlink, file, directory, etc. can be named by either the user or be automatically determined by the system.

Typically, to review a published message, a requestor would request the message by some unique ID. From hereon

I will refer to this unique ID as the message's 'Retrieval Address'. For webpages, this Message Retrieval Address (MRA) is often referred to as a URL (Universal Resource Locator) address or web address. For example, to request the document "specials" that is located in the 'joesdeli' sub-directory of the domain 'easywebs.com', you would enter the URL of 'www.easywebs.com/joesdeli/specials.htm' into a web browser. Alternatively, if you wanted to access a message on a local area network, the messages' address might be '\\server\joesdeli\specials.doc', which is commonly referred to as a UNC (Universal Naming Convention) address. The messages' retrieval address typically contains the address of the messages' storage location along with the messages' filename. However, the messages' retrieval address does not need to contain both types of information. For example, the retrieval address of 'www.easywebs.com/joesdeli' contains only the storage area information, but in fact it will retrieve the filename of 'www.easywebs.com/joesdeli/index.html' because most web servers present the requestor with a default message if a specific message was not specified.

A reviewer could access a portion of a message without requesting the message's hosting webpage. For example, lets say the webpage "Specials.html" has a link to an image of the fax message named "F1.GIF". Typically the reviewer would access the specials.html using a Message Retrieval Address such as 'www.easywebs.com/joesdeli/specials.html'. However, the user could also access the fax image directly by using a MRA such as 'www.easywebs.com/F1.gif'.

The storage area would preferably contain the data indicating the preferences of each user or reviewer. For example, when a facsimile message is retrieved by the Internet Server **1360**, the Internet Server could ascertain, from the data in the storage area, the preferred option of displaying the facsimile message and would generate the appropriate webpage(s) to those preferences.

The system, however, is not limited to the disclosed naming convention but can encompasses other conventions that will be apparent to those skilled in the art.

A block diagram of the MPS **100** is shown in FIG. **13**. As shown, the telephone network and the Internet **130** are connected to an input/output device **1320** that in turn is connected to a central processor **1340** and an Internet server **1360**. The number of telephone lines and the capacity of the Internet connection may be changed to any suitable capacity that would be necessary to accommodate the anticipated number of respective telephone calls and Internet activity that may be sent and received by the MPS. The input/output device **1320** routes data back and forth between an open port of the central processor and either the telephone network or the Internet **130**. The input/output device may also route data back and forth between the Internet Server **1360** and the Internet.

The central processor receives messages and stores the messages in the storage area **1350** in accordance with software **1330**. Preferably, a separate directory in the storage area is established for each user having an account on the MPS so that all the messages for a single user will be stored in the same directory. It should be understood that the number of processors within the central processor is dependent upon the desired capacity for the MPS. With a large number of users and/or requesters, the central processor may actually comprise a number of computers. The input/output device may then function to route the incoming user messages to an available computer within the central processor.

A more detailed diagram of the input/output section is shown in FIG. **14**. The input/output **1320** comprises a number of telephony and fax devices for each telephone line **110***a* that is connected to the telephone network **130***a*. In addition, the input/output may comprise a modem or other interface suitable for connecting the central processor **1340** and the Internet Server **1360** to the Internet **130***b* either directly **110***b* or through the telephone network **130***a*. The telephony devices **1410** provides the ability to detect certain ID signals, play announcements, record audio messages and detect DTMF tones. The fax devices **1420** provide the ability to receive other ID signals and fax messages. The telephony and fax devices are connected to a bus that routes the data and signals to and from the central processor. The central processor also comprises a connection to the Internet **130***b*, such as through its own node or portal using an appropriate interface **1460** or by using a modem **1450** going through the telephone network **130***a*. The system, however, may be practiced with any suitable connection to the Internet **110***b*, such as through an intermediate Internet access provider. An Internet connection may also be establish through **130***c* via the telephone network **130***a* to the Internet. The Internet connection allows the MPS to send and receive email, fax, audio, video and other files and data using a variety or data transfer protocols. The Internet connection also allows the Internet Server **1340** section of the MPS to receive requests for messages and send the messages to the requesters.

The central processor uses the various ID signals to identify the user sending the message and store the message in the appropriate storage area. As discussed above, the central processor may comprise a number of computers or, more precisely, a number of microprocessors with each microprocessor handling a certain number of simultaneous incoming messages or requests. The microprocessor may comprise any suitable microprocessor, but is preferably at least a Pentium based PC.

In addition to handling incoming messages and storing the messages in the storage area, the central processor also coordinates the interactive voice response system of the MPS. Many software development tools, such as Artisoft's Visual Voice™, can allow even intermediate programmers to create sophisticated telephony applications. Based upon the above-referenced flowcharts and the respective descriptions, the production of the software **1330** is within the capability of one of ordinary skill in the art and will not be described in any further detail.

The Internet Server **1360** is connected to the central processor **1340**, such as through a local area network, and has access to the storage area **1350**. The Internet Server performs a number of functions according to software **1370**. For instance, the Internet Server may retrieve unconverted message files stored in the storage area by the central computer and convert the files into the appropriate webpage(s). The converted webpage(s) may then be stored in the storage area. The Internet Server may also handle requests from requesters, which might require the retrieval of files from the storage area and possibly the generation of additional webpages.

The software **1370** for the Internet Server would therefore incorporate the flowchart of operations for generating webpages according to user or reviewers' preferences and the type of message to be published as discussed previously. Based upon the above-referenced flowcharts and their respective descriptions, the production of the software **1370** is within the capability of one of ordinary skill in the art and need not be described in any further detail. The software for the Internet Server may also include TCP/IP or other transport layers. Moreover, while the authentication is typically provided through a hypertext transport protocol daemon, the authentication process for private messages may be supplemented or replaced with other ways of authentication.

The Internet Server **1360** runs on a suitable operating system (OS), which is preferably an operating system suitable for use on an internet server, such as Microsoft's Internet Information Server (IIS). The Internet Server has a number of application programs, such as the ones depicted in the flowcharts discussed above, for communicating with the central processor and for accessing data from the storage area and for handling requests for messages from requesters.

The Internet server is not limited to the structure shown in FIG. **13**, but may comprise additional components. For instance, the Internet Server may be connected to the Internet through typical phone lines, ISDN lines, a T1 circuit, a T3 circuit, or in other ways with other technologies as will be apparent to those skilled in the art.

Furthermore, the Internet Server need not be connected to the Internet but may be connected to other types of networks. For instance, the Internet Server, or more generally the network server, could be connected to a large private network, such as one established for a large corporation. The network server would operate in the same manner by converting messages into webpages, receiving requests for the message from requesters on the network, and by transmitting the message to the requester.

In addition, at least one interface circuit could be located between the Internet Server and the central processor in order to provide communication capabilities between the Internet Server and the central processor. This network interface may be provided within both the Internet Server and the central processor or within only one of the Internet Server or central processor.

The system can receive messages of varying types from a plurality of users and can receive a message from more then one user at a single time. The messages are stored by the MPS and can be reviewed by multiple simultaneous requestors at the requesters' convenience at any time by connecting to the Internet. The Internet World Wide Web is a constantly expanding network that permits a requestor to review a user message from virtually any location in the world. Since the requestor only needs to incur a local charge for connecting to the Internet, the requester can retrieve or review a user message at a relatively low cost.

While the invention has been described with reference to a preferred embodiment (although various preferred embodiments of the present invention have been described herein in detail), it is not intended to be exhaustive or to limit the invention to the precise form disclosed. It will be understood (appreciated) by those skilled in the art that variations may be made thereto without departing from the spirit of the invention or the scope of the appended claims. One skilled in the art will recognize that other features may be supported by the apparatus of the invention. For example, the software **1330** and software **1370** are not limited to the exact forms of the flowcharts shown but may be varied to suit the particular hardware embodied by the invention. The software may comprise additional processes not shown or may combine one or more of the processes shown into a single process. Further, the software may be executed by a single computer, such as a Windows-based PC, or may be executed by a larger number of computers.

Furthermore, the requestor may be provided with a greater or fewer number of options in reviewing or retrieving messages. The options are not limited to the exact forms provided but may permit the requester to review or retrieve the messages in other formats. The options may also permit a requester to print out two or more messages in one step instead of having to request each one separately.

Also, the various menus provided to the user over the telephone may have a greater or lesser number of options and the MPS may accept responses that involve more than just a single DTMF digit. The specific DTMF digits disclosed in the various menus are only examples and, as will be apparent to those skilled in the art, other digits may be used in their place. For instance, a "9" may be used in the place of a "*" in order to exit the menu or to return to a previous menu. In addition, the DTMF digits may be changed in accordance with the user's personal convention. If the user is familiar with another IVR system, the user could customize the commands to correspond with the commands used in the previous system in order to provide a smooth transition to the MPS.

The MPS may restrict a user so they can only publish certain types of messages. For instance, a user may want the MPS to accept only facsimile messages in order to reduce the costs of using the MPS. In such a situation, the MPS would perform an additional step of checking that the type of message a user is sending is an authorized type for that particular user. If a message is unauthorized, the MPS may ignore the message entirely or the MPS may inform the user that the attempted message is invalid.

Moreover, the MPS has been described as having the central processor for processing messages and the Internet Server **1360** for handling requests. The invention may be practiced in various ways other than with two separate processors. For instance, the central processor and the Internet Server may comprise a single computer or workstation for handling the incoming messages and requests, and for interfacing with the Internet. The Internet Server may convert the messages into webpages prior to sending the messages to a requester. In addition, the central processor may communicate with the paging system **1300** instead of the Internet Server. Additionally, as discussed above, the central processor may comprise a number of microprocessors for handling a large number of simultaneous users and/or requests.

The invention has been described as converting the messages into webpages and transmitting the webpages over the Internet to the requestor. Preferably, the HTML format is used to create the webpages. The HTML format, however, is only one preferred format for exchanging information on the Internet and is actually only one type of a Standard Generalized Mark-Up Language. As will be apparent, the invention is not limited to presenting messages on webpages, any method that can present the message for review by a requestor can be used.

The system could be used to publish messages in combination with traditional web publishing methods. For example, let us say a user has a large website (that was created and is currently being maintained using traditional methods) and they sell products whose prices change everyday. Using traditional methods, it may be impractical or too expensive to have a webmaster update the webpage everyday to reflect the current pricing. Because, even in a big company, there are usually only a few webmasters, and they are unable to perform every single beneficial change to the website. Many changes go undone because they become a lower priority or lost in the red tape typical of large corporations. However, by configuring the system to maintain just the price webpage, the process becomes both easy and economical. Because the system can be used by a non-technical person, many more people can update the website that normally wouldn't be able to. In addition, the user can continue to use traditional web publishing methods to maintain the rest of their website. Alternatively, the system could be configured to simply convert the received price list into a GIF image and place the GIF image on the users web server. The user would then simply create a webpage that references that GIF image. Using this

method, the user has full, independent control on creating and maintaining the webpage that hosts the GIF image that the system will continuously update.

The system is not limited to using a disk directory for storing the users' messages. A database can also be used as the storage area. Then, when a request is received, the message can be extracted from the database, published and presented to the requestor using any one of the methods mentioned herein. In should also be know that different portions of the message could be stored in different storage locations. For example, the GIF images of a fax message could be stored in a database, but the webpage to host them could be stored elsewhere or created on the fly when the webpage is requested.

As mentioned previously, a message can be published in separate steps that occur at a different times. For example, each page of a fax message could first be converted into GIF images and saved into the users storage area. The hosting webpages could then be created on the fly when the message is requested. Technologies such as CGI and ASP can be used to create webpages in real time. Using this method, up-to-the-minute information, such as weather reports or stock quotes can be presented to the reviewer along with the message. Alternatively, the system could perform the message conversion after it is stored, but before the message is requested. In this example, a background task could asynchronously extract the unpublished message from the users' storage area, perform one or more publishing processes, and place the fully or partly published message back into the users' storage area.

The storage area and/or the destination of a users' message can be dictated by the user when they are publishing the message, by the users' default preferences or by the system itself. For example, the system may default to placing a published message in the user's default storage area if the user did not specify another location when they published the message. However, it may be preferable for the system to allow the user to specify an alternative storage area when they are publishing a message. Using this method, a user could maintain more then one webpage or account on the MPS. For example, a user who owns a deli may want separate breakfast and lunch menu webpages. The breakfast webpage could be designated as storage area number 1, and the lunch webpage as location #2. By being able to specify the storage location when they are publishing a message, the user can choose which webpage to update.

The system is not limited to just using a storage area owned by the system. The system could publish a users' message in a storage area owned or operated by a third party. For example, a user may already have a website hosted by a third party but wishes to use the system to update one or more pages on their website. The system could be configured to save the users' published messages to the third party's web server by sending the message to the third party server using a protocol such as FTP (file transfer protocol). If the third party server requires a username and password before it will accept any files, the system could be configured to supply such info each time that a message file needs to be transferred to the third party server.

With regard to the transmission of messages to the requester, the MPS can permit the requestor to sample an audio message or to preview a facsimile/image message without requiring the MPS to transmit the entire message to the requester. This is a significant benefit since the transmission of the entire message would frequently tie up the requesters' computer or viewing device for a rather long period of time. Thus, with the preview or sample feature, the requester can determine whether they need the entire message transmitted to them. If the requestor does decide that the entire message needs to be transmitted, as stated above, the requesters' computer or reviewing device might be receiving the message for a relatively long period of time. After the entire message has been received, the requester then has the options of viewing, listening, printing, retrieving, or saving the message. As an alternative, the requesters' computer or reviewing device may instead indicate the contents of the message to the requester as the message is being received. For instance, with an audio message, the requesters' reviewing device could send the message to an audio speaker as the message is being received. In this manner, the message would be played in real time and the requestor would not need to wait until the entire message is received before listening to the message. In order to play the messages in real time, the messages are preferably in a streaming format such as the RealAudio (RA) format, which the requester can select as the preferred format for audio messages. In operation, the MPS would transmit a webpage containing a reference to an RA file. If the requester selects the RA file with the browser on the requesters reviewing device, the browser will activate a program for use with RA files. The operations and functioning of this program will be apparent to those skilled in the art and will be available as a separate software package or will be incorporated within a browser program. The RA program will request the RA data file containing the message from the MPS and, as the RA file is being received at the reviewing device, this program will play the message in real time.

The system has been described as being able to store and transmit audio messages. It should be understood that the voice message would probably be the most often type of audio message stored at the MPS. The system, however, may be used with any type of audio message and is in no way limited to just voice messages.

Video messages can also be easily published by using the same publishing methods as described for audio files. Various formats for video files exist such as Real Video, AVI, MPEG that can be published by the system either as file attachments to an email or transmitted over a network such as the PSTN or the Internet. For example, common video conferencing protocols can be used to transmit a video message over a data network, such as the Internet. It should also be apparent that the system is not limited to any particular method used to send or receive a video message. For example, videophone type devices may be used to publish video messages by sending a video message to the system through the PSTN.

It would also be preferable for the system to automatically create hyperlink references to the various files that may exist for a user. For example, let us say a deli owners' homepage includes the phrases "Breakfast Menu" and "Lunch Menu" and there are files named "breakfastmenu.html" and "lunchmenu.html" in the users storage area. It would be preferably for the system to automatically add a hyperlink to the mentioned phrases so the reviewer can simply select the phrase on the homepage and be presented with the respective webpage. Technologies such as OCR and SR could be used to convert the words in image and audio files into ASCII text and scan the text to see if any phrase matches with existing filenames. When a match is found, the system could automatically create a hyperlink reference between the phrase and the file. Text of an email message could also be scanned for matching phrases and filenames. In addition, the system could scan the text contained in each webpage or a users' website and create hyperlinks between common word phrases. For example, if two users webpages contained the phrase "Common Problems", the system could create hyperlinks that reference each other. Using this method, a reviewer looking at one webpage

could easy see that another webpage contains the same phrase even if the other file's name is not "common_problems.html", and by simply clicking on the phrase's hyperlink, the reviewer is presented with the second webpage that contains that same phrase. With still another method, the system could scan the various messages and extract the first sentence from them. This first sentence could be used as the title for the message. The titles could then be added to a TOC webpage so that each reviewer can get an idea of each message's topic. Using these methods, the system could automatically create hyperlinks between various related topics that will allow reviewers to navigate through a user's website without the user having to manually add the hyperlinks.

It is also preferable for the system to offer the reviewer the option of re-organizing or re-formatting the presentation of one or more messages so they can be printed out or saved by the reviewer in a desired manner. For example, audio messages could be converted to ASCII text so they can be printed out or saved in a memory area much smaller then would be needed to save the original audio message, or because the reviewer does not have audio playback capabilities. Alternatively, a fax message could be resized so each page fits on a normal 8.5"×11" piece of paper when printed out.

The embodiment was chosen and described in order to explain the principles of the invention and their practical application so as to enable others skilled in the art to utilize the invention and various embodiments and with various modifications as are suited to the particular use contemplated. The system is not limited to the described conversion and publishing processes or to the particular software or hardware used in these processes. One skilled in the art will recognize that other features can be supported by the apparatus of the system. In addition, it will also be apparent to those skilled in the art after reading this document that the invention is not limited to any particular method used to send a message to, or retrieve a message from the system.

Finally, in essence, the invention allows virtually anyone to automatically create a new website, complete with multiple webpages, by using just a telephone or fax machine. The user of the system will be able to modify their website at anytime using just a telephone or fax machine. The system offers security so only the owner of a website can modify it. The system also automatically submits the user's website to multiple Internet search engines so other people can find the user's published messages.

I claim:

**1**. A message publishing system (MPS) operative to process a message from a sender in a first format, comprising:

a central processor;

at least one sender account;

at least one storage area configured to store at least a first portion of the message; and

software executing in the central processor to configure the processor so as to:

identify the sender of the message as an authorized sender based on information associated with the message in comparison to data in the sender account, wherein the identification is dependent upon the first format;

convert at least a second portion of the message from the first format to a second format; and

publish the converted second portion of the message so as to be viewable in the second format only if the sender has been identified as an authorized sender.

**2**. The MPS of claim **1**, wherein the information associated with the message that is used by the software to identify the sender comprises a telephone number.

**3**. The MPS of claim **1**, wherein the first format comprises the message type.

**4**. The MPS of claim **1**, wherein the message from the sender is transferred to the system over a first network and wherein the information associated with the message that is used by the software to identify the sender is further dependent upon a protocol of the first network.

**5**. The MPS of claim **1**, wherein the information associated with the message that is used by the software to identify the sender comprises a passcode.

**6**. The MPS of claim **1**, wherein the information associated with the message that is used by the software to identify the sender comprises an account ID and a passcode.

**7**. The MPS of claim **1**, wherein one portion of the information associated with the message that is used by the software to identify the sender is associated with a transfer of the message to the system.

**8**. The MPS of claim **7**, wherein another portion of the information associated with the message that is used by the software to identify the sender is within the message itself.

**9**. The MPS of claim **1**, wherein the information associated with the message that is used by the software to identify the sender comprises information related to the origin of the message.

**10**. The MPS of claim **1**, wherein the data in the sender account is user-selected and associated with the first format of the message.

**11**. The MPS of claim **1**, wherein the message is a text message.

**12**. The MPS of claim **1**, wherein the software publishes the converted portion of the message so as to be viewable by any requester.

**13**. The MPS of claim **1**, further comprising one or more templates accessible to the software and used so that an appearance of any of a plurality of published messages in the second format is consistent with respect to the use of each said template.

**14**. The MPS of claim **1**, wherein the software configures the processor to publish the converted portion of the message so as to be accessible through the Internet at a particular URL or at a particular URL plus one or more paths.

**15**. The MPS of claim **1**, wherein the software configures the processor to publish the converted portion of the message so as to be a part of a web page accessible through the Internet at a URL that is associated with sender's storage area.

**16**. The MPS of claim **1**, wherein the conversion by the software executes to generate a webpage accessible through the Internet that comprises at least a portion of the message.

**17**. The MPS of claim **1**, wherein the conversion by the software executes to generate a webpage accessible through the Internet that comprises a reference to at least one portion of the message.

**18**. The MPS of claim **1**, wherein the converted second portion of the message is presented along with an anchor that comprises a reference to a table of contents webpage.

**19**. The MPS of claim **1**, wherein the converted second portion of the message is presented along with a reference to a table of contents of other messages associated with a particular sender.

**20**. The MPS of claim **1**, wherein the conversion comprises including a portion of the message within an existing web page.

**21**. The MPS of claim **1**, wherein the software is operative to further configure the processor so as to receive a request from a requester for one or more messages from one or more senders, wherein the published portion(s) of the message is (are) viewable by the requestor.

**22**. The MPS of claim **1**, wherein contained with the published portion of the message is the time of publication.

**23**. The MPS of claim **1**, wherein contained with the published portion of the message is information associated with the sender account.

**24**. The MPS of claim **1**, wherein message in the first format is in a non-web page reviewable format and the message in the second format is a web page reviewable format.

**25**. The MPS of claim **1**, wherein the conversion by the software executes in support of an automatic generation of at least a portion of XML which includes at least a part of the message.

**26**. The MPS of claim **1**, wherein the conversion by the software executes in support of an automatic generation of at least a portion of XML which includes at least a reference to at least a part of the message.

**27**. The MPS of claim **1**, wherein the software is further operative to configure the processor so as to automatically generate a table of contents ("TOC") concerning one or more messages associated with one or more senders.

**28**. The MPS of claim **27**, wherein the TOC includes messages having one or more keywords and wherein the TOC is displayed in response to a keyword search for said one or more keywords.

**29**. The MPS of claim **27**, wherein the TOC comprises one or more published messages associated with one or more sender accounts.

**30**. The MPS of claim **1**, wherein the software is further operative to configure the processor so as to report statistics regarding the published message.

**31**. The MPS of claim **1**, further comprising a notification list, the notification list enabling one or more subscribers to receive a notification of the published message from the authorized sender.

**32**. The MPS of claim **31**, wherein the notification list is associated with the sender account.

**33**. The MPS of claim **31**, wherein the software is further operative to provide a reference to subscribe to the notification list.

**34**. The MPS of claim **31**, wherein the software is further operative to configure the processor so as to issue the notification to any subscribers.

**35**. The MPS of claim **31**, wherein the notification contains at least a portion of the published message.

**36**. The MPS of claim **31**, further comprising a connection to a further system configured to provide almost instantaneous notification, wherein the notification is sent via the further system in a format that supports an alphanumeric text message.

**37**. The MPS of claim **36**, further comprising a wireless device, wherein the notification is provided almost instantaneously to the wireless device.

**38**. The MPS of claim **1**, wherein the software is further operative to configure the processor to publish converted portions of one or more messages on the basis of a keyword that is submitted to a searchable database.

**39**. The MPS of claim **1**, wherein the software is further operative to configure the processor to automatically extract text from said message and submit the extracted text to one or more searchable databases such that the published message is findable on the basis of its content or a topic.

**40**. The MPS of claim **1**, wherein the software is further configured to restrict the reviewability of the published portion of the message to only authorized reviewers.

**41**. The MPS of claim **1**, wherein the first portion of the message is stored in a particular storage area among the at least one storage area, and wherein the particular storage area is associated with the authorized sender of the message.

**42**. The MPS of claim **1**, wherein one of said storage areas further stores reviewer preferences, the reviewer preferences including at least an indication of a default method for presenting one or more published messages to the reviewer.

**43**. The MPS of claim **1**, wherein the software is further operative to configure the processor to automatically create hyperlinks between common word phrases of published portions of at least two messages.

**44**. The MPS of claim **1**, wherein the system is connected to a plurality of networks and the message in first format is transferred to the system using a first network, and wherein the publishing of the portion of the message in second format utilizes a second network that is different from the first network.

**45**. The MPS of claim **44**, wherein the information associated with the message that is used by the software to identify the sender is dependant on the first network used to transfer message to the system.

**46**. The MPS of claim **1**, further comprising a prohibited content detector that operates upon the message to identify prohibited content, wherein the software executes to publish either an entirety or only a portion of the message as a function of whether or not the message is identified as having prohibited content.

**47**. The MPS of claim **1**, further configured to restrict publishing to only those messages having a particular type and that are from the authorized sender.

**48**. The MPS of claim **1**, wherein contained with the published portion of the message is information related to a type of the first format.

**49**. The MPS of claim **1**, wherein the first format comprises an email.

* * * * *

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of August 2016, I served the foregoing CORRECTED BRIEF OF PLAINTIFF-APPELLANT EASYWEB INNOVATIONS, LLC on all counsel of record by filing the document with the United States Court of Appeals for the Federal Circuit using the CM/ECF system.

Dated: August 2, 2016

*/s/ Jeffrey S. Seddon, II /s/*

Jeffrey S. Seddon, II
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
(212) 351-3400
jseddon@desmaraisllp.com

*Counsel for Plaintiff-Appellant*
*EasyWeb Innovations, LLC*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☒ The brief contains 13,921 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☒ The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

☐ The brief has been prepared in a monospaced typeface using _____ in a _____ characters per inch _____ font.

Dated: July 29, 2016

*/s/ Jeffrey S. Seddon, II /s/*
Jeffrey S. Seddon, II

*Counsel for Plaintiff-Appellant*
*EasyWeb Innovations, LL*